YI LIN ZHENG, ESQ.
Nevada Bar No. 10811
VEGAS GOLDEN LAW
2801 S Valley View Blvd, Ste 16
Las Vegas, NV 89102
Phone (702) 385-7170
Email: vegasgoldenlaw@gmail.com
Attorney for Defendant
Stephon Whitney

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

UNITED STATE OF AMERICA,

      Plaintiff,

    v.

STEPHON WHITNEY,

      Defendant.

Case No. 21-cr-0002-JAD-NJK

**SENTENCING MEMORANDUM ON THE FOUR-LEVEL ENHANCEMENT UNDER §2K2.1(B)(6)(B)**

Yi Lin Zheng, counsel for defendant Stephon Whitney, hereby files this sentencing memorandum regarding the inapplicability of the four-level enhancement, under §2K2.1(b)(6)(B), for the alleged use or possession of a firearm in connection with another felony, for the foregoing reasons. A supplemental sentencing memorandum will be filed shortly respectfully requesting a sentence of 28 MONTHS as sufficient, but not greater than necessary to achieve the goals of sentencing.

## I. THE FOUR-LEVEL ENHANCEMENT FOR USE OR POSSESSION OF A FIREARM IN CONNECTION WITH ANOTHER FELONY UNDER §2K2.1(B)(6)(B) SHOULD NOT APPLY

The government seeks to apply a four-level enhancement based on Mr. Whitney's use or possession of a firearm in connection with another felony offense. Specifically, the government argues Mr. Whitney possessed marijuana with intent to

sell, a felony in Nevada, and possessed a handgun in connection with that offense. The government's argument, as well as probation's rationale, relies on the fruits of the September 2, 2020 home search.  The government's argument in favor of the four-level "in connection with" enhancement fail for three reasons.  First, the government cannot meet its burden by clear and convincing evidence that Mr. Whitney committed another felony offense or that he possessed the handgun in connection with that offense. Second, irrespective of the government's burden, the evidence seized from the apartment does not lead to the conclusion that the marijuana was being resold. Finally, the location of the handgun rendered it inaccessible and undermines any argument that it was possessed in connection with another felony offense.

### A. The government cannot meet its burden by clear and convincing evidence that the four-level enhancement applies

"The burden of proof for a factual finding underlying a sentencing enhancement depends on the magnitude of the finding's effect on the sentencing range." *United States v. Valle*, 940 F.3d 473, 479 (9th Cir. 2019).  "As a general rule, a preponderance of the evidence standard applies, but the Government must meet a higher standard— proof by 'clear and convincing evidence—in cases where there is 'an extremely disproportionate impact on the sentence.'" *Id.* (quoting *United States v. Jordan*, 256 F.3d 922, 930 (9th Cir. 2001)).  Courts "look to the totality of the circumstances to see if that heightened standard applies." *Id.*  Factors considered include:

> (1) whether the enhanced sentenced falls within the maximum sentence for the crimes alleged in the indictment;
> (2) whether the enhanced sentence negates the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment; (3) whether the facts offered in support of the enhancement create new offenses requiring separate punishment;

(4) whether the increase in sentence is based on the extent of the conspiracy;

(5) whether the increase in the number of offense levels is less than or equal to four;

(6) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence.

*Jordan*, 256 F.3d at 930.

Here, based on the increase in punishment embodied in enhancement as well as the nature of the "in connection with" enhancement, the government is required to establish the enhancement by clear and convincing evidence. As an initial matter, the fourth *Jordan* factor, the enhancements increase on the overall offense level weighs in favor of the heightened standard. The "in connection with" enhancement increases the offense level by four levels, which is the threshold increase necessary to satisfy the fourth factor. Likewise, the third *Jordan* factor weighs in favor of the higher burden. By its nature, the "in connection with" enhancement requires the government to establish that Mr. Whitney committed another felony offense. The felony drug offense the government believes Mr. Whitney committed through his possession of the marijuana discovered in his home could give rise to separate criminal charges for which a separate punishment would be warrant. The third *Jordan* factor thus weighs in favor of the higher burden.

