Electronically Filed
1/7/2021 1:22 PM
Steven D. Grierson
CLERK OF THE COURT

1   **RTRAN**

2

3

4

5                       DISTRICT COURT

6                  CLARK COUNTY, NEVADA

7                                    )
                                     )
8    THE STATE OF NEVADA,            )      CASE#:  C-19-338650-1
                                     )
9                  Plaintiff,        )      DEPT.  XX
                                     )
10   vs.                             )
                                     )
11   STEPHON JAMES WHITNEY,          )
                                     )
12                 Defendant.        )
                                     )
13   _____)

14   BEFORE THE HONORABLE ERIC JOHNSON, DISTRICT COURT JUDGE

15                TUESDAY, SEPTEMBER 22, 2020

16             ***RECORDER'S TRANSCRIPT OF HEARING:***
                 ***REVOCATION OF PROBATION***

17

18   APPEARANCES:

19     For the State:          MEGAN THOMSON
                               Chief Deputy District Attorney
20
       For the Defendant:      YI LIN ZHENG, ESQ.
21                             (Appearance via video]

22

23

24

25   RECORDED BY:  ANGIE CALVILLO, COURT RECORDER

1          [Las Vegas, Nevada, Tuesday, September 22, 2020, at 2:24 p.m.]

2

3          THE COURT:  State of Nevada versus Stephon Whitney, case

4    number C338650.  Counsel, please note your appearances for the

5    record.

6          MS. THOMSON:  Megan Thomson for the State.

7          MS. ZHENG:  And good afternoon, Your Honor.  Yi Lin Zheng

8    on behalf of Defendant Stephon Whitney.  He is present in custody.

9          THE COURT:  All right.

10         THE RECORDER:  We have an officer on this case, Your

11   Honor.

12         THE COURT:  Good.

13         THE RECORDER:  Officer Vargas?

14         MR. VARGAS:  Yes, I'm here, Your Honor.

15         THE COURT:  All right.  This is on for consideration of the

16   violation report dated September 8, 2020.  Where do we stand with this

17   one?

18         MS. THOMSON:  My understanding is the last time we were

19   here, the defendant stipulated to some of the violations but not all of

20   them and that we need to have a hearing on the remaining ones.

21         THE COURT:  All right.  I think it was -- what did you

22   agree -- I don't know if we ever, really, got it firmed up as to what the

23   defendant was stipulating to.  What, if anything, is the defendant

24   stipulating to, Counsel?

25         MS. ZHENG:  We're stipulating to the August 14th presumptive

1    test for marijuana that meet his first test to set the baseline.  We're

2    stipulating to the January 29th curfew violation in regards to the fact that

3    he left the house early for -- to go to his employment and to drop his

4    girlfriend off to her employment.  And I'm stipulating to the fact that on

5    September 1st that he was arrested and ultimately booked for the North

6    Las Vegas Justice Court case.  I do stipulate to the fact that he was

7    ultimately booked as a result of the search warrant that was executed on

8    September 20 -- of September 2nd, however, we disagree as to the

9    circumstances there.

10            THE COURT:  All right.  Well then, I think, pretty much we just

11   have a stipulation to the marijuana and the curfew violations.  Is that

12   correct, Mr. Whitney, you will stipulate to the August 14th presumptive

13   positive test for marijuana and signing an admission form, and then for

14   being not home during a curfew hour on January 29th, 2020?

15            THE DEFENDANT:  Yes, sir.

16            THE COURT:  All right.  State, prepared to go forward today?

17            MS. ZHENG:  Your Honor, we're also stipulating to the

18   fact -- sorry.  We're also stipulating to the fact that he does have a new

19   case in North Las Vegas Justice Court.

20            THE COURT:  All right.  Well I think that will come out when

21   we do the hearing.  So for right now, we'll --

22            MS. ZHENG:  Sure, fair enough.

23            THE COURT:  -- we'll go on from there.  State, ready?

24            MS. THOMSON:  Yes, Your Honor.

25            THE COURT:  All right, call your first witness.

1          MS. THOMSON:  Thank you.  I call Officer Vargas.

2          THE COURT:  All right.  Officer, if you'll raise your right

3   hand and be sworn in by our clerk.

