YI LIN ZHENG, ESQ.
Nevada Bar No. 10811
VEGAS GOLDEN LAW
2801 S Valley View Blvd, Ste 16
Las Vegas, NV 89102
Phone (702) 385-7170
VegasGoldenLaw@gmail.com
Attorney for Defendant
Stephon Whitney

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATE OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STEPHON WHITNEY,<br><br>Defendant. | Case No. 21-cr-0002-JAD-NJK<br><br>**SUPPLEMENTAL SENTENCING MEMORANDUM** |

Yi Lin Zheng, counsel for defendant Stephon Whitney, hereby files this supplemental sentencing memorandum in conjunction with the sentencing memorandum on the four-level enhancement under §2k2.1(b)(6)(B), (ECF #41), respectfully requesting a sentence of 28 MONTHS as sufficient, but not greater than necessary to achieve the goals of sentencing.

**I.  THE COURT SHOULD ASSESS MR. WHITNEY AS A CRIMINAL HISTORY CATEGORY IV**

"All sentencing proceedings are to begin by determining the applicable Guidelines range." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). "The range must be calculated correctly and it would be procedural error for a district court to fail to calculate – or calculate incorrectly – the Guidelines range." *United States v. Hammons*, 558 F.3d 1100, 1105 (9th Cir. 2009) (internal quotations omitted).

"Sentences for the following prior offenses and offenses similar to them, *by whatever name they are known*, are never counted [for criminal history points] … *loitering*." U.S.S.G. § 4A1.2(c)(2) (emphasis added). If an offense is specifically listed in §4A1.2(c)(2), the offense is "never counted" and the court's analysis ends. *United States v. Calderon Espinosa*, 569 F.3d 1005, 1008 (9th Cir. 2009). Courts may look beyond the statute of conviction only when it is being argued that the challenged prior offense is "similar" to an enumerated offense. *Id.*

In *Calderon Espinosa*, the Ninth Circuit held a California "loitering for drugs activities" conviction was "never counted" under § 4A1.2(c)(2). The Ninth Circuit relied on the plain language of § 4A1.2(c)(2) and concluded "the offense of 'loitering' is specifically listed in § 4A1.2(c)(2), and thus is 'never counted' in a defendant's criminal history score." *Id.* The Ninth Circuit distinguished a prior case where it held a California "under the influence of a controlled substance" conviction was not "similar" to the § 4A1.2(c)(2) enumerated offense of "public intoxication." *Id.* Because "loitering," by whatever name is it known, was an enumerated offense in § 4A1.2(c)(2), looking beyond the plain language, and conducting "similar to" analysis, was unnecessary. *Id.*

Here, the prior conviction described in PSR ¶33 should not count for criminal history points under §4A1.2(c)(2). The amended judgment reflects that Mr. Whitney was convicted and sentenced for "loitering about school or public place where children congregate" under NRS 207.270. Because "loitering" is an enumerated offense in §4A1.2(c)(2), *Calderon Espinosa* controls and this conviction is "never counted" for Mr. Whitney's criminal history. 569 F.3d at 1008. Although the statute of conviction was amended after the plea because the Court has not yet commenced "sentencing proceedings" in this case, this Court should treat Mr. Whitney's

2

criminal history as it is on the day of sentencing, modifications and all.  *See Carty*, 520 F.3d at 991.

Mr. Whitney's situation is akin to a state proceeding that requires a person to plead guilty to a misdemeanor DUI, which always counts for criminal history points, but later reduces the statute of conviction to reckless driving, which counts under certain circumstances, if certain requirements are met.  So long as the amended state judgment of conviction reflects a reckless driving at the time of the federal sentencing, this Court would look to §4A1.2(c)(1)'s provisions to determine if the offense counted rather than relying on the preamble that "[s]entences for misdemeanor and petty offenses are counted."

