2:21-cr-00002-JAD-NJK-1 - November 7, 2022

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF NEVADA

 3   UNITED STATES OF AMERICA,     )
                                   ) Case No. 2:21-cr-00002-JAD-NJK
 4             Plaintiff,          )
                                   ) Las Vegas, Nevada
 5   vs.                           ) November 7, 2022
                                   ) 11:02 a.m. - 12:38 p.m.
 6   STEPHON JAMES WHITNEY,        ) Courtroom 6D
                                   ) IMPOSITION OF SENTENCE, DAY 1
 7             Defendant.          )
     _____)   ) CERTIFIED COPY

 8

 9           REPORTER'S TRANSCRIPT OF PROCEEDINGS, DAY 1
              BEFORE THE HONORABLE JENNIFER A. DORSEY
10               UNITED STATES DISTRICT COURT JUDGE

11


12   APPEARANCES:

13   For the Government: DANIEL COWHIG, AUSA
                         UNITED STATES ATTORNEY'S OFFICE
14                       501 Las Vegas Boulevard South, Suite 1100
                         Las Vegas, Nevada 89101
15                       (702) 388-6336

16

17   (Appearances continued on page 2.)

18

19

20

21   Court Reporter:    Amber M. McClane, RPR, CRR, CCR #914
                         United States District Court
22                       333 Las Vegas Boulevard South, Room 1334
                         Las Vegas, Nevada 89101
23                       (702) 384-0429 or AM@nvd.uscourts.gov

24   Proceedings reported by machine shorthand.  Transcript
     produced by computer-aided transcription.
25
```

(Appearances continued on page 2.)

*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

```
1    APPEARANCES CONTINUED:

2    For the Defendant:

3        YI LIN ZHENG, ESQ.
         VEGAS GOLDEN LAW
4        2801 South Valley View Boulevard, Suite 16
         Las Vegas, Nevada 89102
5        (702) 385-7170

6    Also Present:

7        Sunny Cascio, USPO

8                        * * * * *

9                       I N D E X

10   Government's Witness:                          Page

11   JOSH COSTELLO

12       Direct Examination by Mr. Cowhig              8

13       Cross-Examination by Ms. Zheng              35

14       Redirect Examination by Mr. Cowhig         57

15       Recross-Examination by Ms. Zheng           58

16

17                      * * * * *

18                   E X H I B I T S

19   EXHIBIT NO.:        OFFERED      RECEIVED    WITHDRAWN

20   Gov't 1               33           33

21   Gov't 2               28           28

22   Gov't 3 - 17          23           23

23   Gov't 18              33           34

24

25                      * * * * *
```

2:21-cr-00002-JAD-NJK-1 - November 7, 2022

```
 1        LAS VEGAS, NEVADA; MONDAY, NOVEMBER 7, 2022; 11:02 A.M.

 2                              --o0o--

 3                    P R O C E E D I N G S

 4        COURTROOM ADMINISTRATOR:  Now's the time set for an

 5   imposition of sentence in Case Number 2:21-cr-02-JAD-NJK,

 6   United States of America versus Stephon James Whitney.

 7        Counsel, please state your appearances.

 8        MR. COWHIG:  Good morning, Your Honor.  Dan Cowhig

 9   from the U.S. Attorney's Office.  I have here at counsel table

10   the case agent, LVMPD Detective Josh Costello.

11        MS. ZHENG:  And good morning, Your Honor.  Yi Lin

12   Zheng, counsel on behalf of Defendant Stephon Whitney who is

13   present in custody.

14        THE COURT:  All right.  Good morning.

15        This is the hearing set for the imposition of the

16   sentence on Mr. Whitney in this case.  Back in June he

17   appeared before the Court and he pled guilty to being a felon

18   in possession of a firearm.  He did so without the benefit of

19   a plea agreement.  I accepted his guilty plea and adjudicated

20   him guilty of that charge.