The sixth Jordan factor, the enhancement's impact on the overall sentence, also weighs in favor of a clear and convincing standard. Probation's calculation that his base offense level is 24 and his placement in criminal history category V, after a three-level reduction for acceptance of responsibility, this results in a guideline range of 70-87 months. An additional four-levels for the "in connection with" enhancement would

increase the guideline range to 100-125 months.  Admittedly, this 30-month increase is not the "doubling" of the initial sentence envisioned in *Valle* and *Jordan*.  The increase does, however, represent an approximately 43% increase in Mr. Whitney's sentence.  It takes him from a sentence just over the middle of the ten-year statutory maximum to a guideline range that potentially exceeds that maximum.  When combined with the other *Jordan* factors weighing in his favor,[1] the "totality of the circumstances" favors a clear and convincing standard.

### B. The government cannot rely exclusively on Mr. Whitney's probation revocation to establish facts sufficient to support the enhancement

Mr. Whitney anticipates the government will attempt to skirt its responsibility to establish facts supporting the enhancement by relying on the state probation revocation hearing.  At the conclusion of the revocation hearing, a state court judge appeared to conclude Mr. Whitney was engaged in criminal activity involving drugs and that he possessed a firearm as part of the activity.  Although the state judge's remarks fail to state the basis for these conclusions, indeed he appeared to parrot law enforcement's interpretation of the evidence, the government adopts them whole cloth.  The standard to revoke a state probationer's grant of probation, however, does not meet even the lower preponderance of the evidence standard.  *Lewis v. State of Nevada*, 529 P.2d 796, 797 (Nev. 1974) ("In considering the standard to be applied in revoking probation the law is well-established that revocation of probation is within

---

[1] The first *Jordan* factor weighs against the heightened standard.  Even with the four-level enhancement, his guideline range is below the statutory maximum.  Additionally, the fourth *Jordan* factor is irrelevant.  The government did not charge or allege that Mr. Whitney participated in a conspiracy during the instant offense.

the exercise of the trials court's broad discretionary power … [t]he evidence and facts must reasonably satisfy the judge that the conduct of the probationer has not been as good as required by the conditions of probation.").  In adopting a "reasonably satisfy" standard, the Nevada Supreme Court rejected a preponderance of the evidence standard for probation revocations.  *Id.*

Because the state court applied an amorphous standard, lower even than preponderance of the evidence, to revoke Mr. Whitney's probation, this Court should afford those conclusions no weight.  Instead, this Court should examine the same facts and evidence and, for the reasons stated below, find that Mr. Whitney was neither committing another felony offense nor possessing a firearm in connection with a felony offense.

### C. There is insufficient evidence that Mr. Whitney possessed the marijuana with intent to sell

To obtain an enhancement under §2K2.1(b)(6)(B), the government must establish Mr. Whitney was committing another felony offense.  The government believes that Mr. Whitney possessed the marijuana found in his house with the intent to sell.  From the outset, the government does not have direct evidence that Mr. Whitney was selling drugs.  They did not catch him conducting hand to hand transaction nor did they have a tip he was selling.  Rather, the government's conclusion is based largely on items found in Mr. Whitney's home on the day he was arrested coupled with a vague sentence in his 88-page voluntary statement.

In addition to approximately eight ounces of bulk-packaged marijuana in the bedroom, officers seized sandwiches bags, a scale, and $4,450 in a bank envelope. Exhibit A (LVMPD property report); Exhibit B (photo of monies seized).    The

government argues that these items are indicative of Mr. Whitney conducting street-level marijuana sales from his house.  When viewed in their totality, these items, coupled with the notable absence of other indicia of an active drug operation, do not suggest that Mr. Whitney possessed the marijuana with intent to sell.

First, the $4,450 discovered in the headboard were not proceeds from drug sales.  Officers found the money in a bank envelope in crisp, large denomination bills.  This neat collection of $20s and $100s stands in stark contrast to the crumpled, small denomination bills expected in drug sales.  Furthermore, the funds can be traced to a legitimate source.  At the outset of the COVID-19 pandemic, Mr. Whitney and his fiancée, Jessica Rodosh, lost their service-industry jobs.  Both applied for and received state unemployment because of their job loss.  The $4,450 represented the couple's unemployment funds.  Exhibit C (source of funds emails).  The state of Nevada evidently concluded the money was derived from a legitimate source since it returned the money to Ms. Rodosh.  Exhibit D (check issued emails).