4          MR. VARGAS:  Yes, Your Honor.

5                          **JOSE VARGAS**

6          [having been called as a witness and first duly sworn]

7                    **DIRECT EXAMINATION**

8   BY MS. THOMSON:

9          THE CLERK:  Please state and spell your name for the

10  record.

11         MR. VARGAS:  First name is Jose, J-O-S-E.  Last name is

12  Vargas, V-A-R-G-A-S.

13         THE COURT:  Go ahead, Counsel.

14         MS. THOMSON:  Thank you.

15         Q     Officer Vargas, were you supervising Stephon

16  Whitney on September 2nd of this year?

17         A     Yes, I was.

18         Q     And on that date, did you perform a home visit at

19  the address 1888 Winterwood Boulevard?

20         A     Yes, I did.

21         Q     Was that the address that he had provided to you

22  indicating that he lived there?

23         A     Yes, ma'am.

24         Q     Okay.  When you went to the address, were you

25  there with officers from Metro?

1  A       I was accompanied with Officer/Detective

2  Costello, at that time, and two other officers from P&P.

3  Q       Okay.  And during the search of the home both

4  before and after the obtaining of the search warrant, were there any

5  items that concerned you based upon the fact that Mr. Whitney was on

6  probation?

7  A       Yes.  I found two loaded magazines with nine mils

8  that were found on the top right corner of his closet.

9  Q       And how did you know it was his closet?

10  A       I asked him who slept in that room; what side

11  belonged to who, and he was in there with me when we were doing the

12  search.

13  Q       Okay.  And then during the best of the search of

14  the house, was there also a weapon located?

15  A       Yes, that was after Metro got the search warrant.

16  Q       And what kind of weapon was it?

17  A       It was a nine millimeter and two other magazines

18  additional to the two that I had found in the beginning.

19  Q       Okay.  And did you discuss that weapon with Mr.

20  Whitney?

21  A       Before we obtained -- before Metro obtained the

22  search warrant, I did ask Mr. Whitney if there was any weapons; any

23  other weapons, or any ammo.  He told me there was not; there was

24  nothing inside of that residence.  After they obtained the search warrant,

25  I had already departed from the scene when they got the search

1   warrant.  I departed from the scene.  I got a call later on giving me --

2   Metro letting me know that they found the weapon and several other

3   items.

4               Q      And those other items, were they marijuana?

5               A      They were.

6               Q      Can you tell us just generally how much

7   marijuana there was?

8               A      They found two jars and many other items.  If I

9   can look back at my file, real quick, I can tell you the exact amount that

10  they found.

11              Q      If you can -- we don't need it to the decimal

12  accuracy.  But, yes, please.

13              A      Okay.  They found -- in one of the -- in one of the

14  jars they found approximately 69.1 grams; in another one 55.4 grams; in

15  another one 8.4, it was in a gray bottle.

16              Q      And the 69 and 55, do you know if those were

17  weighed with or without the jar?

18              A      They were weighed -- they were weighed with

19  them because there was grams gross.

20              Q      Okay.  And when you had contact with Mr.

21  Whitney, did he provide you with all of his cell phones?

22              A      When I took him into custody and I searched for

23  weapons, he had two cell phones on -- in his right front pocket.  On one

24  of them he gave us with a facial recognition; the other one he suggested

25  it was a family cell phone, but he did not have the passcode to it and

1   kept denying he didn't have the passcode to it; which doesn't make

2   sense of it being a family cell phone.

3               Q       Okay.  And you said that that was in his pocket,

4   correct?

5               A       That is correct.

6           MS. THOMSON:  I'll pass the witness.

7           THE COURT:  All right.  Cross examination.

8                           **CROSS EXAMINATION**

9   BY MS. ZHENG:

10              Q       Officer Vargas, you are relatively new to

11  supervising Stephon, correct?