Section 4A1.2 application notes 6 and 10 are inapplicable to this situation.  Application note 6 provides no guidance.  The prior conviction does not count for criminal history points because the statute of conviction is an enumerated offense listed in § 4A1.2(c)(2), not because the entire prior conviction was "reversed, vacated, or invalidated."  Similarly, application note 10 is not helpful.  The state proceedings did not set aside the conviction, result in pardon, or lead to a restoration of civil rights.  The conviction stands, just under a different statute.  In this situation, *Calderon Espionsa* prevents this Court from looking beyond the "loitering" statute of conviction when assessing criminal history points under §4A1.2(c)(2).  569 F.3d at 1008.

Without the two criminal history points assessed in PSR ¶33, Mr. Whitney moves down from a criminal history category V to a category IV.  This Court should not count the "loitering" conviction for criminal history points and find Mr. Whitney is a criminal history category IV.

## II.   MR. WHITNEY REQUESTS A 26-MONTH DOWNWARD VARIANCE REPRESENTING THE TOTAL TIME HE HAS SPENT IN CUSTODY

Since his arrest on September 2, 2020, Mr. Whitney has been in custody for the same firearm.  By the time of sentencing, Mr. Whitney will have been in continuous custody for 26

3

months. Undersigned counsel represented Mr. Whitney at the probation hearing and continued her representation when the instant case was indicted. Based on the facts known at the time, undersigned counsel made strategic decisions that inadvertently resulted in Mr. Whitney accruing additional criminal history points. Had undersigned counsel known a federal indictment was coming, she would have delayed the imposition of the state revocation sentence to save Mr. Whitney two additional criminal history points.

Mr. Whitney was initially held in state custody pursuant a probation violation. The principal allegation at his violation hearing was that he was a prohibited person in possession of a firearm. Def. Sentencing Memo (ECF #41) Exhibit E. The state court held Mr. Whitney's revocation hearing within twenty days of his arrest, found in violation based on the testimony of his probation officer, and imposed the underlying 18–48-month sentence. Id. Undersigned counsel advised Mr. Whitney to proceed with the revocation hearing quickly with an eye towards resolving any new state charges arising from the gun for a stipulated sentence that would run concurrent to his revocation sentence.

The state did charge Mr. Whitney with being a prohibited person in possession of a firearm in a single-count complaint approximately one month after his revocation hearing. Plea negotiation were well under way but before a plea agreement could be signed, the parties were informed that the U.S. Attorney's office was investigating Mr. Whitney for possible federal prosecution. Negotiations ceased and Mr. Whitney was transferred to state prison to serve his revocation sentence.

In January 2021, the federal government indicted Mr. Whitney on the instant offense. Mr. Whitney was transported to federal custody pursuant to a writ of habeas corpus ad prosequendum. (ECF #5). Undersigned counsel attempted to get Mr. Whitney transferred to

primary federal custody, and thus begin accruing federal time credit, by keeping him in a state facility to finish out his state time as soon as possible. (ECF #11, 15).  Although this position appears counterintuitive at first, the logic behind it lies with the state's parole system.  The state parole system requires that a person be granted parole by the parole board and be physically present in a Nevada Department of Correction facility to complete the parole process.  This is true even if the person would parole into the custody of another jurisdiction.  In short, had Mr. Whitney been allowed to remain at a state facility, the state would have been able to complete the parole process and parole him to federal custody.

The first step did occur.  Mr. Whitney was returned to state custody so that he could attend a video parole hearing from High Desert State Prison in late March 2021.  Undersigned counsel represented Mr. Whitney at the parole eligibility hearing from the parole commissioner's office in Las Vegas.  Despite his desire to remain in state custody, Mr. Whitney was ordered to be immediately transported back to federal custody in Pahrump following the parole hearing. (ECF #11).  Undersigned counsel subsequently confirmed in April that the commissioners had granted Mr. Whitney parole.  However, the state was unable to complete the parole process because Mr. Whitney was not physically at a state facility.  The state needed a body to parole and Mr. Whitney's body was noticeably absent from the state facilities.  Thus, the state could not move forward with the grant of parole and required him to expire his sentence by serving the remaining state custodial time.  Had counsel's plan been implemented, Mr. Whitney would have paroled to his federal detainer on or about April 30, 2021.  This would have allowed Mr. Whitney to accrue 19+ months of federal credit by the time of sentencing.