21        In the PSR Probation has calculated the offense level

22   to be a 25 and recommends a sentence of 100 months.  The

23   defense has filed a sentencing memo, and it argues for a

24   sentence of 28 months.  The Government filed a sentencing memo

25   in which it argues for a sentence of 110 months followed by
```

1     three years of supervised release.

2            It appears that virtually every aspect of this

3     sentencing is objected to or disputed.  So I think this is

4     going to be an extensive hearing, but I'm going to let

5     everyone know that I have a number of other hearings today.

6     So my assumption at this point -- and I'm not certain this

7     will go this way.  But if we go beyond the noon hour or it

8     looks like it's going to go beyond the noon hour, we will have

9     to extend this sentencing.  There are so many issues here, and

10    it's possible, based on whatever additional evidence that is

11    received today, that I might need to do some additional

12    research or investigation on my own into the sentencing file

13    regardless.  So just giving everyone a heads-up that there's a

14    lot going on here.

15           So let's go ahead, though, and start with the PSR and

16    see where that leads us.

17           Ms. Zheng, you have reviewed the PSR carefully with

18    your client; is that correct?

19           **MS. ZHENG:**  I have, Your Honor.

20           **THE COURT:**  And let's talk about unresolved

21    objections so that I'm -- I'm clear on where we need to go.

22           So if you want to walk me through the still

23    unresolved objections, please.

24           **MS. ZHENG:**  Sure, Your Honor.

25           So Objections 1 and 2 were in -- I'd asked that the

 1   language be corrected to reflect that Mr. Whitney has been in

 2   continuous custody since his arrest on September 2nd, 2020.

 3   That has been resolved.

 4          **THE COURT:**  Okay.  Hang on one second.  Let me just

 5   mark that.

 6          Okay.  Next.

 7          **MS. ZHENG:**  As to Objection 3, as to the information

 8   regarding Kevin Lay, I have no reason to dispute or not

 9   dispute that.  I just thought it was unrelated to the case,

10   but if I stand corrected, then...

11          **THE COURT:**  Let me ask Probation, what is that

12   information based on?  So information from the detention

13   center?

14          **PROBATION OFFICER:**  It looks like, yes, information

15   from the detention center.

16          **THE COURT:**  Okay.  And so, Ms. Zheng, do you have any

17   information or documents or evidence to refute that at this

18   point?

19          **MS. ZHENG:**  I don't.  I think we can let that stand.

20   I -- it was an incident that I think happened while he was in

21   custody.  I've no reason to dispute that they were given just

22   a warning.

23          **THE COURT:**  Okay.  Do you withdraw the objection?

24          **MS. ZHENG:**  Yes.

25          **THE COURT:**  Okay.  Next?

2:21-cr-00002-JAD-NJK-1 - November 7, 2022

1    **MS. ZHENG:**  Primarily the remainder -- the other

2  objections relate to what I think will later on be discussed

3  into the four-level enhancement, in connection with

4  enhancement.  So, as of right now, those are still... in

5  dispute.  So that goes to Objection Number 4, Objection

6  Number 5...

7    **THE COURT:**  Okay.

8    **MS. ZHENG:**  ...is predominantly with the four level

9  in connection with enhancement.

10    Objection Number 6 is still pending, dispute as to

11  the change of his criminal history, in which case it would

12  also coincide with the fact that, regardless of what happens

13  and the Court's calculation of Stephon's criminal history

14  points, ultimately paragraph 33 in the amended PSR will also

15  have to change to reflect the subsequent history of the case.

16    And I think that's it.  So Objections 1 and 2 are

17  resolved.  Objection 3 is withdrawn.  Four and -- 4, 5, and 6

18  are still in dispute.

19    **THE COURT:**  Okay.  Does the Government have any

20  position on those other than to address -- I know the

21  Government intends to present some evidence regarding the

22  four-level enhancement, and how about with respect to the

23  criminal history point?

24    **MR. COWHIG:**  Your Honor, with respect to the criminal

25  history point, we submitted documentary evidence to the Court

 1   showing the history of that case and the changes to the case.

 2   We believe that the Probation Office has appropriately

 3   addressed that change in their response to that objection.  We

 4   believe that change is ineffective to change Mr. Whitney's

 5   criminal history in terms of this Court's calculations.  Very

 6   clearly, a state court cannot simply at a whim wipe out a

 7   conviction to alter the sentencing guidelines in a federal

 8   case.

 9          **THE COURT:**  All right.  So let's -- I mean, really,

10   the key issue here is that four-level enhancement.

11          So I understand, Mr. Cowhig, that you intend -- the

12   Government intends to present evidence today in support of

13   that four-level enhancement; is that right?

14          **MR. COWHIG:**  Yes, Your Honor.

15          **THE COURT:**  All right.  I'll let you go ahead and

16   start with that then.  I assume you are calling the case

17   agent?

18          **MR. COWHIG:**  Yes, Your Honor.

19          **THE COURT:**  All right.  Go ahead.

20          **MR. COWHIG:**  The Government will call Las Vegas

21   Metropolitan Police Department Detective Josh Costello.

22          **COURTROOM ADMINISTRATOR:**  Please raise your right

23   hand.

24      *(The witness is sworn.)*

25          **THE WITNESS:**  Yes, ma'am, I do.

1          **COURTROOM ADMINISTRATOR:**  Thank you.

2          Please have a seat.  And will you please state and

3     spell your name for the record.

4          **THE WITNESS:**  My name is Josh, J-o-s-h.  Last name is

5     Costello, C-o-s-t-e-l-l-o.

6          **THE COURT:**  You may inquire.

7          **MR. COWHIG:**  Thank you, Your Honor.

8                          **DIRECT EXAMINATION**

9     BY MR. COWHIG:

10    Q.   Good morning, Detective Costello.

11    **A.**   Good morning, sir.

12    Q.   Where do you work?

13    **A.**   I work for the Las Vegas Metropolitan Police Department.

14    Q.   And what's your duty position there?

15    **A.**   I'm currently assigned as a detective in the Central

16    Intelligence Unit.

17    Q.   What does the Central Intelligence Unit cover?

18    **A.**   A myriad of things.  We gather and disseminate

19    information and intelligence related to any and all crimes

20    occurring within our respective area of responsibility here in

21    Clark County.

22    Q.   Could you tell the Court a little bit about your

23    background, training, and experience.

24    **A.**   I worked for Las Vegas Metro now for about 16 and a half

25    years, coming up on 17 in April.  I was in patrol for six

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1   years.  I then went to the gang unit where I became a

2   detective with gang enforcement.  I later became a detective

3   for the gang intelligence unit where I remained until 2015

4   when the gang unit was at that time disbanded.  Then, from

5   2015 until 2017, I worked as an intel detective in our

6   criminal intelligence unit.  And then, in 2017, they created

7   the central intelligence unit, and at that point I came back

8   to the central intelligence unit where one of my major

9   functions still remains the gang intelligence component.

10  Q.   Did you have essentially identical duties on September

11  2nd, 2020?

12  **A.**   Yes, sir, I did.

13  Q.   Do you know the defendant, Stephon Whitney?

14  **A.**   I do.  He's seated there at the defendant's table wearing

15  the gray shirt and white sleeves.

16        **MR. COWHIG:**  Your Honor, if the record can reflect

17  the witness has identified the defendant?

18        **THE COURT:**  It will so reflect.

19        **MR. COWHIG:**  Thank you, Your Honor.

20  **BY MR. COWHIG:**

21  Q.   How did you come to know Stephon Whitney?

22  **A.**   On August 28th, my team was working with marked uniform

23  officers conducting surveillance related to a gang hood day

24  party that was occurring --

25  Q.   I'm sorry, was that August 28th of 2020?

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1  **A.**   I apologize.  Yes, it was August 28th, 2020.

2           And during that time the patrol officers conducted a

3  traffic stop on a -- like a multi-person, like party bus kind

4  of vehicle.  Ultimately, as a result of that traffic stop,

5  three firearms were located inside of the vehicle, and all the

6  occupants were to be identified and then ultimately released.

7           During that time, in 2020, it was a period of social

8  unrest across the country.  Tensions were very high.  There

9  had been numerous incidents around town.  During that traffic

10 stop an individual turned on Facebook Live and began to

11 broadcast the location of the stop and asked additional people

12 to please come to the location of the stop to try to ask law

13 enforcement to let them go.  Ultimately, people did begin to

14 arrive, and the decision was made that evening that we would

15 arrest the few people that we had currently already

16 established probable cause on, we would identify the other

17 subjects in the vehicle, and follow up at a later time because

18 we didn't want to escalate the situation any further and

19 endanger the officers or the citizens.

20 **Q.**   Was the defendant one of the individuals in that vehicle?

21 **A.**   He was one of the subjects in the vehicle.  However, on

22 the night in question he did not identify himself correctly.

23 He provided a false name, which in the following days I was

24 able to positively identify him as being Stephon Whitney,

25 which then led to our second interaction.

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    Q.   What did you decide to do as a result of that

2    information?

3    **A.**   I learned that Mr. Whitney was currently on probation,

4    and at that point I knew he was a convicted person and I

5    needed to get a sample of his DNA to compare to the firearms

6    that were on the bus due to no one claiming ownership.

7          So I notified his probation officer of record,

8    Officer Vargas, and advised him that I had probable cause to

9    obtain a search warrant from Mr. Whitney.

10          Based on that information, Officer Vargas indicated

11   that he was newly appointed as the officer for Mr. Whitney,

12   and he asked if I would be willing to accompany him at a later

13   time when he went to go do a house check at Mr. Whitney's

14   residence.

15   Q.   And did you do that?

16   **A.**   I did.

17   Q.   What date was that?

18   **A.**   That was on September the 2nd of 2020.

19   Q.   What happened on September 2nd of 2020?

20   **A.**   We met with parole and probation officers in advance of

21   the house visit.  We informed them that we had the probable

22   cause to obtain the search warrant for Mr. Whitney's DNA.

23   Detective Cook from North Las Vegas was with us as well as

24   part of my task force.  Mr. Cook had probable cause to arrest

25   Mr. Whitney for providing false information to him the night

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1   of the traffic stop.  We went to the residence.  The LVMPD and

2   North Las Vegas task force personnel remained inside of our

3   vehicle while parole and probation approached the residence.

4   They contacted Mr. Whitney by phone.  He exited the residence.

5   They then took him and went back into the house, and --

6   Q.   Was that process based upon COVID protocols at the time?

7   **A.**   Yes.  During that time, they were meeting in person

8   outside due to COVID protocols.  Mr. Vargas determined that he

9   wanted to do a home search of Mr. Whitney's home, and so he

10  took Mr. Whitney inside of the residence while we remained

11  outside.

12          After a period of time, I received a phone call from

13  Mr. Vargas stating that he had located two firearms magazines

14  inside Mr. Whitney's bedroom, and he asked me to please come

15  into the residence.

16  Q.   Just to clarify, that was two magazines for a firearm,

17  not two firearms?

18  **A.**   Yes, two magazines for a firearm.

19  Q.   Would you look at the binder of exhibits there in front

20  of you?

21  **A.**   Yes, sir.

22  Q.   Have you previously reviewed those documents?

23  **A.**   Yes, sir, I have.

24  Q.   What happened when you went into the residence?

25  **A.**   I went and I met with Officer Vargas in Mr. Whitney's

1    bedroom.  Mr. Vargas was holding two firearms magazines in his

2    hand.  The magazines for -- two magazines for a firearm, no

3    firearm, in his hand, and he indicated to me that he had found

4    those on the top shelf of the closet.  I then instructed him

5    to place those magazines on the bed and let's walk out, we're

6    going to freeze the residence pending the issuance of a search

7    warrant.

8    Q.   And which bedroom was this?

9    **A.**   This is the -- the adult bedroom.  There's two bedrooms

10   in the residence; a small child's bedroom and then the adult

11   bedroom.  It would be the southern-most bedroom in the

12   residence, if I recall correctly.

13   Q.   How would you characterize the size of the apartment

14   overall?

15   **A.**   It was very small.  It's a duplex.  It's one half of a

16   single-story family home.  Very small.  A small living room,

17   kitchen area when you first initially enter, and then to the

18   right is a very short hallway, which is the little boy's

19   bedroom, a bathroom, and then the bedroom of Mr. Whitney and

20   his girlfriend.

21   Q.   And there's also a laundry facility as part of that

22   apartment?

23   **A.**   Yes.  It's directly outside of the master -- I -- the

24   master bedroom, if you want to call it that, door.  There's a

25   laundry area.  It had no doors.  It was just right there, a

1   little nook built into the wall that only fits a washer and a

2   dryer.

3   Q.   And did Officer Vargas relate to you which bedroom

4   Mr. Whitney identified as his bedroom to him?

5   **A.**   Yes.  He indicated that the bedroom that he was standing

6   in was the one that Mr. Whitney told him that he and his

7   girlfriend were residing in.

8   Q.   Do you recall the girlfriend's name?

9   **A.**   Ms. Rodosh, Jessica Rodosh.

10  Q.   And was there something about the second bedroom that

11  made it clear that that was a child's bedroom?

12  **A.**   Yes.  There was children's toys.  There was, like, a

13  Batman, I believe, bedspread.  Just very obviously it was the

14  bedroom of a small child.  Children's clothes.

15  Q.   After learning about the two magazines, what did you then

16  do?

17  **A.**   That's when I applied for the telephonic search warrant

18  for the residence and was granted a warrant by the Honorable

19  Judge Zimmerman.

20  Q.   And you executed that search?

21  **A.**   I did.

22  Q.   What did -- were there other officers with you who also

23  executed the search?

24  **A.**   There were.  At this time the parole and probation