Second, the way the marijuana was stored coincides more with personal use than with individual sale.  Officers discovered approximately eight ounces of marijuana in three unequally portioned bags, two of which were stored inside glass jars.  The marijuana was loose rather than packaged and proportioned for individual sale.  A person could easily reach into the jar, weigh out a portion for a joint, blunt, or bowl, then reseal the rest for later use.   There would be no need to individually package marijuana for personal consumption, but it would be necessary to weigh out individual servings before consumption.  The lack of individually packaged bundles of marijuana

and other indicia of ongoing sales, such as owe sheets, support the conclusion that the marijuana was for personal consumption.

Additionally, Ms. Rodosh's testimony at Mr. Whitney's state probation revocation hearing supports the personal use conclusion. Ms. Rodosh's testimony at the revocation hearing was that she possessed the marijuana for her personal use.

> Q:    And with respect ultimately to the marijuana that was found, it was hidden in a laundry hamper?
>
> A:    It was.
>
> Q:    And your testimony here today is that, those items belonged to you?
>
> A:    They do.
>
> Q:    And, I guess—I'm sure you understand that he's not supposed to have those items, so why were those items in your home?
>
> A:    We lost a baby in August 8th, 2019, and I was in severe anxiety and I can't—it felt like I can't breathe. So the doctors wouldn't help, and so I smoke because it helps with—it helps with the loss and the anxiety. I can't—there's just times I just—I feel like I can't catch my breath. Like someone sitting on my chest, so I smoke. I didn't think it would get him in trouble. I wasn't trying to get him in trouble. I was five months pregnant when we lost our baby and it happened at home. So it was traumatic experience, its hard to—I don't talk about it still.

Exhibit E at 19:19-20:11(state probation revocation transcript).

Ms. Rodosh further explained that she hid her marijuana use from Mr. Whitney and that he did not partake.

> Q:    Why were you keeping the marijuana in the laundry basket?
>
> A:    I just put it there. To be honest, I just put it in places that only I would go through. He never went through the laundry basket. I do the laundry.
>
> Q:    Okay. So you're saying he didn't know you were smoking marijuana?

A:     Um, he probably didn't.  I didn't smoke in the house.  So if I smoked, I would go outside or go for a walk.  I don't smoke in the house.

Exhibit E at 20:23-21:7.

Ms. Rodosh's testimony is consistent with the physical evidence officers found in the house.  Bulk storage in a laundry basket is convenient for home use, yet the lack of readily accessible, pre-packaged parcels would be a poor sales strategy.

Finally, Mr. Whitney's voluntary statement is insufficient to establish he was selling marijuana.  Mr. Whitney's post-arrest voluntary statement sprawls across 88-pages, the first 60 of which pass without Mr. Whitney claiming ownership of the gun or the marijuana.  Throughout the interrogation, the officers allude that they will charge Ms. Rodosh with the gun and marijuana if Mr. Whitney does not claim ownership.

Q:     I have to present the facts.  So if I present the facts at the district attorney's office as they are now, it-its not my decision.  They're gonna say, "We're gonna charge these folks with a criminal conspiracy and all these charges."  I'm just telling you right now based on my investigation, these are the facts that are before me.  So…

A:     So, it's more than likely she'll be charged too?

Q:     As of right now, yes.

A:     And with what?  Child endangerment?

Q:     Probably the narcotics charge.  The owned or established residence, ah, for narcotic sales with a child present and then there's the felony child abuse and neglect charges because the unsecured firearm was left.  So…

A;     Unless what?

Q:     I still have to interview her.  I'm here to interview you tonight.  I still have to go and interview her.

A:     Just saying, unless what?

8

Q:     Pardon me?

A:     I'm just saying, unless what?

Q:     If someone…

A:     She don't need that bro.  That-that's- she don't even fucking barely have a fucking traffic ticket to my knowledge.  She don't need that.  Now, I mean, she probably do have a traffic ticket.  I don't know, but I do know she don't live like that bro.

Q:     I-I don't know.  I never met her.  I've never met you.

A:     I understand.  That's why I said…

Q:     So I have to take this opportunity-its my job as a detective to try to sort through all the information, right?  I get a set of facts and then there's this person's version of the story.  There's this person's version of the story.  There's these facts and then we kind of lay'em all out and then we make a presentation, this is what we found through the course of our investigation.  That's our job.