12              A       That is correct.

13              Q       And he previously had another probation officer, it

14  was a female officer?

15              A       That is correct.

16              Q       And when you were there to -- when you visited

17  the house on September 2nd, were you there on a regularly scheduled

18  home visit?  Or were you actually there to accompany and assist Metro

19  because they were conducting a separate investigation?

20              A       It was both because he had just gotten -- his file

21  had just gotten to me in the beginning of September; something that I

22  deal with is usually go over the files, and I just randomly go to people's

23  houses.

24              Q       Okay, so this was actually your first contact with

25  him.  And he wouldn't, I guess -- he wouldn't necessarily know that you

1   were with P&P anymore than he would know that you were with Metro,

2   correct?

3               A       Can you rephrase that, please?

4               Q       He had never met you before as his probation

5   officer?

6               A       That is correct, yes.

7               Q       And when you came in, you were accompanied

8   by multiple Metro officers?

9               A       I was not.  I was just with the additional two P&P

10  officers.  Metro was not -- they were standing by near the scene but not

11  right there with me.

12              Q       Okay.  Did you guys identify yourselves first as

13  Metro or -- I mean, as Parole and Probation?

14              A       I did specifically because I was -- I called Mr.

15  Whitney through a cell phone, and I had been talking to Mr. Whitney the

16  whole entire time.

17              Q       Okay.  And when you went in, you had executed

18  what would be a P&P search, right?

19              A       Yes.

20              Q       And you were the one who found the two loaded

21  magazines in the room?

22              A       That's correct.

23              Q       And it was located above on a ledge; above the

24  bed?

25              A       Not on the bed.   It was inside of the closet, the

1    top right corner of the closet.

2                    Q        Okay.  But that bedroom was a shared bedroom,

3    correct?

4                    A        That is correct.

5                    Q        And despite the fact that you found the two

6    magazines, in essence, by Parole and Probation standards, that would

7    be a technical violation?

8                    A        Yes.

9                    Q        But it was then that Metro then took over?

10                   A        We froze the scene.  And I told Metro they can

11   get the search warrant to conduct for further search of the room.

12                   Q        Okay.  And then additional items that Metro

13   ultimately found, you were not -- you said you had departed the scene,

14   correct?

15                   A        That is correct.

16                   Q        So you were not present nor did you see where

17   the other items were located?

18                   A        I did not.

19                   Q        And you couldn't say to what proximity the nine

20   millimeter was to where you found the magazines?

21                   A        No.  I could just go off of the police report or --

22   that Metro had filed when they found it.

23                   Q        Sure.  But at that point, you had no knowledge of

24   the proximity of it?

25                   A        No.

1      Q      Or whether or not -- and you had no further

2    discussions with Mr. Whitney, correct?

3      A      That is correct.  Not until I went to go serve him

4    both the violation report and the supplemental report.

5      Q      Okay.  So you could not have said that he had

6    known that they were present at that time?

7      A      At that time -- at the time, he told me there was

8    no weapons in the house.

9      Q      Okay, fair.  And then as to the marijuana, you did

10   not find those items either?

11     A      That is correct.

12     Q      Okay.  And then as to the cell phones, he did

13   provide you pursuant to the digital search function, at least the passcode

14   to one of them, correct?

15     A      He gave me a face recognition for one of them.

16   He never gave me the extra password --

17     Q      Okay.  The second phone that -- the second

18   phone that you discussed, it was not needed for his face recognition?

19     A      He told me he just didn't know what the code

20   was, or how to get access to that phone.

21     Q      Okay.  But you didn't hold the phone up to his

22   face to see if it would open?

23     A      I did not.

24     Q      Okay.  But otherwise, even if that were the case,

25   that would be a technical violation?

1          A          That is correct.

2          Q          Fair enough.  So as to any of your interactions

3     with Mr. Whitney and everything else that is in the violation report, in

4     essence, this would otherwise be a technical violation report; other than

5     the fact that subsequently Metro then booked him on the charges?