Mr. Whitney's state sentence and this sentence result from the same firearm.  He requests that this Court vary down 26 months to represent the total time he has spent in custody before

5

sentencing. In the alternative, Mr. Whitney requests a 19-month downward variance to represent the federal custody credit he would have accrued had he completed the state parole process and paroled to federal custody. Mr. Whitney was and remained, until very recently, in state custody for the duration of this case. Despite undersigned counsel's best efforts, Mr. Whitney served the entirety of his expected state sentence even after he was granted parole.

### III. THE INCREASE IN BASE OFFENSE LEVEL FOR THE FELONY KIDNAPPING CONVICTION OVERREPRESENTS THE SEVERITY OF MR. WHITNEY'S CRIMINAL HISTORY

The two felony offense entries in Mr. Whitney's criminal history disproportionately impact his guideline calculations. Mr. Whitney only has two instances where his conduct resulted in felony convictions. PSR ¶31, 34. Both instances now serve as predicates to increase his base offense level. Mr. Whitney has no other felony convictions. In particular, the 2007 conviction for felony kidnapping,[1] classified as a crime of violence, disproportionately impacts Mr. Whitney's guidelines

At the age of 17, Mr. Whitney was certified to adult court and convicted of felony offenses arising out of a robbery, where one of his co-defendants died. Mr. Whitney did not plan the robbery. He was not the first or the second to enter the store. He did not carry a gun. Mr. Whitney was the lookout and seen standing by the getaway car. PSR ¶ 31. Despite his minor role, Mr. Whitney pled guilty to all counts and was sentenced to 56–240 months in prison.

Considering Mr. Whitney's youth, the near absence of parental guidance growing up, and the lack of other violent crimes in his criminal story, the 2007 kidnapping conviction is an

---

[1] Although the PSR does not specify, the only conviction that would qualify as a crime of violence is the Nevada kidnapping. The Nevada robbery with a deadly weapon and the conspiracy to commit robbery are categorically excluded from being crimes of violence. *United States v. Edling*, 895 F.3d 1153, 1156-57 (9th Cir. 2018).

aberration. The rest of Mr. Whitney's criminal history is either minor traffic offenses or drug related. The classification of the kidnapping conviction as a crime of violence has a disproportionate impact on his overall guideline calculation. It is over representative of the severity of his criminal history.

### IV. THE MITIGATING CHARACTERISTICS OF MR. WHITNEY, BASED ON 18 U.S.C. § 3553(a) FACTORS, CALL FOR A 28-MONTH SENTENCE AS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO SERVE SENTENCING PURPOSES

Being able to finish his sentence and go home to his fiancée, son, and their family might be the only thing left in the world for Mr. Whitney to hold out hope for. Reflecting on his past and his life, he states "I don't remember ever being hopeful of anything." This dogma developed given the lifetime of traumas that he has endured. However, after each setback, he persevered and worked hard to rebuild his life. The area in his life that he has worked hardest on are his relationships with the people that he loves. Mr. Whitney would sacrifice himself to protect those closest to him, so that they would not have to suffer the same fate or pain that he has. He remains steadfast in his commitment to uplift and protect those who most need him. Naturally, each defendant comes before the court with their individual struggles that put them on the path for which they stand to be sentenced. The nature and circumstances of the offense and the history and characteristics of the defendant must then be given individualized consideration. *18 U.S.C. § 3553(a)(1)*. In this case, a guideline sentence is overly punitive, a sentence of 28-months is appropriate to serve sentencing purposes.

### A. A childhood event resulted in a pervasive and continuing series of traumas, which has impacted all aspects of Mr. Whitney's life.