25  officers had left, and my team remained as well as a patrol

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    supervisor who responded to supervise the service of the

2    warrant.

3    Q.   If I could direct you to what's been marked as

4    Government's Exhibit 3 in that binder.

5    **A.**   Yes, sir.

6    Q.   Could you describe to the judge what that 3, 4, and 5

7    show?

8    **A.**   Yes.

9    Q.   The judge has it --

10   **A.**   Oh --

11   Q.   -- a set of the exhibits --

12          **THE WITNESS:**  -- show you, Your Honor.

13       *(Reporter instruction.)*

14          **THE WITNESS:**  Oh.

15          **THE COURT:**  Go ahead.

16          **THE WITNESS:**  So Exhibit 3 is the bed frame and the

17   headboard for what did contain the mattress prior to the

18   service of the search warrant beginning.

19          Jumping over to 4, you have a view there looking down

20   behind the bed showing the back of the headboard there.

21          **THE COURT:**  And this is all in the adult -- what

22   you've described as the adult bedroom?

23          **THE WITNESS:**  Yeah.  If you want to just call it a

24   master bedroom, if you want to call it that, yes.

25          **THE COURT:**  Okay.

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1        **THE WITNESS:**  In the adults' bedroom.

2        And then this is -- 5 is going to be a picture

3   looking inside of the headboard.  So the headboard has that

4   weird, like, black fibrous cloth that kind of covers the back

5   of -- well, headboards in this case or underneath of couches

6   or whatever.  And it had a zipper on it.  And when I unzipped

7   the zipper to look inside, there's approximately maybe a

8   three-inch wide gap of the headboard.  And what you see there

9   is the firearm and the magazine laying at the bottom of the

10  headboard.  It's just been placed in there, sitting in there.

11  **BY MR. COWHIG:**

12  Q.   What does Government Exhibit 6 show?

13  **A.**   Six is -- at this point I have recovered that firearm

14  from inside of that headboard, and I'm holding it there prior

15  to placing it inside the evidence bag.

16  Q.   Government Exhibit 7?

17  **A.**   Seven is the additional magazine that was also located

18  inside of the headboard next to the firearm which was fully

19  loaded.

20  Q.   And Government Exhibit 8?

21  **A.**   Eight is a paper sleeve containing money.  Kind of like

22  when you go to a bank, if you make a deposit or withdrawal,

23  they put it inside that little paper sleeve.  That's what that

24  is.

25  Q.   These images show no mattress on the bed frame and a

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1   bunch of other stuff moved around.  Is that a result of your

2   search?

3   **A.**   Yes, sir, it is.

4   Q.   If someone knew that firearm was inside the headboard,

5   would it be hard for them to access?

6   **A.**   No.  It literally took just a moment to zip open the

7   zipper, and you can reach right in and grab it.

8   Q.   And how far in terms of feet was this from the closet

9   where the initial magazines were found?

10  **A.**   The room wasn't very big.  Maybe 10 feet.  It was just

11  across.  So if you're looking at the bed (indicating) this way

12  as the court lies, like Your Honor and I are looking --

13  there's a men's and women's side of the bed; right?  We all

14  know that if we're married or we have a significant other.  So

15  the right side of the bed was the men's side.  It had

16  Mr. Whitney's prescriptions and other things belonging to him

17  on that side.  And then this side (indicating), items

18  belonging to Ms. Rodosh.  And then directly next to that there

19  was a small walkway between what would have been a closet and

20  the bed.  And so maybe 10 feet across from where the -- where

21  those magazines were located on the top shelf to where -- in

22  the lower right-hand corner of the bed frame is where the --

23  if you're looking at it, the lower right-hand corner of the

24  bed frame is where the firearm was located.

25  Q.   Would you look at Government Exhibit 9, please, and tell

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    the Court what that shows.

2          **THE COURT:**   And when you say, so lower right-hand

3    corner of the bed frame where the firearm was located, that

4    was the side of the bed you were attributing to Mr. Whitney?

5          **THE WITNESS:**   Yes.

6          I'm sorry.  Government Exhibit 9 is a clothes hamper,

7    and you can see the top of a large glass jar there.

8    **BY MR. COWHIG:**

9    Q.   And does 10 show that same jar in a closeup?

10   **A.**   It does.  There's a closeup photo, and you can see the

11   green, leafy substance believed to be the marijuana there.

12   Q.   And Government Exhibit 11?

13   **A.**   That is the jar showing that it's about two and a half,

14   three-quarters of the way full of marijuana when we removed

15   it.

16   Q.   And was this jar in that same room?

17   **A.**   Yes.  It was inside that clothes hamper, yes.

18   Q.   What does Government Exhibit 12 show?

19   **A.**   Twelve shows that, when additional clothing was removed,

20   there was another jar and another plastic bag with marijuana

21   in it.

22   Q.   And does 13 show that other jar and the other plastic

23   bag?

24   **A.**   Yes, it does.

25   Q.   And that other jar has marijuana within a plastic bag

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1   inside it as well as lose marijuana?

2   **A.**   Yes.   There's a small amount of loose marijuana in the

3   bag that contains it, and you can kind of see the label of

4   whatever strain of marijuana it was that was there on the side

5   of the bag.   And then the other plastic bag with additional

6   marijuana in it.

7   Q.   And was this marijuana tested?

8   **A.**   No, it was not.

9   Q.   Did Mr. Whitney identify this as marijuana?

10   **A.**   Yes, he did.

11   Q.   Would you tell the Court what Government Exhibit 14

12   shows, please.

13   **A.**   Government Exhibit 14 is a box of sandwich bags with a

14   digital scale sitting on top of them, and that's on top of the

15   dryer.

16          **THE COURT:**   Can I go back one --

17          **THE WITNESS:**   Yes, ma'am.

18          **THE COURT:**   -- quick second?   When you said

19   Mr. Whitney identified this as marijuana, what -- how did he

20   do that?

21          **THE WITNESS:**   Later on, I conducted a post-Miranda

22   interview with him at the North Las Vegas Jail, and during

23   that conversation he identified it as being marijuana.

24          **THE COURT:**   Okay.   Go ahead, Mr. Cowhig.

25          **MR. COWHIG:**   Thank you, Your Honor.

1    **BY MR. COWHIG:**

2    Q.   Was there anything noted about that scale in Government

3    Exhibit 14?

4    **A.**   Yes.  It had small, green, leafy residue on top of it.

5    Q.   And where did you say that this box with baggies and

6    scale was found?

7    **A.**   Directly outside of the -- we'll just call it the master

8    bedroom.  The adult bedroom door, as you're leaving the room,

9    on your left-hand side there was immediately that little

10   laundry nook that contained the washer and dryer.  And it had

11   a shelf above the washer and dryer, like where you would have

12   a -- have laundry detergent, dryer sheets, things like that,

13   it was sitting there on that shelf.

14   Q.   And Government Exhibit 15?

15          **THE COURT:**   And, I'm sorry, can I just go back before

16   we do that?

17          **THE WITNESS:**   Certainly, Your Honor.

18          **THE COURT:**   Where was this laundry basket that we see

19   in photos... 9, 10, and 12?

20          **THE WITNESS:**   So the laundry basket is sitting

21   directly next to the television.  The television's on, like, a

22   small stand.  The laundry basket is located directly next to

23   it.  So if you were lying on the bed, like the headboard is

24   behind us here, this granite wall, and that's the foot of the

25   bed, just beyond that is the far wall of the bedroom.  There's

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1   a television, and then immediately to the right of it was the

2   clothes hamper that contained the marijuana.

3           **THE COURT:**  All of this then was in the master

4   bedroom?

5           **THE WITNESS:**  All of it was in the bedroom, yes,

6   ma'am.

7           **THE COURT:**  Thank you.

8   **BY MR. COWHIG:**

9   Q.   And then the box of baggies and digital scale was

10  immediately outside of the bedroom?

11  **A.**   Just outside of the bathroom in that -- we'll call it the

12  laundry nook where the little cutout was where the washer and

13  dryer are.

14  Q.   I'm sorry, bathroom or bedroom?

15  **A.**   Just outside the bedroom.

16  Q.   And then Government Exhibit 15?

17  **A.**   Fifteen are the two magazines that I made mention of that

18  the probation officer was holding in his hands when I entered.

19  Q.   That doesn't show where they were found, just where the

20  probation officer put them down?

21  **A.**   Exactly.  I told him to place them there on the bed.

22  Q.   And then Government Exhibit 16 and 17, what do those

23  show?

24  **A.**   16 and 17 show two boxes of Winchester nine millimeter

25  ammunition with a receipt, and I'll let you --

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1   Q.   Are you able to read the receipt in Government Exhibit 17

2   or at least portions of it as to who the buyer was?

3   **A.**   On 16, no.  On 17, yes.  You can see the name Jessica R.

4   Rodosh about halfway down on the receipt just below the total

5   charged.

6   Q.   And where -- these were found in a bag?

7   **A.**   So as you're standing looking into the laundry nook -- so

8   as you exit out of the master bedroom, immediately to your

9   left is that laundry nook.  If you turn and look to your left

10  into the laundry nook, you have a washer and a dryer, and

11  above it is that shelf where you put soaps, detergents, things

12  like that.  There was a shoebox that was sitting on that

13  shelf.  When that shoebox was pulled down and looked inside,

14  there was the black plastic bag.  You see a portion of that

15  there in Government Exhibit 16.  Inside that bag was the

16  ammunition and the receipt.

17  Q.   And this was the same area where the box of baggies and

18  digital scale was found?

19  **A.**   Yes.  It was sitting a washer's width away to the -- just

20  to the right of it.

21          **MR. COWHIG:**  Your Honor, I'd like to offer Exhibits 3

22  through 17 into evidence.

23          I'm sorry.  I should ask the obvious evidentiary

24  question.

25  **BY MR. COWHIG:**

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    Q.    Do these images depict the search and the items you

2    described as they appeared on that day?

3    **A.**    Yes, sir, they do.

4    Q.    And they're a fair and accurate representation of that?

5    **A.**    Yes, sir, they are.

6              **THE COURT:**  Now you move them in?

7              **MR. COWHIG:**  Yes, Your Honor.

8         *(Government Exhibit Numbers 3 through 17, offered.)*

9              **THE COURT:**  Any objection?

10             **MS. ZHENG:**  No, Your Honor.

11             **THE COURT:**  All right.  They will come in.

12        *(Government Exhibit Numbers 3 through 17, received.)*

13   **BY MR. COWHIG:**

14   Q.    Regarding the marijuana, what did you note about how this

15   marijuana was packaged?

16   **A.**    There was a large quantity.  It was in a -- in a jar.

17   There was a significant amount of marijuana, much beyond what

18   I know to be consistent with personal use.

19   Q.    Was there something about the packaging that told you

20   where it may have come from?

21   **A.**    We consistently see in our line of work those large

22   plastic bags like we saw there in that second jar where

23   they're inside of that plastic bag, and then they have that

24   label either on the outside or the piece of paper on the

25   inside that indicates the particular strain of marijuana that

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    it is, which is not how marijuana is purchased if you purchase

2    it legally at a dispensary.

3    Q.   So this packaging is consistent with what you're used to

4    seeing on the illicit market?

5    **A.**   That is correct, sir.

6    Q.   And the quantity of marijuana that you saw here, this --

7    I think you already said this would not be typical for an

8    individual user?

9    **A.**   No.

10   Q.   Would the cost of this amount of marijuana be potentially

11   out of reach for someone who's out of work and struggling to

12   pay their bills?

13   **A.**   Yes, that would be an accurate representation.

14   Q.   Did you find anywhere else in the apartment any

15   indications of marijuana being purchased from a dispensary?

16   **A.**   No, sir, we did not.

17          **THE COURT:**  Let me back you up for just a second.

18   You --

19          **THE WITNESS:**  Yes, Your Honor.

20          **THE COURT:**  -- just testified that the cost of this

21   marijuana would be potentially out of reach for someone who's

22   out of work and struggling to pay their bills.  Do you know

23   the estimated value of that marijuana?

24          **THE WITNESS:**  Not a narcotics dealer, but based on

25   market price at the time -- it just depends on the strain or

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1   the THC content.  I would estimate probably somewhere there

2   around --

3           **MS. ZHENG:**  Your Honor, I'm going to object to the

4   speculation of it.  Either the detective knows or doesn't.

5   But as to the speculation of the cost of the market value --

6           **THE COURT:**  All right.

7           **MS. ZHENG:**  -- of it and what's within the bounds --

8           **THE COURT:**  I'm going to sustain that for right now.

9           Mr. Cowhig, I'm going to ask, if you want me to

10  consider that testimony about the value of this marijuana, if

11  you can lay a greater foundation for the knowledge of this

12  witness about such costs.

13          **MR. COWHIG:**  Certainly, Your Honor.

14  **BY MR. COWHIG:**

15  Q.   During the course of your investigations, do you

16  frequently investigate individuals who are selling illicit

17  drugs, particularly marijuana?

18  **A.**   Yes, sir, I do.

19  Q.   Those prices have a substantial range and vary over time?

20  **A.**   That is correct.

21  Q.   Do you know, during this time frame of September of 2020,

22  during COVID, what the approximate price of this quantity of

23  marijuana would be?

24          **MS. ZHENG:**  Your Honor, I'm going to object again.  I

25  don't think that that's a sufficient foundation in regards to

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

 1    that.  The testimony is that it depends on the quantity and

 2    the strain.  We have neither information about the strain or

 3    the type of marijuana that it is.  I don't believe that the

 4    detective should testify based on pure speculation as to the

 5    value.

 6           **THE COURT:**  Mr. Cowhig, can you -- does this witness

 7    know the quantity of this marijuana?  Can he testify to that?