A:     That's why I said, or what?

Q:     Unless there's some type of…

A:     There is no-there's always a different side.

Q:     Unless there's some type of mitigating circumstances or some additional information that I've learned throughout the course of my investigation then those are the facts that have to be presented in court, you understand?

A:     And you mean that as in what?  To my owning up to everything?

Q:     I'm not asking to own up to anything that's not yours.

A:     No-no.  I'm-I'm not saying you're asking me.  *I'm just saying that-to get an understanding of the only way to protect her from that.  All of that is going to occur unless what?  There's always another side.*

Exhibit F at 47-49 (voluntary statement) (emphasis added).

Mr. Whitney also struggled to provide details about the marijuana he was allegedly

selling.

Q:      Okay The marijuana that I found where did I find it?

A:      In the bathroom.

Q:      Anywhere else?

A:      Um, by the TV-by the TV

Q:      Which TV?

A:      In our room.

Q:      In your room?

A:      Yeah.

Q:      Okay  What was it packaged in?

A:      What you mean?

Q:      How was it stored?

A:      Um, it was individually, um, put into one container because, like, majority of it, like the-the-not the-the loose-not the loose stuff, but the stuff that was inside something is the stuff that she smokes.

Q:      Okay.

A:      So that's why it was all put in there together.
        …
Q:      The scales and baggie.  Where did I find the baggie and scales?

A:      Um, I don't really know where the baggie was at though?  'Cause I gave it to…

Q:      What about the scale?

A:      Those had to be together wherever they were.

Q:      Okay.  You-you…

A:      I don't really remember.

Exhibit F at 66-68.

Even when officers directly asked Mr. Whitney about selling marijuana, he gave an

obtuse, non-response.

> Q:     Okay.  Were you actively involved in trying to sell a little bit of marijuana to make money?  Remember, I only want your truth.  I don't want her involvement.  I just want your involvement.  I'll ask her for her involvement.
>
> A:     If only I- I ain't know what to do with it last minute like that.  I just went back to the first thing that I was ever taught by somebody bro. That's...

Exhibit F at 68-69.

The officers, and the government, understood the "went back to the first thing"

statement to mean that Mr. Whitney was selling marijuana from his house.  On closer

examination, however, the officers supply Mr. Whitney with that conclusion

> Q:     Can I ask you how old you were when someone taught you to sell drugs?
>
> A:     Taught me to sell drugs?
>
> Q:     Mm-hm.
>
> A:     Man, I been running the streets since I was nine-years-old bro.  I start selling drugs at nine-years-old.
>
> Q:     What'd you start selling?  Little bit of weed
>
> A:     A little bit of weed, but that was...
>
> Q:     Was that on the West?
>
> A:     Nah.  That was actually on the eastside 'cause on the Westside we had-it was too domestic over there at that time...

Exhibit F at 69.

Throughout the interview, officers believed Mr. Whitney was selling marijuana

from his house.  They signal their theory when they tell Mr. Whitney that his

girlfriend would be charged with felony child abuse for having a child present during drug sales conducted from the home. The apparent "admission," however is inconsistent with this theory. Mr. Whitney qualified the "went back to the first thing" statement by telling the officers that, as a child, he sold marijuana away from his home and community because it was "too domestic." This would mean that had Mr. Whitney been selling the marijuana, he would have been doing so away from his home. The fact that officers did not find any evidence of the marijuana being transported for sale, such as pre-packaged marijuana in a car, backpack, or pants pocket, undermines the officers' theory that Mr. Whitney was reselling the marijuana they discovered in the laundry hamper. The ambiguity of the "went back to the first thing" statement combined with the offices' coercive interrogation tactics and Mr. Whitney's desire to protect Ms. Rodosh render his "statement" that he was selling marijuana out of the house unreliable.

In conclusion, the government cannot establish that Mr. Whitney was selling marijuana in violation of Nevada or federal law. The officers did find approximately eight ounces of marijuana and a handgun inside the house. Apart from a scale and sandwich bags, however, officers did not discover any evidence that the marijuana they found was being resold. None of the marijuana was pre-packaged for individual sale. There were no owe sheets. The money found in the headboard was from a legitimate source. The items discovered are more consistent with Ms. Rodosh's assertion that the marijuana was for her own personal use than with any criminal activity on Mr. Whitney's part.