6          A          Well, first, he was going to get charged for the

7     north case for lying to them, and also being over his curfew on

8     September 1st when he had -- on August when he had contact with

9     Officer Cooke [phonetic] of North Las Vegas.

10          Q          Fair enough.  But his charges in the North Las

11    Vegas case nonetheless still constitute a technical violation, it does not

12    constitute a new felony or gross misdemeanor, correct?

13          A          It would just constitute that him lying to Officer

14    Cooke of his identity, which would not constitute to a technical violation;

15    that would be a nontechnical.

16          Q          Okay.

17          MS. ZHENG:  I have no further questions for this witness.

18          THE COURT:  Redirect.

19          MS. ZHENG:  Well actually --

20    BY MS. ZHENG:

21          Q          Officer Vargas, even though you were new to the

22    file, your file does note that -- originally, with the first violation was that

23    he had come in and his first test was a positive and that was a baseline

24    test, correct?

25          A          That would've been during his intake.

1          Q     Sure.  And then subsequent to that, he's provided

2   a negative test?

3          A     That is correct.

4          Q     As a result of that first test, he was also ordered

5   to do an evaluation, and he was also ordered to do counseling for those

6   items after the evaluation, correct?

7          A     Correct.

8          Q     And he in fact had done all of those things?

9          A     Yes.  He had completed the evaluation, and he

10  conducted the classes that were instructed for him to do.

11         Q     Thank you.  And then during the January 29th

12  violation, your file shows that he was in fact employed at that time?

13         A     In January, yes.  According to the last P&P

14  officer.

15         Q     Okay.  And that, I think, they had a discussion in

16  regards to that curfew violation that his shift started shortly after eight

17  a.m. but that morning he had dropped his girlfriend off to work?

18         A     According to the notes, it was that they had the

19  discussion after they had already gone and checked -- and tried to

20  attempt the home contact.  Obviously, he was not there.  So when they

21  finally got in contact with him, that's when he explained the reason why

22  he was in violation of the curfew.

23         Q     And then because you were -- you had departed

24  the scene; you didn't know that the additional items were found;

25  following this, you went to see Mr. Whitney in custody to give him the

1    violation report -- the supplemental report, correct?

2              A      That's correct.

3              Q      Had you also received a call from someone

4    claiming ownership of those items that were ultimately found?

5              A      No.  I received a call from his girlfriend.  I believe

6    it's the girlfriend.  She stated that one of those items was hers.

7              Q      Okay.  Thank you.

8    THE COURT:  All right.  Redirect.

9    MS. THOMSON:  No, Your Honor.

10   THE COURT:  Officer, when you found the loaded magazines,

11   you indicated that you had some conversations with the defendant at the

12   time concerning control of the room?

13   MR. VARGAS:  Yes, Your Honor.  When we went in I asked

14   him, which one was his room; he directed me to his room.  I asked him,

15   if he shared the bedroom; he said, yes.  I asked him, if there was a

16   certain side that he slept on or which -- wherever his property was at; he

17   said, yes; he directed me, that's when I went into the closet.  One side of

18   the closet had purses, and the other side was a little bit more empty, and

19   so that's when I went to the other side of the closet, Your Honor.

20   THE COURT:  Okay.  Did he make any statement when you

21   found the magazines?

22   MR. VARGAS:  I asked him, who did they belong to?  And he

23   said he didn't know where those come from; that those weren't his.

24   THE COURT:  Okay.  All right.  Does that generate anything

25   further from the State?

1

**REDIRECT EXAMINATION**

2   BY MS. THOMSON:

3          Q        Officer, the report that you received from Metro

4   regarding their search, did you provide that to Defense and the Court?

5          A        I emailed to the Defense, and I emailed initially

6   to -- whoever was the one that contact -- I can't remember their name,

7   I'm sorry.

8          Q        Elise.

9          A        I emailed them everything that Metro sent me

10   from their report; to even the report from North Town; to the pictures that

11   they sent me as well of what they found.  I emailed it to both sides, yes.