Mr. Whitney's life was forever altered from infancy when in a single stroke he was deprived of his father and older brother. When he was nine months old, Mr. Whitney and his

siblings were left in the care of his biological father, Keith. While caring for the children, during a bathing incident, Mr. Whitney's older brother, DeAngelo, was scalded and suffered third-degrees burns throughout his body. Their father was eventually convicted of felony child abuse and was sentenced to 15 years in prison. As a result, DeAngelo was removed from the home and adopted out of the family. His incarcerated father would not be present in Mr. Whitney's life until his teenage years. PSR ¶46.

Accordingly, Mr. Whitney was "raised" by a single mother. The family lived in Section 8 subsidized housing. His mother worked graveyard shifts in hotel housekeeping. His mother was absent at night, presumably for work, but also absent during most of the day. His mother spent her days gambling the family's money away. She had a gambling addiction that led her to neglect her children. Mr. Whitney remembers not knowing where his mother was or where their next meal was coming from or when it would be. The children were left to fend for themselves. They would alternate between learning to cook their own meals, stealing food, and occasionally getting a square meal or some leftovers from their aunt's house. PSR ¶46.

The removal and adoption of Mr. Whitney's brother, DeAngelo, evolved into a continuing and new source of trauma. The brothers continued to have contact with each other through and open adoption. DeAngelo's adoptive parents would allow him to visit the family regularly. And once or twice a month, Mr. Whitney would spend the weekend with DeAngelo and his adoptive parents. This proved to be a double-edged sword for both of them. As children they had no way to process how or why their childhoods were so different. DeAngelo's interpretation was that he was taken away from his rightful family and forced to live apart. Whereas, Mr. Whitney craved the resources, opportunities, and stability that DeAngelo's family

provided. It underscored for each of them that they were no longer a family and that their father was incarcerated because of the physical abuse. PSR ¶49.

Mr. Whitney's visits with DeAngelo's adoptive family exposed him to another kind of abuse. While at their house, Mr. Whitney recalls a lot of inappropriate touching, which he considers to be sexual abuse. The touching mainly occurred while he was being bathed. He remembers being touched at his private parts and feeling violated and very uncomfortable, but denies that there was any penetration involved. Mr. Whitney reports that his older cousins also inappropriately touched his private areas without penetration. PSR ¶49.

On more then one occasion, Mr. Whitney and his family were the victims of violent crimes. Once, Mr. Whitney witnessed a home invasion when a group of males, who were associates of his cousin, broke into their apartment and roughed up his mother intending to rob her of something they thought she had in her possession. On another occasion, when he was about age 14, Mr. Whitney was jumped, in what he believed was a gang affiliated incident. He remembers feeling a hot pain at the back of his head. When he touched the area, his hand came away with blood. He saw one of the females with a box cutter in her hand. He immediately ran home and had to go to the hospital to get stiches. Mr. Whitney suffered a significant cut on the back of his head resulting the scar/identifying mark that remains. PSR ¶50.

Mr. Whitney was in high school when his father was released from prison and returned home. Everyone insisted that things go "back to normal" and acted as if nothing had happened. His parents married and they began living together as a family. Mr. Whitney struggled to adjust to his father's return. Unsurprisingly, his parents were volatile as a couple and the marriage lasted roughly a year before they divorced. There was always an undercurrent of friction in the house. During their short marriage, they argued frequently and fought fiercely. While he did

9

not directly witness when the incidents turned physical, Mr. Whitney saw the aftermath of the physical violence between his parents.  Years later, the horrors of domestic violence would once again rip through his family.  In 2017, Mr. Whitney lost his eldest brother, Teddy Seals, when he was shot and murdered by an ex-girlfriend in a domestic violence incident. PSR ¶47, 50.

Under the same roof as his parents, Mr. Whitney could not reconcile his idealized version of having his father back versus the reality. They clashed over the respect and submission his father demanded despite his prolonged absence from the family and his father's "street" attitude. Mr. Whitney challenged his father's authority by asking questions and wanting to discussed what had happened and/or was happening. But his concerns were brushed aside and not addressed. The lack of family support and the denial of the existence of any issues caused the unprocessed trauma to fester and grow. PSR ¶47.