 8    I just don't know if this is within his knowledge.

 9    **BY MR. COWHIG:**

10    Q.    Did you seize the marijuana in this case?

11    **A.**    Yes, we did.

12    Q.    Did you make a record of that seizure?

13    **A.**    We did.

14    Q.    Would you look at Government Exhibit 2 for

15    identification, please.

16    **A.**    You said 2, Counselor?

17    Q.    Yes.

18    **A.**    Two... yes, sir.

19    Q.    Did you complete that form?

20    **A.**    Yes.  This is the LVMPD property report.

21    Q.    What does that form say?

22    **A.**    It lists all the items that were taken as evidence during

23    the service of the search warrant.

24    Q.    Does it include the quantity of marijuana that was

25    seized?

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1  **A.**   It does in multiple -- multiple different packages,

2  multiple weights.

3  Q.   The first item that is seized there is 140 grams net of

4  marijuana?

5  **A.**   That is correct.

6       **MS. ZHENG:**  Your Honor, I'm going to object to that

7  categorization.  It says it's 140 grams net.  That includes

8  the container that it was in.  It does not give us an

9  indication of the marijuana in itself.

10       **THE COURT:**  You filled this out; correct?

11       **THE WITNESS:**  Yes, ma'am.

12       **THE COURT:**  You can ask him about what he seized and

13  what his recollections of the amounts were.

14  **BY MR. COWHIG:**

15  Q.   What did you seize in terms of marijuana?

16  **A.**   In this case, you see here an item one, package one,

17  quantity one, green, leafy substance, marijuana, 140 grams

18  net.  That is net weight.  That is raw marijuana, no

19  packaging.

20       However, if you move down below it, you see package

21  one, item two, 69.1 grams gross.  That is gross weight.  Gross

22  weight indicates that it's the marijuana and the packaging

23  that is with it.

24       So that's the differentiation between the net and the

25  gross weights that you see there.

1    Q.   And then looking on to the second page of that, there's

2    also another weight for net?

3    **A.**   There's an additional -- at the very bottom of the first

4    page where there's 55.4 grams gross, and then on the back page

5    there's another 8.4 grams net.

6    Q.   Would this total amount be consistent with someone who is

7    simply using marijuana?

8    **A.**   Based on my training and experience, no, sir, it would

9    not.

10           **MR. COWHIG:**   Your Honor, I move Government Exhibit 2

11   into evidence.

12       *(Government Exhibit Number 2, offered.)*

13           **MS. ZHENG:**   No objection.

14           **THE COURT:**   All right.  2 will come in.

15       *(Government Exhibit Number 2, received.)*

16   **BY MR. COWHIG:**

17   Q.   During -- or preceding your search, did you talk with

18   Ms. Rodosh who was there at the apartment?

19   **A.**   I did very briefly, yes, sir.

20   Q.   Did you ask her questions about what was found in the

21   apartment?

22   **A.**   I did.  I briefly asked her if she had any firearms or

23   any narcotics inside of the residence prior to my application

24   of the search warrant -- or applying for the search warrant,

25   and she indicated to me that she did not have any firearms or

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1  narcotics located inside of the residence.

2  Q.   Did she tell you why she wouldn't have any firearms or

3  narcotics in the residence?

4  **A.**   Yes.  Because she has a small child inside the home.

5  Q.   And for that reason, she would not have either firearms

6  or narcotics in there?

7  **A.**   Yes.

8  Q.   Did you then interview Mr. Whitney?

9  **A.**   The following day, I went to the North Las Vegas

10  Community Correctional Center with Detective Cook, and we

11  conducted an interview with Mr. Whitney.

12  Q.   Was that interview recorded?

13  **A.**   Yes, sir, it was.

14  Q.   Was a transcript prepared?

15  **A.**   Yes, sir, it was.

16  Q.   Is Government 18 a transcript of that recording?

17  **A.**   Yes, sir, it is.

18  Q.   Have you reviewed that for accuracy?

19  **A.**   I have.

20  Q.   And is it accurate?

21  **A.**   Yes.  There are a few minor grammatical errors, but it is

22  accurate.

23  Q.   At the outset of the interview, did you advise

24  Mr. Whitney of his rights under Miranda?

25  **A.**   Yes, sir, I did.

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1   Q.   And did he indicate that he understood those rights?

2   **A.**   Indicated he understood and he agreed to speak with me.

3   Q.   Did you ask him about the firearm at the beginning of the

4   interview?

5   **A.**   I did.

6   Q.   What did he tell you?

7   **A.**   He told me he had no knowledge of the firearm and that

8   his fingerprints and DNA would not be located on it.

9   Q.   Would not be found on it?

10   **A.**   Yes.

11   Q.   Did you ask him about the marijuana?

12   **A.**   I did.

13   Q.   What did he say about the marijuana?

14   **A.**   Initially he stated he knew nothing of it.

15   Q.   Could you walk the Court through the course of that

16   interview.

17   **A.**   The interview was a little bit more than an hour and a

18   half in length, and over the course of the interview

19   Mr. Whitney changed his story a few different times, initially

20   indicating that he had no knowledge of the items located

21   inside the apartment.  Then we went into a portion of the

22   interview where we discussed his history and his upbringing,

23   and ultimately, over the course of the interview, he indicated

24   that he didn't want Ms. Rodosh to be implicated in anything

25   that was located inside the apartment.

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    I asked him on numerous occasions to take

2    accountability for only those things that he was responsible

3    for, for nothing else.  Ultimately, he tells me that he

4    reverted back to what he's known to do his entire life and

5    that was sell drugs.  And then he explained that beginning at

6    age 9 he began by selling a small quantity of marijuana, and

7    then later ultimately sold harder drugs.  He admitted to

8    selling cocaine, which is what he was on probation for at the

9    time of his arrest that day.  And when we came back to the

10   firearm, he indicated that he knew that the firearm was there,

11   he knew that the firearm was there with the money.  He

12   indicated that his DNA would be on the firearm.  He described

13   the caliber of the firearm and the color of the firearm.  And

14   he also described to me that the marijuana would be located

15   next to the TV, which is where it was located, directly next

16   to the TV inside of the clothes hamper.

17   Q.   And why did you ask him these questions about where

18   things were or the characteristics of the firearm?

19   **A.**   Because, in my training and experience, individuals would

20   oftentimes try to take charges for other people to help them

21   avoid in getting prosecuted, but I asked him specific

22   questions that only individuals who are involved in possessing

23   or handling those items would know exactly where those items

24   were located.

25   Q.   And Mr. Whitney, I think you already told the Court, was

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1  gone by the time you executed your search warrant?

2  **A.**    Yes.  Once the residence was frozen and the application

3  was being made for the service of the search warrant,

4  Detective Cook had transported -- or I believe it was parole

5  and probation, when they left, they loaded him into their

6  vehicle and they transported him to North Las Vegas for

7  Detective Cook so that he could complete that booking.

8  Mr. Whitney was not present during the service of the search

9  warrant.

10  Q.    So he did not see any of the search that you described

11  here for the Court?

12  **A.**    No, sir, he did not.

13  Q.    During a significant portion of the interview,

14  Mr. Whitney is talking about whether someone else would take

15  responsibility for the gun and the marijuana.  Could you

16  explain that a little bit to the Court?

17  **A.**    Could you elaborate slightly further?

18  Q.    There's a discussion during the interview where

19  Mr. Whitney is talking about whether Ms. Rodosh is the one who

20  possesses the firearm and the marijuana.

21  **A.**    Yes.  There's extensive conversation about him not

22  wanting her to be involved in any way, that she's not involved

23  in that, that she's a great mother, and she takes great care

24  of her child, that she was not raised -- she's not involved in

25  any of that.  We have extensive conversation about his

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    childhood and how he was brought up around narcotics dealing

2    and the life that he had lived growing up.  And through that

3    he said he could never ask her to try to take responsibility

4    for something that he was involved in.

5    Q.   Did you write up a final report, a declaration of arrest

6    report in this incident?

7    **A.**   Yes, sir, I did.

8    Q.   Would you look at Government Exhibit Number 1 for

9    identification, please.

10   **A.**   That is my declaration of arrest for Stephon Whitney in

11   reference to this incident.

12   Q.   Is that a fair and accurate representation of this

13   incident and the investigation?

14   **A.**   Yes, sir, it is.

15        **MR. COWHIG:**  Your Honor, I'd move Government

16   Exhibit 1 into evidence.

17        *(Government Exhibit Number 1, offered.)*

18        **MS. ZHENG:**  No objection, Your Honor.

19        **THE COURT:**  All right.  1 will come in.

20        *(Government Exhibit Number 1, received.)*

21        **THE COURT:**  I don't think you moved in 18.  Did you

22   intend to move in 18?

23        **MR. COWHIG:**  Yes, Your Honor.  I'm sorry.

24        *(Government Exhibit Number 18, received.)*

25        **THE COURT:**  So 18's the transcript.  Any objections

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    to that one?

2            **MS. ZHENG:**  Likewise, no objection.

3            **THE COURT:**  All right.  18 will come in.

4        *(Government Exhibit Number 18, received.)*

5    **BY MR. COWHIG:**

6    Q.   With regard to the drugs and the drug paraphernalia and

7    the firearm and the magazines and the ammunition, were these

8    all essentially located in the same part of that apartment?

9    **A.**   Yes.  They were all located either within or immediately

10   outside of what we've been referring to as the master bedroom.

11   Q.   And in your experience as a law enforcement officer, is

12   it common to see firearms and drugs that are being sold

13   together in the same place?

14   **A.**   Yes.  Individuals who engage in narcotics sales

15   oftentimes possess firearms to protect themselves for fear of

16   being robbed during narcotics transactions.

17           **MR. COWHIG:**  No further questions, Your Honor.

18           **THE COURT:**  Thank you.

19           Cross?

20           **THE WITNESS:**  Before we begin, do we have a bottle of

21   water or something?

22           **COURTROOM ADMINISTRATOR:**  I'll go grab one.

23           **THE COURT:**  Danielle will go grab you one.

24           **THE WITNESS:**  Thank you so much, Your Honor.

25           Thank you so much, ma'am.  Thank you.

1        **CROSS-EXAMINATION**

2    **BY MS. ZHENG:**

3    Q.   Good morning, Detective Costello.  I'm going to try to

4    track as close as I can to the testimony that was previously

5    given.

6            So let's go back and start with the August 28th

7    incident.  Were you involved in that incident?

8    **A.**   Yes, I was.

9    Q.   You were physically present during the stop of the party

10   bus?

11   **A.**   Yes.  However, in a covert manner.  I remained inside my

12   vehicle down the street watching the traffic stop occur and

13   the crowd beginning to grow.

14   Q.   And with respect to that incident, there were allegedly

15   firearms that were found within the bus; correct?

16   **A.**   Yes, ma'am.  There were three firearms located inside the

17   bus.

18   Q.   None of those firearms were physically on Mr. Whitney?

19   **A.**   No.  They physically remained on the bus when all the

20   subjects exited the bus.

21   Q.   And, ultimately, there's no determination that

22   Mr. Whitney possessed any of those guns that were associated

23   with that bus?

24   **A.**   A DNA comparison was requested, and his DNA was not

25   definitively located on any of those three firearms.

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    Q.   And, ultimately, in the course of that investigation he

2    was identified, and then it was a requested follow-up which is

3    what led to the September 2nd home inspection?

4    A.   Yes.  I contacted parole and probation after I learned

5    that he had provided a false name that night.

6    Q.   And so, in essence, the home inspection on September

7    7th -- I'm sorry, September 2nd was an assist to your

8    investigation?

9    A.   It was -- it was two part.  So -- I don't want to mess up

10   his name.  I believe it was Officer Vargas said that he had

11   just taken over as being the supervising officer for

12   Mr. Whitney.  He indicated that he needed to go out and do his

13   duty and conduct a home inspection, and he asked if I would --

14   if I wanted to do my warrant, if I would just accompany him so

15   that we could handle two things at one time.

16   Q.   Okay.  And at that point had you already received the

17   warrant for the buccal swab?

18   A.   I don't recall.

19   Q.   During the home inspection, you had testified that you

20   did not go into the house first?

21   A.   Initially I did not.  It was only parole and probation

22   personnel.

23   Q.   Okay.  And of the parole and probation personnel, was it

24   just Officer Vargas or were there other officers present with

25   him also?

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1   **A.**   He had other officers with him.

2   Q.   Do you recall how many officers there were?

3   **A.**   There was more than one.  I -- I can't testify to exact

4   number.

5   Q.   And as to the entry into the house and any contact that

6   they made with either Mr. Whitney or anyone that lived in the

7   house, you were not privy to it?

8   **A.**   No, I was not.

9   Q.   So you would have no information as to whether or not, if

10  any of the items were found, if anybody in the house were told

11  that they were going to be charged with a crime or otherwise?

12  **A.**   I have no knowledge of their conversation with those

13  individuals.

14  Q.   Okay.  As to the two magazines that were found, were you

15  ever shown specifically what location the two magazines came

16  from?

17  **A.**   Yes.  He pointed to the closet where he saw them sitting

18  on the top shelf.

19  Q.   Do you recall, in regards to the master bedroom, there

20  was actually two closet areas in the house?

21  **A.**   You're saying there's two separate closets within the

22  master bedroom?

23  Q.   There's two separate spaces.

24  **A.**   Okay.

25  Q.   Do you recall that?