12

**D.    There is insufficient evidence that Mr. Whitney used or possessed a firearm in connection with any drug felony**

"[I]n imposing enhancements under the Guidelines, [courts] cannot be swayed by speculation or convinced by conjecture." *United States v. Grimaldo*, 993 F.3d 1077, 1082 (9th Cir. 2021).  "For the four-level [in connection with] enhancement to apply, the government 'must show that the firearm was possessed in a manner that permits an inference that it facilitated or potentially facilitated – i.e., had some potential emboldening role in – a defendant's felonious conduct.'"  *Id.*

While an emboldening role may be sufficient to find "facilitation," mere possession is not.  *United States v. Pinex*, 720 Fed. Appx. 345, 348 (9th Cir. 2017).  "Key to the determination that the gun emboldened [a defendant's] conduct was the fact that it was easily accessible."  *Id.* ("Here, the gun was not accessible to Pinex.  Indeed, it was in a locked suitcase in the trunk of his car. … The fact that the gun and the drugs were both in the trunk does not support the district court's finding that the gun emboldened Pinex's possession of the drugs.  The district court erred by focusing on proximity rather than accessibility.").

Here, the handgun discovered in zipped up headboard did not embolden Mr. Whitney to commit any crime.  Although marijuana was found in the same room as the handgun, the handgun's location in the room made it inconvenient for someone looking to quickly arm themselves prior to an impromptu drug sale.  Officers discovered the handgun in a hollow cavity inside a zipped headboard.  The headboard was pressed against a wall and sandwiched between another wall and a heavily laden trash bin.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Based on the purple sheet in the background, it appears officers discovered the handgun in the section nearest the corner of the room.



The handgun's location in the room made it practically inaccessible. To retrieve the gun, someone would need to maneuver through the narrow space between the bed and the wall, push the entire bed set away from the wall, unzip the headboard, reach into the crevasse, and retrieve the gun. Like a gun stored in a locked suitcase was inaccessible to the defendant in *Pinex*, a handgun hidden in a headboard wedged between the mattress and the wall would be inaccessible to Mr. Whitney. 720 Fed. Appx. at 348. Highlighting the difficulty of this task, officers removed the mattress from the bedframe before pushing the headboard away from the wall and unzipping the headboard. An arduous task for officers searching Mr. Whitney's bedroom under controlled circumstances would be next to impossible for someone needing to quickly arm themselves before or during a tense drug transaction. *See id.*

Indeed, the storage of the handgun in the same location as the couple's unemployment money indicates that the handgun was intrinsically valuable. The headboard cavity was akin to a safe. The couple stored their valuables, including the handgun, in this area. Its physical proximity to the marijuana is a coincidence. The handgun's inaccessibility is the determining factor and renders the "in connection with" enhancement inapplicable. *Pinex*, 720 Fed. Appx. at 348.

### Conclusion

The government cannot establish the four-level "in connection with" enhancement. First, due to the impact the enhancement has on Mr. Whitney's overall sentence, the government must prove the enhancement by clear and convincing evidence. Second, the items discovered inside the house do not establish

15

that Mr. Whitney was reselling the marijuana found in the bedroom.  Finally, the handgun's inaccessibility, wedged inside a headboard between a wall and the mattress, precludes a finding that the handgun somehow emboldened or facilitated the nefarious conduct the government believes Mr. Whitney was committing inside his house.

DATED: October 25, 2022.

Respectfully submitted,

By:  */s/ Yi Lin Zheng*
Yi Lin Zheng
Vegas Golden Law
Attorney for Stephon Whitney

## CERTIFICATE OF ELECTRONIC SERVICE

The undersigned hereby certifies that she is an employee of the Vegas Golden Law and is a person of such age and discretion as to be competent to serve papers. That on the 28th day of October, 2022, she served an electronic copy of this **SENTENCING MEMORANDUM ON THE FOUR-LEVEL ENHANCEMENT UNDER §2K2.1(B)(6)(B)** by electronic service (ECF) to the persons named below:

JASON FRIERSON
United States Attorney
DANIEL COWHIG
Assistant United States Attorney
501 Las Vegas Blvd. South
Suite 1100
Las Vegas, NV 89101

*/s/ Yi Lin Zheng*
Employee of Vegas Golden Law