12          MS. THOMSON:  At this time, I would ask for admission of the

13   declaration of the arrest report.  I have a copy for the Court if you don't

14   already have one.

15          THE COURT:  Okay.  And that's what's provided to Defense

16   Counsel?

17          MS. THOMSON:  Yes.

18          THE COURT:  Okay.  All right.

19          MS. ZHENG:  It was, Your Honor.

20          MS. THOMSON:  And I have no further questions.

21          THE COURT:  Okay.  Any objection to the declaration of the

22   arrest report?

23          MS. ZHENG:  No, Your Honor.

24          THE COURT:  All right, that will be admitted.  Okay.  Any other

25   witnesses for the State?

1    MS. THOMSON:  No, Your Honor.

2    THE COURT:  Well let me just ask you, Defense Counsel, my

3  questions to the officer generate any further questions from you?

4    MS. ZHENG:  Yes.

5                    **RECROSS EXAMINATION**

6  BY MS. ZHENG:

7    Q    Officer, I guess, in regards to the bedroom that

8  you entered, were there in fact two closets in that bedroom?

9    A    No.  I just remember seeing the big one next to

10  the bedroom -- next to the bed, I'm sorry.

11    Q    When you walk in, is there an additional -- if you

12  remember, when you walk in, is there an additional closet on the right-

13  hand side?

14    A    Walking into the bedroom?

15    Q    Yes.

16    A    Not that I remember on the right-hand side, no.

17    Q    Okay.  But you are also saying that the closet in

18  which you found the magazine; when you went into that closet, it also

19  contained like women's purses, and clothing and those items, correct?

20    A    I remember seeing the purses.  I don't remember

21  seeing the women's clothing.  I do remember seeing a few purses inside

22  the closet off to the left.

23    Q    Okay, fair.  Thank you.

24    THE COURT:  All right.  Does that generate anything further

25  from the State?

1      MS. THOMSON:  No, Your Honor.

2      THE COURT:  You did say -- you did say, Officer, that the

3  person representing themselves to be a girlfriend called and said one of

4  the items seized was theirs?

5      MR. VARGAS:  Yes, Your Honor.

6      THE COURT:  What item did they say was theirs?

7      MR. VARGAS:  It was the four thousand five hundred that they

8  found in cash.

9      THE COURT:  Okay.  Does that generate anything further

10  from either side?

11      MS. THOMSON:  No.

12      THE COURT:  Defense?

13      MS. ZHENG:  No, not for Officer Vargas.

14      THE COURT:  All right.  Thank you, Officer, you're excused.

15  Does the State have any other witnesses?

16      MS. THOMSON:  No, Your Honor.

17      MR. VARGAS:  Thank you, Your Honor.

18      THE COURT:  Defense, have any witnesses?

19      MS. ZHENG:  I do, Your Honor.  I want to call Jessica Rodosh

20  who is Mr. Whitney's girlfriend and was sharing the bedroom with him.

21      THE COURT:  All right.

22      MS. ZHENG:  And she's actually present.

23      THE COURT:  Okay.  I'll ask her to raise her right hand and

24  then be sworn in.

25                          **JESSICA RODOSH**

1    [having been called as a witness and first duly sworn]

2    **DIRECT EXAMINATION**

3    BY MS. ZHENG:

4    THE CLERK:  Can you please state and spell your name for

5    the record?

6    MS. RODOSH:  Jessica Rodosh, J-E-S-S-I-C-A,

7    R-O-D-O-S-H.

8    THE COURT:  All right.  Go ahead, Counsel.

9    Q    Ms. Rodosh, what is your relationship to Mr.

10   Whitney?

11   A    I'm his girlfriend.

12   Q    And how long have you guys been together?

13   A    Three years.

14   Q    And do you share a residence together?

15   A    We do.

16   Q    And that includes sharing a bedroom together?

17   A    Yes.

18   Q    And were you present on the day of September

19   2nd when Officer Vargas arrived at the home?