At age 16, after an argument with his mother, Mr. Whitney was told to leave the house. He went and moved in with his sister, Ebony, who had also been kicked out of the house at age 15 when she got pregnant (from a statutory sex seduction relationship). PSR ¶48.

Up until this point, Mr. Whitney was still on track to graduate from high school. However, shortly after turning 17, Mr. Whitney was involved in the offense that resulted in his first felony conviction and incarceration. On that day, his cousin's boyfriend and his friends picked up Mr. Whitney. After getting in the car, he learned that the group was on its way to rob a jewelry store.  Mr. Whitney was told to be the lookout.  He did not plan the robbery.  He was not the first or the second to enter the store.  He did not carry a gun.  He was seen standing by the getaway car.  He witnessed his cousin's boyfriend get shot with and die by his own gun. Even though Mr. Whitney was a juvenile, he was certified as an adult and prosecuted. Despite his minor role, he accepted responsibility, pleaded guilty to multiple charges, received a

substantial sentence, and served eight years. Because of his incarceration, he could not finish high school. PSR ¶31, 48.

Mr. Whitney's family history is the antithesis of a healthy childhood. He has struggled since infancy. His father was sent to prison for physically abusing his older brother. That brother was adopted out of the home. His absentee-mother gambled away the family's subsistence. He was sexually abused/molested. He and his mother are both victims of violent crimes. He experienced a significant history of domestic violence in his upbringing. He was kicked out of the house and left to fend for himself again. His childhood culminated with receiving a lengthy sentence all before turning the age of majority. With the odds so stacked against him, Mr. Whitney has nonetheless consistently tried to rise above of his circumstances.

**B.     Mr. Whitney is someone who is determined to seek and create a stable and supportive life for him and his family.**

Despite the unpredictability of his home life and tumultuous childhood, Mr. Whitney has always sought stability and to provide support to those closest to him. As children raising themselves, Mr. Whitney prided himself on trying to maintain a clean home. It was practically the only part of his environment he could control. With little to no support and resources, Mr. Whitney tried to stay out of trouble by enrolling in youth sports. He signed himself up for football between fifth and eighth grade. He stopped when he did not have the means to continue and/or the support to get to and from practices and games. Mr. Whitney maintained good grades in school. He credits his older sister, Ebony, with impressing upon him the importance of staying in school and graduating high school. He was on track to graduate high school and earning a diploma, until the event that resulted in his first felony conviction and incarceration. PSR ¶46, 48. When he was released from prison, Mr. Whitney obtained and sustained employment up until his arrest in the instant case. PSR ¶67-73.

Mr. Whitney's demeanor is remarkable. He is quiet, polite, introspective, and thoughtful. He reports that he often spends his free time thinking about the events of his life and how they have impacted him as well as others. Mr. Whitney expressed a willingness to attend mental health counseling to help him process and live with the immense bouts of trauma he has experienced in his life. He wants to be able to heal and help those around him to heal also.

For someone whose life is punctuated with extreme trauma and who has not really been given any tools to process his trauma, Mr. Whitney is reliably the one person that everyone depends on to be there for them. For having little to no support given to him, Mr. Whitney is the support system and source of motivation for those closest to him. This is evident in the multiple letters submitted on his behalf. He will give every bit of himself to see someone not have to suffer as he did. He will give you hope, even if he has none for himself. Mr. Whitney is the person who will hold you together, even as he is falling apart. Exhibits G-N.

**C.    The tremendous loss that predicated the nature and circumstances of the instant case warrants a departure from a guideline sentence.**

Mr. Whitney has been a committed relationship with his fiancé, Jessica Rodosh, for the past five years. Initially, she had pursued him. He was resistant to the idea of being in a relationship. Mr. Whitney believed that he had too much emotional baggage to be good for anyone in a relationship. But when he decided to engage in a romantic relationship with Ms. Rodosh, he did so wholeheartedly. He describes his relationship with her as "the best relationship I have with anyone." She describes her relationship with him as, "he treated her better than anyone has ever treated her." PSR ¶52, Exhibit H.