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    **A.**   Not off the top of my head, no.

2    **Q.**   Okay.  And you wouldn't be able to testify as to whether

3    or not it was in his closet specifically or her closet?

4    **A.**   There's other photographs of the closets.  I don't have

5    them here before me.  I just know that, when we were standing

6    and looking at the closet, he pointed and said, Hey, I found

7    those magazines right here on the top shelf.

8    **Q.**   At the time that any of the evidence was found, in this

9    case as it appears before us, you have no direct evidence that

10   Mr. Whitney was, in fact, engaged in the sale of marijuana?

11   **A.**   Could you repeat the question?

12   **Q.**   There's no direct evidence that he has engaged in the

13   sale of marijuana?

14           **MR. COWHIG:**   Objection, Your Honor.  I think that's

15   calling for a legal characterization.

16           **THE COURT:**   Sustained.  Rephrase.

17   **BY MS. ZHENG:**

18   **Q.**   In regards to the marijuana that was found, this was not

19   specifically an investigation into marijuana sales; correct?

20   **A.**   It was not.

21   **Q.**   There is no indication that -- or surveillance that

22   anyone had come to the home and purchased marijuana?

23   **A.**   I have no evidence of that.

24   **Q.**   There's no evidence that there was any hand-to-hand sale

25   that was conducted that you know of?

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    **A.**   I have no evidence of that.

2    Q.   You initially booked him for marijuana -- for the

3    possession of marijuana also?

4    **A.**   When -- so his initial arrest was for the probation

5    violation and the false info or obstructing, and that was done

6    by North Las Vegas Detective Cook.  I then follow up and later

7    rebooked him for the ex-felon in possession of a firearm and

8    the possession with intent to sell marijuana.

9    Q.   And are you aware if he's ever been charged for the

10   marijuana, for the possession with intent to sell?

11   **A.**   I know what I arrested on.  I don't know if the district

12   attorney chose to file those charges or not.

13   Q.   Okay.  Do you know that there was a state case filed

14   against Mr. Whitney?

15   **A.**   I made the initial arrest.  Yes, I'm aware of that.

16   Q.   Okay.

17   **A.**   As far as the DA's charging, I don't know what the -- the

18   charging was.

19   Q.   Okay.  So you don't know that the marijuana charges were

20   denied as it pertains to him?

21   **A.**   I learned that just now, ma'am.

22   Q.   Okay.  And in regards to the items that was found -- I'm

23   now tracking into the exhibits that were provided.  When they

24   came in, I guess -- you called for a telephonic search

25   warrant; correct?

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    **A.**    I did, yes.

2    Q.    And when the search warrant is executed, are you

3    specifically the person that is executing?  So in the

4    Government's Exhibit 3.

5    **A.**    The picture of the bed frame?

6    Q.    Correct.

7    **A.**    Yes, ma'am.

8    Q.    Were you involved in removing the mattress --

9    **A.**    Yes, ma'am, I was.

10   Q.    -- on the bed?

11         And at the time of -- where the bed frame was, was it

12   pushed up against the wall, or it wasn't free-floating in the

13   room, was it?

14   **A.**    No.  What you're seeing here is we've already begun the

15   search, and so things had been moved at this point as we began

16   searching.  So, again, there's photographs that are taken

17   before the search began.  That is it our standard protocol.

18   We take pre-search warrant photos.  We take post-search

19   warrant photographs to show the condition of the residence

20   when we leave.  And so in the initial you would see that the

21   bed was more off the wall and that there was a nightstand over

22   there next to the bed.

23   Q.    On both sides of the bed there was a nightstand?

24   **A.**    I believe so, yes.  I know for certain there was on

25   Mr. Whitney's side because of the -- the pill bottles and such

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1  that were located right there.

2  Q.   And since in these pictures they were already moved, was

3  the bed initially -- prior to the execution of the search

4  warrant, was the bed pushed up against the wall, do you

5  recall?

6  **A.**   No, ma'am, it was not.

7       I'm sorry.  When you say pushed up against the wall,

8  do you know like we see it here where it's all the way up to

9  the wall to the right and all the way back, or are you talking

10  about the headboard being against the wall?

11  Q.   The headboard being against the wall, being back against

12  the wall.

13  **A.**   The headboard was against the wall, yes, ma'am.

14  Q.   Okay.

15  **A.**   I'm sorry.  I apologize.  I thought you were referring to

16  where you see in Government's Exhibit 3 where it's pushed all

17  the way to the right --

18  Q.   Into the corner --

19  **A.**   -- up against the wall --

20       *(Reporter instruction.)*

21       **MS. ZHENG:**  I'm sorry.

22  **BY MS. ZHENG:**

23  Q.   Your testimony is that the bed was not pushed up against

24  the corner of the room --

25  **A.**   It was --

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1  Q.  -- correct?

2  **A.**  -- not pushed into the corner, but the headboard was

3  against the wall.

4  Q.  Okay.  And moving to Government's Exhibit 4, there is a

5  ledge against the headboard wherein the zipped compartment

6  sits; correct?

7  **A.**  I'm sorry?  I'm not understanding your question.

8  Q.  So where the headboard is, there's a ledge that comes

9  out, and the zippered compartment sits within that ledge area

10  of the headboard?

11  **A.**  Yes.  So there's -- the headboard -- you see the top

12  board there.  It's maybe three to -- three and a half inches,

13  4 inches wide.  And then there's that fabric that's affixed to

14  it that is away from the front portion of the headboard so it

15  leaves that -- that cavity that's in there, and that's

16  accessible with a zipper.

17  Q.  Sure.

18      But that zipped portion is nestled within the cavity

19  of the headboard is your testimony; correct?

20  **A.**  It's inside of the headboard, yes.

21  Q.  And when you walked into the room, however that headboard

22  was pushed up against the wall?

23  **A.**  Yes, ma'am, it was.

24  Q.  And so in order then to access the gun or the money, the

25  bed would have to be slightly pulled away from the wall in

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    order to access the compartment?

2    **A.**   That is correct.

3    Q.   And within that compartment you found the gun, a

4    magazine.  Was the gun loaded?  The magazine was separate from

5    the gun; correct?

6    **A.**   There was a magazine in the firearm, which is depicted in

7    Government Exhibit Number 6.  You see there that there's a

8    firearm in the magazine.  And then there was a separate

9    magazine that was loaded as well that I believe you see in

10   Government's Exhibit -- yes, Government's Exhibit 7.

11   Q.   And then, along with those two items, you found the bank

12   sleeve of cash?

13   **A.**   Yes.  Government's Exhibit 8, the paper envelope with the

14   money in it, yes, ma'am.

15   Q.   Do you remember laying out the cash and taking inventory

16   for it?

17   **A.**   Yes, ma'am.  We took a photograph of it, and then we

18   counted it to be impounded.

19   Q.   And predominantly the monies were large denominations;

20   correct?

21   **A.**   I believe there were multiple hundred-dollar bills in

22   there.

23   Q.   Okay.

24   **A.**   I'd have to refer to my money accounting form which

25   breaks it down specifically.

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    Q.   And the monies were seized in connection with the

2    marijuana that were found -- that was found presumably to be

3    proceeds of marijuana sales; correct?

4    **A.**   Yes, ma'am.

5    Q.   Were you aware ultimately that in a state forfeiture

6    proceeding the entirety of those proceeds were returned to

7    Mr. Whitney and Ms. Rodosh?

8    **A.**   I was not aware of a state forfeiture proceeding.

9    Q.   Okay.  And so you -- in the course of the search warrant,

10   you were neither looking for documentation that would verify

11   the source of funds for the monies?

12   **A.**   The search warrant was for the firearm, firearms

13   paraphernalia, and the DNA of Mr. Whitney.

14   Q.   Okay.  With respect to marijuana, Government's Exhibit 9

15   to 13, you testified that all of that was found within the

16   laundry hamper?

17   **A.**   The jars and the plastic bag, yes.

18   Q.   Okay.  So, in essence, the bulk of the marijuana

19   itself --

20   **A.**   Was located inside --

21   Q.   -- was all within the laundry hamper?

22   **A.**   Yes, ma'am.

23   Q.   And then --

24           **THE COURT:**  Wait.  Was the bulk or all of it?

25           **THE WITNESS:**  There was one additional small plastic

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1   vial that was, I believe, on the bathroom counter.  Like a

2   small little snap-top bottle, and that was listed on the

3   property report.  I think it had maybe 8 grams or something in

4   it.  It was near the end of the property report.

5           **THE COURT:**  Thank you.

6   **BY MS. ZHENG:**

7   Q.  And you're referring to Government's Exhibit 2 wherein

8   you're talking about package one, item four?

9   **A.**  One moment.  Let me get there.

10          Yes.  Package one, item four:  A green, leafy

11  substance, marijuana, 8.4 grams net in gray bottle.

12  Q.  But for the 8.4 grams, everything was found in the

13  laundry hamper?

14  **A.**  Yes, ma'am.

15  Q.  And you testified that there were other items that were

16  found by the laundry area; correct?

17  **A.**  Yes, ma'am.

18  Q.  And in this case it was the digital scale, and it was in

19  a sandwich bag box; correct?

20  **A.**  Yes, ma'am.

21  Q.  And we are talking about the fact that these are, like,

22  lunch bags, sandwich bags with the roll-up, not with the zip

23  top or the Ziploc top?

24  **A.**  Yes, ma'am.

25  Q.  Okay.  Other than that one container for 8.4 grams, all

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    of the marijuana was packaged in bulk?

2    **A.**   Yes, ma'am.

3    Q.   In -- anywhere in the house, did you find any small bags

4    of marijuana that were packaged for sale?

5    **A.**   No, I did not find any small bags.

6         Am I making the correct assumption, when you're

7    talking about, like, the -- what they sometimes refer to as

8    jewelry bags, like the small, square --

9    Q.   Correct.

10   **A.**   Okay.  So, no, never did I find any small bags that would

11   be consistent with either personal-use consumption or with the

12   packaging in that manner.

13   Q.   And then, also, in the laundry area, the ammunition that

14   was found that was contained in Government's Exhibit 16 and

15   17, that was also found near and around the laundry area?

16   **A.**   Yes, ma'am.  It was found on the same shelf as the scale

17   and the baggies.

18   Q.   Okay.

19        **MS. ZHENG:**   Court's indulgence, please.

20   **BY MS. ZHENG:**

21   Q.   On the day of the search, did you interview Ms. Rodosh?

22   **A.**   Formally, no.  It was a brief interaction.  She said she

23   needed to leave to attend to her son.  I don't remember.  She

24   had to take him somewhere or she had to pick him up from

25   somewhere, but she left.

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    Q.   Okay.  Did you indicate to her that you would need to

2    speak to her later in regards to the investigation?

3    **A.**   At that time I did not because I did not know what I was

4    going to find inside the residence.  I told her I would

5    contact her again when the search warrant was over so that I

6    could turn the residence back over to her so we didn't have to

7    board up the door.  We wanted to make sure the residence was

8    secure.

9    Q.   Okay.  And you did not testify at the state revocation

10   proceedings; correct?

11   **A.**   No.

12   Q.   You were... you would otherwise be unaware that

13   Ms. Rodosh had called Officer Vargas, Mr. Whitney's probation

14   officer --

15        **MR. COWHIG:**  Your Honor, I'm going to object at this

16   point.  I think counsel's essentially testifying.

17        **THE COURT:**  Please rephrase.

18   **BY MS. ZHENG:**

19   Q.   Were you aware that Ms. Rodosh had contacted

20   Officer Vargas?

21   **A.**   I have no knowledge of their interaction.

22   Q.   Okay.  Were you aware as to whether or not any charges

23   were filed against Ms. Rodosh in relation to what was found in

24   the house?

25   **A.**   I only know what charges I filed.  As far as my case, my

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    charges were solely for Mr. Whitney.  I don't know if anyone

2    else followed up or filed any charges against Ms. Rodosh.

3    Q.    The day after the search warrant was executed, you went

4    to North Las Vegas Jail to interview Mr. Whitney?

5    **A.**    That is correct.

6    Q.    And you had testified earlier that much of his

7    conversation with you is that he absolutely did not want her

8    implicated; correct?

9    **A.**    Yes.

10   Q.    And in the course of the interview, it spanned an hour

11   and a half?

12   **A.**    A little bit longer than that, yes, ma'am.

13   Q.    About.

14         And the transcribed document showed that it was

15   approximately 88 pages?

16   **A.**    Yes.

17   Q.    Initially, in the course of the interview, there were

18   several mentions that were made by you or Detective Cook,

19   who's also present for the interview?

20   **A.**    Correct, he was present.

21   Q.    That you were also investigating Ms. Rodosh, and the

22   likelihood was that she would be charged with the items in the

23   house?

24   **A.**    Is that a question?  I apologize.

25   Q.    Do you remember that?  Did that happen?

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1  **A.**   We discussed that she could potentially be arrested or

2  charged, yes.

3  Q.   And, in fact, that was how the interview started;

4  correct?

5  **A.**   I believe it started with me saying I don't want you to

6  take credit for anything that you're not involved in; however,

7  I have to do my due diligence and I have to speak to all

8  parties, and I'm speaking to you today.

9  Q.   And you did tell him that there was a good possibility

10  coming down the line that there would be charges for both

11  Mr. Whitney and her?

12  **A.**   I did indicate that was a possibility, yes.

13  Q.   Okay.  And then that continues.

14       And then later on, in the next breath, you tell him

15  that she's looking at charges coming down against her for

16  child abuse?

17  **A.**   That was possible, yes.

18  Q.   And then, immediately at the start of the interview you

19  had asked him about the marijuana, and he had -- he was

20  actually unclear as to what was present in the house; isn't