20   A    Yes.

21   Q    Did you have any contact with Officer Vargas at

22   that time?

23   A    No.  Oh, well, they just brought him in -- they

24   didn't say -- Officer Vargas never really talked to me.  It was another guy

25   with them that talked to me, but he didn't.

1      Q       Okay.  And so, you were separated from Mr.

2  Whitney during the Parole and Probation?

3      A       Yes.

4      Q       And given that you were separated from him, you

5  know that ultimately there were items that were found in the bedroom

6  that would constitute contraband for Mr. Vargas?

7      A       I think -- I didn't know until they said they were

8  seizing the house.

9      Q       Did you know that those items were in the house?

10      A       Yes.

11      Q       And why do you know that those items were in

12  the house?

13      A       Because they were mine.

14      Q       And when you say that they were yours, what

15  items are you referring to?

16      A       The gun, the money, ammunition, and the

17  marijuana.

18      Q       And do you know where they were located?

19      A       I do.

20      Q       As to -- so you heard a lot of testimony in regards

21  to the loaded magazine that was found in the closet.  Whose closet did

22  that -- was that magazine in?

23      A       That was my closet.

24      Q       And how many closets are in that bedroom?

25      A       There's two closets in the bedroom.  When you

1  walk in, there's the one that's right there to the right.  And then you go

2  further in the bedroom, which is mine on the left.  Stephon's is in -- so

3  Stephon's is right there on the right-hand side when you walk in the

4  bedroom, it's all male's clothes.  And that's -- I have a lot of clothes, so I

5  have my own closet which is on the left.

6          Q        And that's the closet that Officer Vargas is

7  referring to in regards to whether there were purses that are located?

8          A        Yes.

9          Q        And then, is the side that Stephon sleeps on the

10  bed, is that closer to your closet?  However, that is not the closet on the

11  left is necessarily his closet.

12          A        No.

13          Q        But he sleeps closer to the left side of the closet

14  on the left?

15          A        Yeah.  I mean, if -- kind of.  We just -- yeah.

16          Q        So he would not necessarily have known the

17  entirety of the contents that were in your closet?

18          A        No.

19          Q        And with respect ultimately to the marijuana that

20  was found, it was hidden in a laundry hamper?

21          A        It was.

22          Q        And your testimony here today is that, those

23  items belonged to you?

24          A        They do.

25          Q        And, I guess -- I'm sure you understand that he's

1  not supposed to have those items, so why were those items in your

2  home?

3          A     We lost a baby in August 8th, 2019, and I was in

4  severe anxiety and I can't -- it felt like I can't breathe.  So the doctors

5  wouldn't help, and so I smoke because it helps with my -- it helps with

6  the loss and the anxiety.  I can't -- there's just times I just -- I feel like I

7  can't catch my breath.  Like someone sitting on my chest, so I smoke.  I

8  didn't think it would get him in trouble.  I wasn't trying to get him in

9  trouble.  I was five months pregnant when we lost our baby and it

10  happened at home.  So it was a traumatic experience, it's hard to -- I

11  don't talk about it still.

12          Q     But as to the fact that you have those items, this

13  is not something that Stephon partakes with you as he continues to

14  provide negative drug tests?

15          A     No, not at all, not at all.

16       MS. ZHENG:  I have no further questions, Your Honor.

17       THE COURT:  Cross examination.

18                      **CROSS EXAMINATION**

19  BY MS. THOMSON:

20          Q     Why were you keeping the marijuana in the

21  laundry basket?

22          A     I'm sorry?

23          Q     Why were you keeping the marijuana in the

24  laundry basket?

25          A     I just put it there.  To be honest, I just put it in

1   places that only I would go through.  He never went through the laundry

2   basket.  I do the laundry.

3              Q       Okay.  So you're saying he didn't know you were

4   smoking marijuana?

5              A       Um, he probably didn't.  I didn't smoke in the

6   house.  So if I smoked, I would go outside or go for a walk.  I don't

7   smoke in the house.