In the beginning, her family was concerned with her involvement with Mr. Whitney. But they stood by each other. When Mr. Whitney was introduced to Ms. Rodosh's son, Michael Wills, he stepped up and was present for all the milestones of Mikey's life. He was there for

12

Mikey's first day of kindergarten, parent-teacher conferences, school projects, practices and games, and they had developed their own daily and weekly rituals. Mr. Whitney modeled the father figure he wanted for himself. Ultimately, he won over Ms. Rodosh's family. This was no easy task considering the opposition they faced. Ms. Rodosh's family have now fully embraced Mr. Whitney and remain supportive of their union, even in light of the current case. Exhibits H-J. Mr. Whitney proved himself by letting his actions speak for him.

Over the course of their relationship, they have weathered through several losses together and discovered joyous news. Ms. Rodosh learned that she was pregnant and they were expecting a baby boy to be named Legacy. It was a high-risk pregnancy and there were complications. But nothing could have prepared either of them for the devastating loss they suffered in August 2019. Of the experience, Ms. Rodosh writes:

> But like I said I was having complications and the doctor just wouldn't listen. I woke up one night, 5 1/2 months pregnant, at 3am to go to the bathroom and my water broke. I looked down and Legacy's tiny feet were coming out. I had to pull our son the rest of the way out of me. My heart broke. I screamed "the baby," and Steff stood in the bathroom door, on the phone with the ambulance screaming "I can't lose them." My heart was broken. At the hospital, I was holding our son and the nurses were doing whatever they do to try to help, but I needed Steff so bad right then. That night I thought he would leave but he didn't he stood there in the hospital room and said, "baby look at me, baby look at me, just pay attention to me, you're my person, I'm never leaving you." I knew his heart was broken but he was being strong for me, for us. That night we laid in the hospital bed and held our son.

> Steff had to go home and clean the blood and mess from me and Legacy. I can't imagine what he went through cleaning that. He made it look like nothing had happened. He did that to protect me, all while he was hurting. Still, he never left. Most couples don't make it through that but we became stronger. Steff got stronger for us whereas I had a mental breakdown. He never left me, he stood by me through my mental breakdowns, he comforted me when I was crying and in pain, he took me to counseling, he also when to counseling.

13

Exhibit G.

In the wake of the tragedy and unable to cope, Ms. Rodosh goes on to explain:

> I didn't want to take pills or anything like that so I smoked marijuana. It would help me to sleep by numbing the pain of losing our son. I was barely able to function as a normal person. The marijuana kept me from crying all the time and it helped get my anxiety and depression a little more under control. I tried to hide it from Steff. That's why I hid it in the laundry hamper and the other stuff around the house. I would smoke when they would go to sleep and before they would wake up, I would go outside so nobody would smell it or know.
>
> When Covid happened, I was scared, I felt like I had to and so I went and got a gun to protect my family. Steff had nothing to do with it. He didn't want it in the house but I wanted it. I didn't know what was gonna happen, I had already lost our son, I wasn't losing anymore people I love. I know it doesn't make sense and it wasn't rational but my depression was so bad. I was so scared and my anxiety was out of control. It was just like I couldn't breathe, it's like someone is sitting on my chest, and I can't catch my breath. I've never felt anything like this until we lost our baby boy. I know now I shouldn't have gotten the gun but I wasn't in my right mind. Between losing our baby, Covid, losing our jobs, and being stuck in that house, I just felt like we needed protection. If I could go back and change it all I would. I blame myself for him being in there. Steff is in in this case because of me, because of what I wanted. I feel like this is my fault. I wish I could take the charge instead of him.

Exhibit G.