21  that correct?

22  **A.**   I'd have to refer to the exact transcript.  Again, it

23  was --

24  Q.   So if it helps --

25  **A.**   -- a lengthy interview.

 1   Q.   If it helps to refresh your recollection, I'm referring

 2   to what's on pages 7 and 8.

 3   **A.**   You say 7 and 8?

 4   Q.   Um-hum.

 5   **A.**   Where are you starting at here on 7, ma'am?

 6   Q.   On the bottom of 7.

 7   **A.**   On the bottom of 7... we're talking about selling

 8   cocaine?

 9   Q.   No -- yes.  Well, he was talking about a prior felony,

10   but then it starts at the bottom of 7, rolling into page 8.

11   **A.**   So we talk about his past with him --

12   Q.   I just need you to refresh your recollection --

13   **A.**   Oh.

14   Q.   -- if you want to just look at it.

15        So have you had a chance to review pages 7 and 8?

16   **A.**   I'm finishing just now, ma'am.  Yes, I have.

17   Q.   So initially he was not very clear as to whether or not

18   there was shake in the bag or there was actual whole-leaf

19   marijuana.  And his initial claim was that, if there was

20   marijuana in the house, it was marijuana that she smoked;

21   correct?

22   **A.**   He was ambiguous about the marijuana and indicated that

23   she smoked marijuana, yes.

24   Q.   And then you testified, in fact, that a large portion of

25   the interview you go into his criminal history, his prior

1    criminal history, his upbringing.

2    **A.**   Yes, we discussed that.

3    Q.   And then, midway into the interview there was another

4    inference that, as a result of her connection with him, that

5    Ms. Rodosh was now caught up in this investigation; is that

6    correct?

7    **A.**   Again, from the very beginning there was no hiding the

8    fact that she was potentially being investigated for the

9    marijuana charges and the potential child abuse charges as

10   well.

11   Q.   And, again, his response to you was he didn't want her

12   implicated, and his answers to you were:  So you're basically

13   saying, unless I own up to all that shit -- and testify

14   multiple times that she was a good girl, she didn't need

15   that -- meaning she didn't need to be charged -- she don't

16   need that, man.  And then he kept asking you whether or not,

17   if he claimed responsibility for it, it would prevent her from

18   being charged; correct?

19   **A.**   He did ask that.  However, when I answered, I told him I

20   don't want her side of the story.  I need his side of the

21   story.  And I asked him to only testify and give me comment

22   regarding his involvement, not hers.  At no time did I promise

23   him that, by him taking this charge or accepting guilt, would

24   she be not implicated in any way.

25   Q.   Sure.  But your answer and the implication was, unless

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1   there's some type of mitigating circumstance or some

2   additional information that I've learned through the course of

3   my investigation, then those facts have to be presented in

4   court.  And his response was:  And you mean that as in what,

5   to me owning up to everything?

6   **A.**   I don't know what --

7          **THE COURT:**  I'm sorry.  What's the --

8      *(Simultaneous crosstalk.)*

9          **MR. COWHIG:**  -- where we are in the transcript?

10         **MS. ZHENG:**  Oh.  I'm sorry.  We're on page 49.

11         **THE COURT:**  And -- and is there a question?

12  **BY MS. ZHENG:**

13  Q.  Was that the implication, that there was -- if mitigating

14  circumstances were presented to you that she was not the owner

15  of those items, then that would be the way to see her out of

16  the case?

17  **A.**   My indication was to him that the facts are the facts.  I

18  have to present the facts.  This is what I know right now.

19  I'm here to get your side of the facts.  He continually asked

20  me, if he would -- if he would take the charge, if she'd been

21  left alone.  I indicated to him at no time that she would ever

22  receive any type of immunity or not be charged.  He repeatedly

23  asked.  I repeatedly refused to give him that answer because

24  that's ultimately not how the investigation goes.  I'm there

25  to discuss his involvement in the investigation that day, not

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    Ms. Rodosh's involvement.

2    Q.    Sure.  But when he did accept responsibility to it, did

3    he continue to remain ambiguous as to the details of where the

4    items were?

5    **A.**    No.  He was a very -- in fact, he was detailed.  It's

6    located at this location.  It's by this.  It's located here.

7    There was --

8    Q.    But he answered -- did it seem as if he answered all of

9    your questions with a question?

10   **A.**    No.  He and I had the conversation multiple times

11   throughout the hour and I believe 42-minute conversation.  In

12   the end, when he ultimately accepted guilt, I told him I had

13   some very pointed questions I had to ask regarding specific

14   details, and he answered them.

15   Q.    What's saying I think it was this or I think it was that

16   or I don't know where specifically -- so I'm referring to --

17   **A.**    May I follow along in the transcript so I see what you're

18   speaking to?

19   Q.    Sure.

20   **A.**    Where are you at, ma'am?

21   Q.    I'm on page 66.

22   **A.**    66.  Okay.

23   Q.    So you asked him what the gun looks like; he wasn't sure.

24   The question was just generically.  He says:  I think it was

25   all black.  He wasn't even specifically sure as to the

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    difference between a revolver and a semiautomatic.  His guess

2    was that a revolver has the spinny thing --

3             **MR. COWHIG:**  Objection to the characterization as a

4    guess.

5             **MS. ZHENG:**  I mean, they are, in fact, written with a

6    question attached to it.

7             **THE COURT:**  Overruled.  You can continue.

8    **BY MS. ZHENG:**

9    Q.   He continues to say:  I think it was all black, though.

10   Well, the majority of it black.

11            And then, when we moved on to the marijuana, he

12   believed that the marijuana predominantly was in the bathroom.

13   You had to ask him where else it was.  Then he said it was by

14   the TV.  He couldn't tell you how it was packaged.  I'm now

15   rolling on to page 67.

16            **THE COURT:**  And I hope there's a question in there

17   somewhere, Counsel.

18   **BY MS. ZHENG:**

19   Q.   You're directing -- so he was not specific as to the

20   details, the location of the items found that were considered

21   contraband, correct, in this exchange?

22   **A.**   Not correct.  During the totality of the -- this line of

23   questioning, he identified it as being a semiautomatic, not a

24   revolver.  He identified it as being black.  He told me that

25   it was a nine millimeter; he knew that.  He discussed where

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    the marijuana would be by the TV.  He then mentioned that it

2    was in the jar or, like, bulk package.  He had very

3    specific -- and, again, as he was trying to answer the

4    questions, I would come back with another clarifying question

5    to make sure -- again, my -- my attempt is not to get this man

6    to take a charge that he's not responsible for.  I'm looking

7    for clarifying questions to make sure that he does have that

8    knowledge of these items before I charge him with them.

9            Does that make sense, Counselor?

10   Q.   I understand.  Yes, what you're saying makes sense.

11           But in terms of the characterization of his responses

12   to you, predominantly they're categorized in this interview as

13   he is responding to your question with the question, and there

14   are a lot of I don't really knows.  But some of this

15   information was given to him prior to us getting I'm going to

16   guess probably an hour into the interview at this point.

17           I mean, he was previously told what items were found

18   in the house.  So he would have those details as a result of

19   what was told to him earlier; correct?

20   **A.**   Who would have told him what items were found?

21   Q.   In the course of the interview it was mentioned.

22   **A.**   I mentioned that we'd found a firearm, and I mentioned

23   that we'd found narcotics.  But never did I tell him that the

24   gun would be hidden in the headboard.  Never did I tell him,

25   that I recall, that the gun -- or that the marijuana was in

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1   the basket.  He even went so far as to say it's by the TV.

2   And I said, Well, which TV?  Because there was multiple TVs in

3   the residence.  He said, "The TV in our room," which is

4   exactly where it was found next to.

5           **MS. ZHENG:**  Court's indulgence, please.

6   **BY MS. ZHENG:**

7   Q.   Detective Costello, do you remember or recall showing

8   Mr. Whitney the search warrant return at any point prior to

9   the interview?

10  **A.**   No.  What I had for Mr. Whitney for the search warrant

11  return is I was serving a DNA buccal swab on him that day.  So

12  prior to the interview beginning at the very beginning, if you

13  listen to it, you can hear me opening the package and such.  I

14  am fulfilling the second half of the search warrant, which was

15  the collection of the DNA swab.  So when he was presented a

16  search warrant and a return, he was given the -- the portion

17  of the return and the warrant regarding his DNA collection,

18  not the -- not the warrant in the return that were left at the

19  apartment or the house, if that makes sense.

20  Q.   You don't recall whether or not if preinterview he had

21  seen a copy of the search warrant return from the house?

22  **A.**   He would have no way to see it because he's been

23  incarcerated.  The search warrant return wasn't generated

24  until after he was in custody in North Las Vegas.  The return

25  that I gave him was the warrant and the return for the

*Josh Costello - Redirect*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    collection of his DNA.  He was photographed holding that

2    return just showing that I collected two buccal swabs from his

3    mouth.

4          **MS. ZHENG:**  Court's indulgence.

5          I have no further questions, Your Honor.

6          **THE COURT:**  Thank you.

7          Rebuttal?

8          **MR. COWHIG:**  Very briefly, Your Honor.

9                     **REDIRECT EXAMINATION**

10   BY MR. COWHIG:

11   Q.   Detective Costello, with regard to the search warrant

12   return for the search of the residence, did that search

13   warrant return say where things were found or just what was

14   seized?

15   **A.**   Just the items seized.

16   Q.   So it wouldn't have answered the question as to where the

17   marijuana was, where the gun was?

18   **A.**   No.  We just list an itemized list:  Firearm, ammunition,

19   money, marijuana.

20   Q.   And with regard to accessing the firearm in the

21   headboard, how difficult would it be for a person to get into

22   that headboard and get the firearm out if they knew it was

23   there?

24          **MS. ZHENG:**  Your Honor, I'm going to object to that

25   as a cause of speculation.  He neither lived in the house nor

*Josh Costello - Recross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    was he there to move the bed.

2          **THE COURT:**  And you actually asked that question

3    during your direct.

4          **MR. COWHIG:**  Certainly, Your Honor.

5    **BY MR. COWHIG:**

6    Q.   And then, the false name that Mr. Whitney provided on

7    August 28th, was that also a violation of his parole and

8    probation conditions?

9    **A.**   He has a general condition -- I don't want to speak to

10   all the terms of his probation agreement, but a general

11   condition of parole and probation is to cooperate with law

12   enforcement and not commit new crimes.  And in doing so, he

13   violated that, and that's why his officer initiated the -- the

14   initial violation.  The secondary violation was what we

15   discovered during the service of the search warrant.

16         **MR. COWHIG:**  Thank you.  No further questions,

17   Your Honor.

18         **THE COURT:**  Anything else?

19         **MS. ZHENG:**  Just very briefly.

20                     **RECROSS-EXAMINATION**

21   **BY MS. ZHENG:**

22   Q.   Just to follow up on the line of question that I had

23   asked in regards to direct evidence of drug sales --

24         **MR. COWHIG:**  Objection, Your Honor.  Beyond the

25   scope.

 1          THE COURT:  Let me hear the question, and then I'll

 2    rule on it.

 3    **BY MS. ZHENG:**

 4    Q.   You didn't find any owe sheets in the house during the

 5    execution of the search warrant?

 6          THE COURT:  I'll just allow it.  Go ahead.

 7          THE WITNESS:  No, ma'am, I did not.

 8          MS. ZHENG:  Okay.  I'll just leave it at that.  Thank

 9    you.

10          THE COURT:  Thank you.

11          MR. COWHIG:  Nothing further, Your Honor.  Thank you.

12          THE COURT:  Thank you.

13          May I excuse this witness?

14          MR. COWHIG:  Please, Your Honor.

15          MS. ZHENG:  Yes, please.

16          THE COURT:  All right.  You can step down.  Thank

17    you, sir.

18          THE WITNESS:  Thank you, Your Honor.

19          THE COURT:  Any other witnesses or evidence,

20    Mr. Cowhig?

21          MR. COWHIG:  No, Your Honor.  Out of an abundance of

22    caution, though, I'd like to clarify, in case at some point in

23    the filings I identified the two magazines in the closet as

24    fitting the Canik, I think it's obvious from the testimony

25    they did not.  I was searching through my filings to see if I

1    had made that representation because I have some recollection

2    of writing that.  If I did, that is not accurate.  The

3    testimony here --

4         **THE COURT:**  So the magazines found in the closet did

5    not fit the gun?

6         **MR. COWHIG:**  Yes, Your Honor.

7         **THE COURT:**  All right.  Ms. Zheng, anything in

8    response?  Did you want to put on any evidence?

9         **MS. ZHENG:**  No, Your Honor.  I think with the

10   remainder of it I'll just argue.

11        **THE COURT:**  All right.  So here's what we're going to

12   do.  It's now 12:20.  I'm going to let each of you argue the

13   effect of the evidence that we've just seen today on the

14   four-level enhancement.  So I will start with Mr. Cowhig.  But

15   then we'll -- we'll have to break after that, and we'll pick

16   this back up at a continued hearing.  So -- but I want to make

17   sure that we close out all the evidence and argument on this

18   point so that I don't have to try to go back and -- and pick

19   up where we left off.

20        So, Mr. Cowhig, argument in support of the

21   enhancement and in response to any of the further objections

22   that were raised to the PSR with respect to --

23        **MR. COWHIG:**  This point.

24        **THE COURT:**  -- this point.

25        **MR. COWHIG:**  Yes, Your Honor.  And I believe we've

2:21-cr-00002-JAD-NJK-1 - November 7, 2022