8              MS. THOMSON:  Okay.  Thank you.

9              THE COURT:  Any other questions?

10             MS. THOMSON:  No, Your Honor.

11             THE COURT:  All right.  Any other redirect?

12             MS. ZHENG:  No, Your Honor.

13             THE COURT:  All right.  Thank you, you're excused.  Any

14  other witnesses for the Defense?

15             MS. ZHENG:  No, Your Honor.

16             THE COURT:  All right.  Any rebuttal from the State?

17             MS. THOMSON:  No, Your Honor.

18             THE COURT:  Does the State wish to argue on the alleged

19  violations?

20             MS. THOMSON:  Just briefly, Your Honor.  And I'm going to

21  focus on that firearm because I think that, when we look at the report,

22  the defendant's statements pretty much tell us where we're going with

23  this revocation.  When he indicated that he knew it was a nine millimeter;

24  that he knew it was a brand that he hadn't heard of before, that tells us

25  that he knows the firearms in the house.

1    Particularly when we look at the fact that it is a brand

2    that's really quite unique, it's not something that -- like a Glock where we

3    expect sort of a name that we have heard before.  And the combination

4    of the facts, and the facts that he didn't know about that firearm, tells us

5    he knew it was in the house; he knew he was on probation.  And for that

6    reason, he had access and possession of the firearm.

7    And it's the State's position that when you combine that

8    along with the other facts of the revocation report; the fact that he

9    indicated that he didn't know the password to the phone he was carrying

10   in his pocket; the phone that was with the other phone that he could

11   open with his face, it tells us that it's not that he was waiting for a phone

12   call, he just didn't want P&P in that phone.

13   He is not being honest with the officers.  He's being

14   stopped in vehicles where there are other individuals who are felons;

15   where there are other firearms.  At this point, it's the State's position that

16   the possession of the firearm has been proven up; that it is a non-

17   technical violation; that he should be revoked.

18   THE COURT:  All right.  Defense.

19   MS. ZHENG:  And, Your Honor, I'm going to ask that, in this

20   case -- you know, in preparing for this, I had a lot of conversations with a

21   lot of people.  And given what Officer Vargas encountered when he went

22   to the house; what was otherwise contained on the violation report, most

23   of it stands to be technical violations.

24   I do understand that it is concerning in regards to the

25   North Las Vegas case.  But I think to that extent, he was candid about

1    the matter and that he was somewhere where he shouldn't have been.

2    And he was candid in regards to the fact that he didn't want problems

3    with Parole and Probation because to the extent for the time that he has

4    been on probation, I think Officer Vargas has it right in his report that, I

5    think Stephon has done quite well on probation for what one would

6    assume he was otherwise.  There were a lot of conditions that were put

7    on him, but he was, otherwise, working.  He showed up.  He was testing

8    negative, and he has been on probation for quite a period of time.

9                With regards to the matter of the gun, I don't necessarily

10   read it the same way as the State in regards to the fact that I know

11   Officer Vargas wasn't present, but I've had a lot of conversations with

12   the individuals.  With regards to when Metro had come into execute the

13   search warrant, they were asked -- Ms. Rodosh was asked at that time

14   whether or not those items were hers.  And she was afraid to say

15   anything because what was applied to her was that a protective services

16   could've been called and that she might have been facing the fact that

17   she was having her children removed for having those items in the

18   house.

19               And then subsequent to that, when he was -- when Mr.

20   Whitney was subsequently interviewed at the jail, he had told the officers

21   initially, "I don't know anything about those items; they're hers; ask her

22   about it; she is the one who smokes."  And then the report goes on to

23   say, it wasn't until Metro explained the totality of the circumstances to

24   him; that he then stated, "He didn't want his girlfriend to get in any

25   trouble."  And that's when he admitted those items were his because

1    ultimately what was told to him; the totality of the circumstances was

2    that, she stood to have her child removed given the situation and her

3    association with him.