Mr. Whitney accepts full responsibility for his constructive possession of the gun in the home. He is in fact a felon and prohibited from possessing a gun, actual or constructive. However, the nature and circumstances for the presence of the gun in this case warrants special consideration. It is also important to note that Mr. Whitney has no prior criminal history involving his possession or use of a gun. Guns are not his thing. This is uncharacteristic of him. As Ms. Rodosh explained and for the reasons stated in the sentencing memorandum regarding

the four-level enhancement under §2K2.1(b)(6)(B), (ECF #41), the gun was not possessed in connection with Mr. Whitney committing another felony offense, to-wit: reselling the marijuana.

Probation's guideline range is disproportionately high because it calculated the "in connection with" enhancement at a higher criminal history category. However, undersigned counsel did not know that the same gun, which forms the basis of Mr. Whitney's state probation violation and state gun case, would be indicted federally and would inadvertently result in additional criminal history points. Nor could it have been anticipated that when Mr. Whitney was transported back to federal custody immediately after his state parole eligibility hearing, it would keep him in primary state custody, forcing him to expire his state sentence without accruing federal time credit.  A guideline sentence would simply compound punishment for constructive possession of the same gun across two different systems.

A 28-month sentence is more than sufficient to serve sentencing purposes. This number represents the largest bottom number Mr. Whitney could have received in a state gun case, had it not been federally indicted. Combined with the 26 months that he has been in continuous custody since the discovery of the gun, it is basically the equivalent having to expire consecutive time between the state revocation and a state gun case.

So long as Mr. Whitney releases to a stable home environment, he will be able to succeed after any term of incarceration and able to successfully reintegrate into society. Mr. Whitney has a consistent employment history and an offer of employment that awaits him at Robertson Industries upon his release.  He has the love and support of his fiancé, as well as that of her family.  For all that he has suffered, Mr. Whitney deserves the spark of hope that he can return home to his family as soon as possible.

**V.      EXHIBITS IN AID OF SENTENCING**

Attached hereto, please find a list of the following exhibits in support of Mr. Whitney's arguments in mitigation of sentence:

- **A.** LVMPD Property report, dated September 2, 2020; (ECF #41)
- **B.** Photo of monies seized on September 2, 2020; (ECF #41)
- **C.** Source of funds emails for return of monies seized, dated October 23, 2020; (ECF #41)
- **D.** Check issued emails dated January 14-21, 2021 for monies seized on September 2, 2020; (ECF #41)
- **E.** State probation revocation transcript, Case No. C-19-338650-1, dated September 20, 2020; (ECF #41)
- **F.** Stephon Whitney's voluntary statement, dated September 3, 2020; (ECF #41)
- **G.** Letter from Jessica Rodosh, Mr. Whitney's fiancée, dated October 20, 2022;
- **H.** Letter from Brian Robertson, owner of Robertson's Industries, Mr. Whitney's future employer, and Ms. Rodosh's cousin;
- **I.** Letter from Bette Rodosh, Ms. Rodosh's mother/Mr. Whitney's future mother-in-law;
- **J.** Letter from Cody Rodosh, Ms. Rodosh's cousin;
- **K.** Letter from Janice Whitney, Mr. Whitney's mother;
- **L.** Letter from Ebony Whitney, Mr. Whitney's older sister;
- **M.** Letter from De'Asia Whitney, Mr. Whitney's second niece; and

/ / /

/ / /

/ / /

**N.** Letter from Datajjah Shumate, Mr. Whitney's niece.

DATED: October 31, 2022.

Respectfully submitted,

By: /s/ Yi Lin Zheng
Yi Lin Zheng, NV #10811
Vegas Golden Law
Attorney for Stephon Whitney

**CERTIFICATE OF ELECTRONIC SERVICE**

The undersigned hereby certifies that she is an employee of the Vegas Golden Law and is a person of such age and discretion as to be competent to serve papers. That on the 31st day of October, 2022, she served an electronic copy of this **SUPPLEMENTAL SENTENCING MEMORANDUM** by electronic service (ECF) to the persons named below:

JASON FRIERSON
United States Attorney
DANIEL COWHIG
Assistant United States Attorney
501 Las Vegas Blvd. South
Suite 1100
Las Vegas, NV 89101

/s/ Yi Lin Zheng
Employee of Vegas Golden Law