```
 1   covered most of the points that I would make in our briefings.
 2   One that I addressed tangentially, not directly, is that the
 3   correct standard is preponderance of the evidence, not clear
 4   and convincing evidence here.  Under the case law applicable,
 5   we don't really get into the question of whether a higher
 6   burden is needed until you get above four -- I'm -- above four
 7   levels, five or greater.  Even if, however, the higher
 8   standard of proof were applicable, the evidence here meets
 9   that standard of proof.
10           Just summarizing very quickly the evidence that shows
11   that Mr. Whitney was involved in the sale of marijuana during
12   the time frame and the firearm was connected with that, all of
13   these items we've been discussing have been found inside a
14   very small apartment.  The application of the enhancement does
15   not depend upon a witness or a video or some other direct
16   evidence showing that he was engaged in marijuana, simply
17   evidence to show that he was engaged in the trafficking of
18   marijuana and that the firearm was found in close connection
19   with that.
20           The law recognizes and the experience of law
21   enforcement recognizes that persons who sell illicit
22   substances very often do so with a firearm available to them.
23   They have to do so because they have to protect themselves
24   both from theft of the illicit substances and theft of the
25   money because they obviously cannot have recourse to law
```

1    enforcement if that were to happen to them.

2            Here the marijuana was found in bulk.  It was not

3    small -- small items or small amounts that were purchased for

4    one individual's use, but it was in bulk in the apartment.

5            Detective Costello did not find prepackaged, multiple

6    small amounts for sale.  That's not an indication that there

7    wasn't distribution of marijuana going on.  It simply means

8    that Mr. Whitney and/or Ms. Rodosh were not at that point

9    ready to walk out the door and sell those small amounts.  The

10   bulk amounts that were there were packaged the way that

11   illicit marijuana is packaged, not the way that marijuana that

12   is purchased from a dispensary for individual use is packaged.

13   There were no wrappings, no containers, no -- nothing to

14   indicate that this marijuana had been purchased from a

15   dispensary for individual use.

16           As to the argument that it was illicitly purchased

17   for individual use, the quantity of marijuana is simply too

18   large for that.  Mr. Whitney, in his interview with

19   Detective Costello and in the testimony that was presented by

20   defense as part of their filings in the revocation proceedings

21   before the state indicated that they were going through

22   financial hard times, they were having trouble making ends

23   meet.  The claim was that the cash that was found in the

24   headboard was cash that they had recently received and backed

25   up unemployment benefits.  All of that evidence would tend to

2:21-cr-00002-JAD-NJK-1 - November 7, 2022

1    indicate that Ms. Rodosh and Mr. Whitney did not have a lot of

2    available income for buying a large quantity of marijuana

3    simply for personal use.

4         It's possible Ms. Rodosh was using marijuana

5    personally, but that does not eliminate the evidence that

6    shows that there was sale of marijuana going on or

7    distribution of marijuana going on.

8         Defense argues in their brief about the firearm

9    needing to be essentially used in the course of a marijuana

10   distribution or distribution of the drugs.  That's simply not

11   what the case law indicates.  The case law indicates clearly

12   that the possession of the firearm simply would need to

13   support that illicit activity, and here it clearly did support

14   that illicit activity.  The gun, the ammunition, the magazines

15   were all stored in the same general area where the marijuana

16   was stored.  The ammunition was stored on the shelf next to

17   the baggies for breaking down those large quantities of

18   marijuana with the scale.

19        Defense, in their filings, makes a representation

20   that that scale was used for marijuana but it was used to

21   portion out essentially a portion for consumption.  I think

22   that's such common sense that that's not a necessary step in

23   the process of consuming marijuana that that argument should

24   be given no weight.

25        Your Honor, I believe that we've shown both by a

1    preponderance of the evidence and by clear and convincing

2    evidence that Mr. Whitney was involved in the distribution of

3    marijuana.  And that that distribution of marijuana is

4    connected with his possession of the firearm and the

5    four-level enhancement should apply.

6           **THE COURT:**  Response?

7           **MS. ZHENG:**  Your Honor, I believe that the Court

8    should apply the higher clear-and-convincing-evidence

9    standard.  It's a four-level increase.  It just reaches the

10   threshold.  However, this four-level increase represents such

11   a significant jump in Mr. Whitney's sentence that he -- it

12   would be a 30-month distinction with where Probation and the

13   Government has him calculated.  And, in essence, this

14   enhancement alone represents 43 percent of his sentence.

15          And as a result of that heightened standard or even

16   if it was a preponderance-of-evidence standard, I'm not sure

17   that we can specifically just rely on the findings of the

18   judge as to the revocation proceedings.  The revocation

19   proceedings are a much lower standard than what is called for

20   here in regards to the fact that whether there were other

21   factors involved or specifically as it pertains to the gun in

22   this case, the uncharged marijuana, or otherwise, whether or

23   not his conduct the judge believed was sufficiently good

24   enough for a probationer is the standard that's applied there.

25          So that finding and the Court's finding there does

1  not bind this Court in any way from reaching an independent

2  determination.  Quite frankly, I just don't think that the

3  Government can get there.  The Government's argument is very

4  much that of a predetermined conclusion.  That in order to

5  support the four-level enhancement, it has to be that Stephon

6  is selling the marijuana.  And quite frankly, that's not the

7  case.  There is no direct evidence here that there was any

8  type of marijuana sales that was going on.  In regards to the

9  fact that we have no evidence that there were hand-to-hand

10  sales.  There were no evidence that any of the marijuana was

11  broken up within the house and packaged to be resold.  There

12  was no owe sheets of any kind.  I don't deny that the

13  marijuana is in bulk, but in a state that allows for

14  recreational use and medical use, it is not uncommon that

15  people don't buy marijuana specifically from a dispensary.

16  Just because marijuana is not purchased for -- from a

17  dispensary as it should be, that said, it doesn't mean that

18  they're not personally using.  And just because it's not

19  purchased from a dispensary does not mean that the marijuana

20  was necessarily purchased in anticipation of repackage for

21  sales.  We simply don't have that here.

22         On many levels, I'm sure -- later on, I know that

23  Ms. Rodosh is going to wish to speak on Mr. Whitney's behalf

24  in mitigation, but she did testify at the revocation hearing.

25  She also tried to contact Officer Vargas before the revocation

1    hearing happened in regards to what had happened in their life

2    and what was going on with her as to the presence of the gun

3    and the marijuana in the house.

4          Her testimony simply is -- and much of this stuff is

5    all located around the laundry area --

6          **MR. COWHIG:**  Your Honor, I believe defense is arguing

7    material that's not in evidence at this point.

8          **THE COURT:**  This is in their sentencing materials.

9          **MS. ZHENG:**  That... because most of the things were

10   in a general area, the detective testified that this is a very

11   small residence, and it's hard necessarily not to know what

12   was there.  But her testimony is and the physical evidence

13   supports the fact that all of the stuff is found directly in

14   or about or related to the laundry area.  And quite frankly,

15   that kind of comes down to a division of labor in the home.

16   She does the laundry; he doesn't.  Whatever her intent was to

17   perhaps hide it from him, keep it from him, or keep it

18   individually hers, laundry was her way to do that.  Everything

19   is either found above the dryer, in the laundry hamper for its

20   use.

21         I know Detective Costello has had a sterling record

22   of working for the state, and it's certainly not my argument

23   that he's trying to get Mr. Whitney to admit to something that

24   is contrary to the truth.  However, in that interview and in

25   what was said to them, there was more than just the