4             That means that -- I know that ultimately the new case

5    isn't filed yet.  The fact that he was ultimately booked in on it stands to

6    be a violation.  What I'm asking the Court to do is consider this; consider

7    the year plus that he has been on probation; consider the fact that the

8    remainder of the violation report stands to be technical violations and

9    that they haven't filed new charges yet.

10             And there is quite a murky area here in terms of the

11    providence of the gun; the marijuana; where it was located; his

12    knowledge of it.  And count the somewhere between a first and a second

13    technical violation; give him 45 days in custody and let him serve out the

14    45 days as a punishment for his involvement in this, and then allow him

15    to return on probation because everything else -- the indications are that,

16    he was doing well on probation, and he can succeed the rest of his term.

17        THE COURT:  All right.  Does your client wish to make any

18    statement?  I'm not hearing anything.  All right.  I do find the defendant in

19    violation of conditions of his probation.  I'll find the stipulated use of

20    marijuana in August of 2019; the curfew violation in January of 2020;

21    that he was arrested and charged in relation to false statement to a

22    police officer.  And what concerns the Court with that event is that he

23    was with apparently multiple felons, known gang members, and there

24    was a firearm in the vehicle.

25             I do find him in violation as to the second home visit

1   based upon the results of the search and the information provided in the

2   declaration of arrest.  The defendant knew or had access to a semi-

3   automatic handgun with two loaded magazines involving at least -- and

4   then there was additional 70 rounds of nine millimeter ammo that was

5   found.  There was a substantial amount of marijuana.  The

6   circumstances here suggest that it was being sold, and especially

7   looking at the amount of currency found in the house.  So I do find him in

8   violation and sufficient evidence of his possession and access both to

9   the magazines -- loaded magazines and to the firearm.  I am going to

10  revoke his probation; institute the original sentence of 18 to 48 months in

11  the Nevada Department of Corrections.  Do we have an agreement as

12  far as credit for time served?

13          MS. ZHENG:  I think there is 30 days, Your Honor.  Is there

14  any chance that the Court, if you will, consider reinstating him to

15  consider a modification of his probation down to a 12 to 30 sentence?

16          THE COURT:  No.  So how many days credit for time served?

17          MS. THOMSON:  Officer Vargas, do you know?

18          MS. ZHENG:  I think I have him at, like, 32 or --

19          MS. THOMSON:  Officer Vargas, do you know?

20          MR. VARGAS:  Give me one second.  I'm actually looking

21  back at the violation report now.

22          MS. ZHENG:  I have 30 days.

23          MS. THOMSON:  That sounds right.

24          MS. ZHENG:  So according to the violation report, eight days

25  in the PSI; eight days pursuant to his stay at city jail; eight days up to the

1    17th, and then we've now gone five additional days.

2              MR. VARGAS:  That's correct.

3              THE COURT:  All right, 30 days credit for time served.  Thank

4    you.

5              MS. THOMSON:  Thank you.  And just for the record,

6    obviously, he's on felony probation.  The Court took judicial notice that

7    he's a felon.

8              THE COURT:  Yes.  The Presentence Investigation Report

9    indicates three prior felonies.  The most significant one which concerned

10   the Court was the 2007 robbery with a deadly weapon.  He was

11   convicted of first-degree kidnapping, conspiracy to commit robbery,

12   robbery with use of a deadly weapon and was dishonorably discharged

13   from the day of the weapon enhancement in 2017.  He's also convicted

14   with possession convicted -- well those were his three felonies.

15             MS. THOMSON:  Thank you.

16             THE COURT:  All right.  Thank you, Your Honor.

17             MR. VARGAS:  Thank you, Your Honor.

18                      [Hearing concluded at 3:00 p.m.]

19

20

21   ATTEST:    I do hereby certify that I have truly and correctly transcribed the
     audio/video proceedings in the above-entitled case to the best of my ability.

22

23   _Angie Calvillo_
     _____

24   Angie Calvillo
     Court Recorder/Transcriber

25