```
 1    implication that both people would be charged.  And right,

 2    wrong, or otherwise, in his head he's always accepted

 3    responsibility for this crime.  But I think what's important

 4    to remember here is that there's no indication, one, that he

 5    was selling marijuana, at least not definitively, or that the

 6    marijuana existed in that house to be resold.  I don't think

 7    that the Government can clearly establish that.

 8            But beyond that, there's no indication that that gun

 9    was used in connection or possessed in connection with the

10    marijuana in any way to embolden him.  Ultimately, what it

11    comes down to is that the possession of the gun in the house

12    does not necessarily mean that it was used in facilitation of

13    any type of marijuana sales, if that could even be

14    established.  Ultimately, the key consideration is that the

15    gun was not easily accessible, and the detective -- so much as

16    to testify to that.  It was hidden within a zipped compartment

17    that is nestled in a bed frame, and that bed frame is pushed

18    up against the wall.  And that's how it was, and that's how it

19    existed in that house.  It wasn't something that they were

20    going to -- if he -- if there were either alleged drug sales

21    at the house, outside of the house, that there was any

22    indication that it was consistently moved or that the gun was

23    retrieved.  Other than the fact that there was possession of

24    it and its presence of it, there's no connection that

25    emboldened any type of another offense, if another offense
```

1    could even be established in this case.

2          As to his statements, he believed that -- he knew the

3    gun was in the house.  He knew the marijuana was in the house.

4    The possession of it for him being a felon is that it's

5    constructive.  He knew about the gun.  It shouldn't have been

6    there, and it's as simple as that.  That doesn't mean that the

7    presence of the gun being there was something that he asked

8    for and that the gun was used in any way in connection with

9    any other type of crime.

10          And for those reasons, Your Honor, I'm going to ask

11   that the four-level enhancement does not apply in this case

12   because the lack of the accessibility and the lack of ability

13   to establish that there, in fact, was another felony that was

14   happening.

15          **THE COURT:**  Thank you.

16          All right.  Just two -- or just, yeah, two quick

17   questions before I give a new date for the continuation of

18   this hearing.

19          Is he still in primary state custody, or has he been

20   transferred over to federal?

21          **MS. ZHENG:**  My belief is that at this point he has

22   been.  I asked for an in-custody calculation of it, and his

23   expiration date in full from the state sentence should have

24   been September 6th, 2022.

25          **THE COURT:**  Okay.  And with -- I just want to clarify

1    that the defense is not disputing that the two felony

2    convictions of either a crime of violence or controlled

3    substance offense applies when calculating the base offense

4    level; is that right?

5           MS. ZHENG:  I'm sorry, say that again, Your Honor.

6           THE COURT:  Right.  So just so that I know going

7    forward, so the base offense level that Probation has

8    calculated is 24 because the defendant committed the offense

9    subsequent to sustaining two felony convictions of either a

10   crime of violence or a controlled substance offense.  There's

11   not an objection to that paragraph; is that correct?

12          MS. ZHENG:  Correct.

13          THE COURT:  Okay.

14          MS. ZHENG:  There's no objection to the fact that he

15   has, in fact, sustained two prior felonies --

16          THE COURT:  Those are --

17          MS. ZHENG:  -- that qualify as enhancements.

18          THE COURT:  -- qualifying offenses.  Okay.

19          MS. ZHENG:  With that said, there was a statement.

20   There was an argument that -- as to his involvement with one

21   of those offenses, that it would seem to overrepresent his

22   involvement.

23          THE COURT:  So -- but that would just be a 3553(a)

24   factor?

25          MS. ZHENG:  Correct.

*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1          **THE COURT:**  Okay.  All right.  We're going to stop

2     here and pause.  I will pick up -- when we return, I will rule

3     on the objections to the four-level enhancement and its

4     application and move forward with the rest of the issues,

5     including the criminal history computation.

6          Mr. Cowhig, did you have something to say before I

7     give a new date?

8          **MR. COWHIG:**  Yes, Your Honor, just briefly.

9          I don't have direct information from the state on

10    whether he rolled over into federal custody on September 6th.

11    I know that that was the projected expiration date of his

12    sentence, but I don't know that that actually occurred on the

13    date that was anticipated.

14          **THE COURT:**  Sure.

15          And Ms. Zheng said she -- but likely.  So I know she

16    wasn't definitively making that representation.

17          All right.  So, unfortunately, I've got some trials

18    that are going to be taking up a significant portion of my

19    time in the next couple weeks.  So I am continuing this to

20    December 5th at 1:30.  So we will pick this up again December

21    5th at 1:30.  And I anticipate we'll be able to complete it

22    then.

23          Anything else before we continue this?  Mr. Cowhig,

24    anything else?

25          **MR. COWHIG:**  No, Your Honor.  Thank you.

*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1          **THE COURT:**  Ms. Zheng?

2          **MS. ZHENG:**  Not at this time, Your Honor.  Thank you.

3          **THE COURT:**  All right.  We'll see you in December.

4     We're adjourned.  Defendant's remanded to the custody of the

5     Marshal.

6          *(Proceedings adjourned at 12:38 p.m.)*

7                         --o0o--

8               COURT REPORTER'S CERTIFICATE

9

10         I, AMBER M. McCLANE, Official Court Reporter, United

11    States District Court, District of Nevada, Las Vegas, Nevada,

12    do hereby certify that pursuant to 28 U.S.C. § 753 the

13    foregoing is a true, complete, and correct transcript of the

14    proceedings had in connection with the above-entitled matter.

15

16    DATED:  5/1/2023

17

18    /s/ *Amber M. McClane* _____

19         AMBER McCLANE, RPR, CRR, CCR #914

20

21

22

23

24

25