2:21-cr-00002-JAD-NJK-1 - December 5, 2022

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF NEVADA

 3   UNITED STATES OF AMERICA,    )
                                  ) Case No. 2:21-cr-00002-JAD-NJK
 4              Plaintiff,        )
                                  ) Las Vegas, Nevada
 5   vs.                          ) December 5, 2022
                                  ) 1:37 p.m. - 12:38 p.m.
 6   STEPHON JAMES WHITNEY,       ) Courtroom 6D
                                  ) IMPOSITION OF SENTENCE, DAY 2
 7              Defendant.        )
     _____) CERTIFIED COPY

 8

 9           REPORTER'S TRANSCRIPT OF PROCEEDINGS, DAY 2
                BEFORE THE HONORABLE JENNIFER A. DORSEY
10              UNITED STATES DISTRICT COURT JUDGE

11

12   APPEARANCES:

13   For the Government: DANIEL COWHIG, AUSA
                         UNITED STATES ATTORNEY'S OFFICE
14                       501 Las Vegas Boulevard South, Suite 1100
                         Las Vegas, Nevada 89101
15                       (702) 388-6336

16

17   (Appearances continued on page 2.)

18

19

20

21   Court Reporter:      Amber M. McClane, RPR, CRR, CCR #914
                          United States District Court
22                        333 Las Vegas Boulevard South, Room 1334
                          Las Vegas, Nevada 89101
23                        (702) 384-0429 or AM@nvd.uscourts.gov

24   Proceedings reported by machine shorthand.  Transcript
     produced by computer-aided transcription.
25
```

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

1    APPEARANCES CONTINUED:

2    For the Defendant:

3         *YI LIN ZHENG, ESQ.*
          *VEGAS GOLDEN LAW*
4         *2801 South Valley View Boulevard, Suite 16*
          *Las Vegas, Nevada 89102*
5         *(702) 385-7170*

6    Also Present:

7         *Michelle Cravotta, USPO*

8                          * * * * *

9

10                      *I N D E X*

11                    *E X H I B I T S*

12   EXHIBIT NO.:        MARKED        RECEIVED        WITHDRAWN

13   Court's A            119            119

14

15                          * * * * *

16

17

18

19

20

21

22

23

24

25

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

```
1              LAS VEGAS, NEVADA; MONDAY, DECEMBER 5, 2022; 1:37 P.M.

2                                  --o0o--

3                       P R O C E E D I N G S

4              COURTROOM ADMINISTRATOR:  Now's the time set for

5    imposition of sentence in Case 2:21-cr-2-JAD-NJK, United

6    States of America versus Stephon James Whitney.

7              Counsel, please make your appearances for the record.

8              MR. COWHIG:  Good afternoon, Your Honor.  Dan Cowhig

9    from the U.S. Attorney's Office.  I'm here at counsel table

10   with the case agent and -- Officer Josh Costello.

11             MS. ZHENG:  And good afternoon, Your Honor.  Yi Lin

12   Zheng, counsel on behalf of Defendant Stephon Whitney.  He is

13   present in custody.

14             THE COURT:  All right.  Good afternoon.

15             And just to add to that record, this is actually more

16   of our continuation of the sentencing hearing.  We were here

17   last month, heard some testimony on one of the enhancements in

18   the sentencing guideline calculations, but the hearing had

19   started to go quite long, and I needed to continue it to

20   complete it.

21             So my recollection is that we concluded all of the

22   evidentiary presentation regarding the application of the

23   four-level enhancement under 2K2.1(b)(6)(B), which in the PSR

24   is paragraph Number 17.

25             Is that everyone else's recollection, too, we
```

1    completed that portion of the hearing?

2           **MR. COWHIG:**  It is, Your Honor.

3           **MS. ZHENG:**  Yes, Your Honor.

4           **THE COURT:**  Ms. Zheng, is that your recollection,

5    too?

6           **MS. ZHENG:**  Yes, Your Honor.

7           **THE COURT:**  All right.  Great.

8           So before I rule on that, let's see what's left with

9    respect to objections to the PSR.  That was Objection

10   Number 4.  It was also Objection Number 5, I believe.  And

11   then I think we may have still had Objection Number 6 that was

12   at play?

13          Ms. Zheng, if you can let me know if you concur with

14   that.

15          **MS. ZHENG:**  I do concur with that, Your Honor.

16          **THE COURT:**  Okay.  So we've -- we've heard the full

17   presentation with respect to Objection 4 and Objection 5;

18   correct?

19          **MS. ZHENG:**  Correct.

20          **THE COURT:**  Okay.  So let's talk about Objection

21   Number 6 then.  This is to paragraph 33.  This is in the

22   criminal history computation.  Paragraph 33 is a 2017

23   conviction for possession of drug not for interstate commerce,

24   a misdemeanor.  And the objection -- Ms. Zheng, if you just

25   want to address the objection for me.

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

1          **MS. ZHENG:**  Sure, Your Honor.

2          I think part of the objection was that paragraph 33

3    also needs to be changed because Mr. Whitney's conviction is

4    not for the possession of dangerous drugs not to be introduced

5    into interstate commerce.  It was subsequently amended, and so

6    that's part of what's in play here, is with respect to his

7    calculation as to whether or not he falls under criminal

8    history category of V or IV.

9          As we stand today, his conviction is based on

10   NRS 207.270, which is a loitering about public school or place

11   where children congregate charge.  And Probation is correct in

12   regards to the fact that that conviction was amended after the

13   PSR was completed.

14         That said, I don't think there's a dispute today

15   that, as we stand before this Court for sentencing, that the

16   conviction stands for loitering.  And quite frankly, with

17   respect to that, calculations for criminal history are

18   calculated as it is on the day of the sentencing,

19   modifications and all.  Because the conviction is for that of

20   loitering, specifically under U.S. Sentencing Guideline

21   4A1.2(c)(ii), loitering, in whatever its name and however form

22   it is known, it is not counted against Mr. Whitney's criminal

23   history points.

24         **THE COURT:**  Let me stop you there right quick.

25   Ms. Cravotta, let me ask that question.  If we were looking --

```
 1    if it hadn't been amended and if the original conviction had
 2    been for loitering, would that be correct, not counted?
 3               PROBATION OFFICER:  It would not be counted,
 4    Your Honor.
 5               THE COURT:  Okay.  Thank you.
 6               All right.  You can continue, Ms. Zheng.
 7               MS. ZHENG:  And that said, I bring this to the Court
 8    because for years that's how it's been.  Criminal history has
 9    just been counted at the time of sentencing, regardless what
10    happened.  And I bring up, for example, if this had been some
11    other case, if there was a DUI case, often in state court I
12    negotiate cases where they enter a plea to the DUI; however,
13    subsequently, it's amended after they've completed the
14    requirements for reckless driving.  In that sense, it wouldn't
15    be counted.
16               So there are changes, and we do look at convictions
17    that have been changed by the time we come to sentencing.  It
18    seems a double-edged sword in this instance that the
19    Government or Probation would fight me on this and say that he
20    has to have the two levels from the conviction back in 2017.
21    It's just that it's so often that I have cases where I argue
22    an overrepresentation or that those facts did not accurately
23    reflect what the conviction stands for.  And in every other
24    case the Government tells me, well, if you don't like it or
25    you don't think it matches, go back and change the JOC.  And
```

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

1    in this case, it was, in fact, changed.  The JOC was changed,

2    and now they're saying, well, that doesn't count because you

3    changed it.  Well, I want to be clear that's not disallowed.

4    The guidelines do not in any way disallow me from doing this

5    or it doesn't disallow that type of representation.

6        So for those purposes, because it is allowed, because

7    it stands today as loitering, and because loitering does not

8    count and his criminal history, as it is today, makes him a

9    criminal history category IV.

10       **THE COURT:**  So let's -- let's talk about that a

11   little more deeply, though.

12       So it's not just that they're arguing it shouldn't

13   count just because it -- or, I'm sorry, it must count despite

14   the fact that it got amended.  But we look at, for example,

15   4A1.2, Comment Number 6, which tells us what to do about

16   reverse, vacated, or invalidated convictions.  Sentences

17   resulting from convictions that have been reversed or vacated

18   because of errors of law or because of subsequently discovered

19   evidence exonerating the defendant or which have been ruled

20   constitutionally invalid in a prior case are not to be

21   counted.

22       And then, if we look also at *United States versus*

23   *Alba-Flores*, 577 F.3rd 1104, Ninth Circuit, 2009, this one --

24   although the facts aren't completely on point because that was

25   a revo case -- I'm sorry, not a revo case -- because that was

1    a case -- a safety valve case, that case essentially tells us

2    that a conviction in order to not be counted has to be

3    reversed or vacated due to innocence or errors of law under

4    4A1.2.

5            So where does this fall into all of that?

6            **MS. ZHENG:**  I would say that this is the exception.

7    I think the Court hit it on the head in terms of the fact that

8    the other case is a safety valve case.  Where safety valve is

9    concerned, the conduct and the convictions or the criminal

10   history points that the defendant has at the time of the

11   offense as to where and when safety valve would be counted is

12   the benchmark there.  So when we're saying whether or not

13   safety valve applies to a defendant, we look at what his

14   criminal history point was, whether or not he later then

15   debriefed, whether or not there was a gun used, whether or not

16   he was a major participant.  We look at that as to the time of

17   the facts of the case for which he stands to be sentenced on.

18   But in this case, this is different.

19           What happened in 2017 has no impact on the facts of

20   his case here, nor does it have an impact specifically on his

21   conduct at the time of this offense nor for the calculation.

22   This is specifically just a criminal history calculation only,

23   and criminal history should be calculated as it is at the time

24   that he stands before this Court for sentencing.

25           **THE COURT:**  All right.  Thank you.

1          Mr. Cowhig.

2          **MR. COWHIG:**  Your Honor, I want to be clear at the

3   outset that the Government did not invite defendant to change

4   the Judgment of Conviction here or the criminal history here.

5          **THE COURT:**  I think she was talking in a general

6   sense, not this case specifically.

7          **MR. COWHIG:**  Certainly, Your Honor.

8          There's not a significant difference between a safety

9   valve case or any other case in terms of examining the

10  criminal history.  The reason the criminal history score and

11  categories are part of the formula for establishing a

12  guideline range is that it's the defendant's prior criminal

13  history, his prior bad acts, and the judgment of those prior

14  bad acts go into the formulation of what is an appropriate

15  sentence under 18 U.S. Code 3553.

16         It's very clear under the case law, including

17  *Alba-Flores* but also the decision that we cited in our brief,

18  *Yepez* and *Lizarraga-Carrizales*, that it is not appropriate for

19  a defendant to seek a change in his criminal history in order

20  to modify the calculation of the criminal history score or

21  category in order to reduce the sentence in the present case.

22         The change in this instance was not a result of any

23  type of change of facts, change of law, change of the

24  application of the constitution but, in fact, was simply a

25  matter of attempting to alter the defendant's criminal

```
 1    history.  And that's, I think, apparent in the motion that was
 2    filed in that case, which is Exhibit C to Government's 44
 3    dash -- I'm sorry, 44 is the exhibits.  43 is our motion,
 4    exhibit C.  Where Mr. Whitney does not assert that there is
 5    any type of legal error or change in facts.  It's not a matter
 6    of a conditional conviction of a DUI that will be altered or
 7    diminished if he completes the appropriate requirements.  This
 8    was a serious offense and, indeed, it was a drug trafficking
 9    offense, that he was in possession of drugs not to be
10    introduced in interstate commerce.
11         The motion to change to another offense, to
12    loitering, bears no resemblance, particularly loitering about
13    a school bears no resemblance to that case or the facts
14    underlying that case.  As Your Honor knows, the County keeps
15    in their court records the underlying declaration of arrest.
16    That also is included in our filings.  That shows that the
17    facts had nothing to do with loitering about a school.  It was
18    simply the possession of that controlled substance.
19         We believe that the change to the criminal history is
20    inappropriate.  We believe that it runs contrary both to the
21    application notes of the guideline and to the case law, and we
22    believe that those two criminal history points are correctly
23    included in his criminal history as Probation Office has done.
24         THE COURT:  Thank you.
25         Rebuttal.
```

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

1          **MS. ZHENG:**  Response just briefly.

2          I don't think it's necessarily fair for the

3     Government in this case to argue what it reflects as to

4     whether or not it was a serious offense or not or how it

5     should be counted in this case.  This matter was brought

6     before the state, and the District Attorney's Office, after

7     having rereviewed the case, agreed that clerically it should

8     be changed to the loitering conviction and that, ultimately,

9     the state, in terms of looking at the case, the rationale was

10    that, given what it was in 2017 and where we stand now, had

11    this case come down, the likelihood of it was that it would

12    have been denied or that it would not have been charged at

13    all.  Quite simply, the amount that was involved in that case

14    was .1 grams.  And so I think that the change in terms of the

15    conviction and the state looking at it, the change is what

16    actually reflects how the state views the seriousness of the

17    case and what conviction they believe should stand or not

18    stand given those facts.

19          **THE COURT:**  Thank you.

20          All right.  With respect to this objection, Objection

21    Number 6, to the counting of this conviction, this prior

22    conviction that has since been amended, I'm going to overrule

23    the objection.  I believe that it -- it's the judgment of --

24    of the original conviction as it was originally determined,

25    not the amendment by agreement of the parties that controls

```
 1    here under the Ninth Circuit authority of U.S. versus
 2    Alba-Flores and also United States versus Yepez.  And so for
 3    those reasons I -- that and also the notes, the commentary
 4    under 4A1.2, particularly number -- Note 6, I think that I'm
 5    bound by this Ninth Circuit authority which essentially says
 6    that I have to go by the prior original conviction which
 7    remains countable even despite the eventual state order
 8    because the conviction was not reversed or vacated due to
 9    innocence or errors of law within the meaning of the
10    guidelines.
11         So the two criminal history points do apply here.  I
12    don't find this -- the circumstances here distinguishable from
13    the safety valve situation in Alba-Flores.  Just to use the
14    language in Alba-Flores, to quote the language in Alba-Flores,
15    it is the same odor of gaming the federal sentencing system
16    that was emanating from that case.  That's the -- the way that
17    Judge Fernandez described it in Alba-Flores.
18         And I think that's essentially what we have here.
19    Not that there's any aspersions that I cast on that.  I
20    completely understand the motivation, but the net result is
21    that it doesn't change the fact that we count that original
22    conviction.  So I overrule the objection.  However, I will
23    consider those objections and everything that Ms. Zheng has
24    explained as essentially an argument about overrepresentation
25    of criminal history when I'm applying the 3553(a) factors.  So
```

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

 1   I will keep that in mind when doing so.  I will -- I will

 2   consider the nature of this offense and also the fact that it

 3   does change this from a IV to a V in a criminal history

 4   category.

 5          Going, then, back to the objections in 4 and 5 --

 6   Objections 4 and 5, with respect to the four-level enhancement

 7   under 2K2.1(b)(6)(B), I'm ready to rule on that, and I'm going

 8   to do so now so that we can work through the rest of the

 9   sentencing calculations.

10          I first find by applying the factors under *United*

11   *States versus Jordan*, 256 F.3d 922, that the heightened

12   clear-and-convincing evidence standard does not apply to this

13   sentencing enhancement.  Rather, the standard is preponderance

14   of the evidence because there's not an extremely

15   disproportionate impact on the sentence caused by this

16   four-level increase which bumps the low-end guideline here

17   from a 70 to a 100 for an increase of 30 months.

18          I then conclude that the Government has established

19   by a preponderance of the evidence that the defendant

20   possessed this firearm in connection with the crime of

21   possession of marijuana with intent to distribute it.

22   Although the defendant certainly has an exculpatory

23   explanation for virtually every fact here, I do find that the

24   totality of the facts, when combined with the reasonable,

25   logical inferences from those facts, proves this

```
 1    in-connection-with offense by a preponderance of the evidence.
 2    The quantities, how the pot was stored, the baggies, the
 3    scale, and the cash stashed with the handgun, and the
 4    proximity of all of these items to one another in this small
 5    apartment lead me to the conclusion that the defendant was
 6    possessing this firearm in connection with the possession of
 7    marijuana with intent to distribute it.  I am not persuaded
 8    that the marijuana was the personal-use stock of the
 9    defendant's fiancée.  The manner and places in which it was
10    hidden are inconsistent with the way in which a mother who was
11    purportedly concerned with her children's safety would store
12    such a substance for personal use.  And even if I were to
13    apply a clear-and-convincing standard here, I would still find
14    that the enhancement would apply as the evidence reaches that
15    level for me as well.
16            And for the record, I do not consider the state court
17    revocation judge's findings or conclusions in making my own
18    with respect to this enhancement.
19            So I do find that the four-level increase applies.
20    So let's continue to -- let's pick up there and work through
21    the rest of the guideline calculations.
22            So that gives me an adjusted offense level of 28.
23    Probation has applied a three-level decrease for acceptance of
24    responsibility.  Does the Government move for the third point,
25    and if so, why, Mr. Cowhig?
```

1        **MR. COWHIG:**  Your Honor, we do because Mr. Whitney

2   announced his intention to plead guilty early in the process

3   avoiding the expenditure of resources in preparation of the

4   case for trial.

5        **THE COURT:**  All right.  And then I do find that all

6   the factors under 3E1.1(a) and (b) are satisfied by a

7   preponderance of the evidence so I apply the three-level

8   decrease, and that gives me a total offense level of 25.

9        Do we agree that that is correct?  Obviously you

10  reserve your objections to my -- my inclusion of the

11  four-level increase.

12       **MS. ZHENG:**  Yes, Your Honor.

13       **MR. COWHIG:**  Yes, Your Honor.

14       **THE COURT:**  Thank you.

15       Turning to the criminal history computation on

16  page 14, the criminal convictions result in a subtotal

17  criminal history score of nine, but because the defendant

18  committed this offense while under a criminal justice sentence

19  for possession of a controlled substance with intent to sell,

20  two points were added under 4A1.1(d) giving us a criminal

21  history score of 11 which establishes a criminal history

22  category of V.

23       Setting aside your objection, which is obviously

24  preserved, Objection Number 6 with respect to the amended

25  conviction, do we agree that that calculation is accurate?

1    **MR. COWHIG:**  The Government does, Your Honor.

2    **MS. ZHENG:**  Setting aside objections, yes, Your

3    Honor.

4    **THE COURT:**  Thank you.

5        The maximum term of imprisonment for this offense is

6    ten years.  The maximum term of supervised release is three

7    years.  The maximum fine is a quarter of a million dollars,

8    and a special assessment of $100 is mandatory.

9        Based on a total offense level of 25 and a criminal

10   history category of V, the guideline imprisonment range is 100

11   to 125 months.  But because the 125-month high end exceeds the

12   maximum sentence under statute, the guideline range is 100

13   months to 120 months.  The guideline supervised release range

14   is one to three years, and the guideline fine range is 20

15   to -- $20,000 to $200,000.  Do we agree those are accurate?

16   **MR. COWHIG:**  Yes, Your Honor.

17   **MS. ZHENG:**  Yes, Your Honor.

18   **THE COURT:**  Thank you.

19       All right.  So Probation recommends a sentence of 100

20   months to run consecutive to the state court case, C338650,

21   followed by three years of supervised release and no fine.

22       Mr. Cowhig, I will hear the Government's argument in

23   support of sentencing.

24   **MR. COWHIG:**  Your Honor, just very briefly, I believe

25   we expressed our recommendation and the reasons for that

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

1    recommendation in our filing.  In recognizing that our filing

2    recommended 100 months, I ask the Court sentence Mr. Whitney

3    to 100 months consecutive to the state court case with three

4    years of supervised release to follow on the conditions

5    recommended by the Probation Office.  We ask that you not

6    impose a fine as we don't believe that Mr. Whitney would be

7    able to pay it.

8         Mr. Whitney engaged in the possession of a firearm

9    while involved in the possession of marijuana with the intent

10   to sell.  That is a particularly dangerous and deadly

11   combination in our society.  It was not unique to him in his

12   criminal history.  He was at the time serving probation for a

13   similar offense in the state, and we believe that continued

14   behavior, even while on state supervision, indicates that a

15   strong sentence is necessary to deter Mr. Whitney and to send

16   the message of general deterrence.  We ask that you sentence

17   him to 100 months custody followed by three years of

18   supervised release on the terms recommended by the Probation

19   Office.

20        Thank you, Your Honor.

21        **THE COURT:**  Ms. Zheng.

22        **MS. ZHENG:**  Your Honor, despite the calculations, I

23   stand by what I asked the Court for.  I'm asking the Court to

24   sentence him to 28 months because one of the things that was

25   brought up briefly last time in regards to Mr. Whitney is the

1    fact that, in actuality, he has been in continuous custody on

2    this case even though he was not indicted until later, since

3    September 2nd of 2022.  The Court is correct he was on

4    probation at the time as a result of the fact that initially

5    he was on a bus with other people and then subsequently

6    cleared from that, it triggered the fact that they had

7    executed the search clause and this case came to.

8            Despite the Court's ruling, I know that -- I stand by

9    the representations that Mr. Whitney has made to me as well as

10   that of Ms. Rodosh -- she's in court -- that they've made in

11   regards to the gun.  It was in the discovery.  I don't think

12   there's any dispute in this case that Ms. Rodosh was the

13   person who went out and purchased the gun.  It was then placed

14   in a house.  There were so many things that was going on for

15   them at the time that she'll tell you herself that, whether it

16   made sense or not and whether or not it was rational, it was a

17   choice that she made and it was a choice that he allowed.  It

18   was a choice that he certainly was aware of.

19           Ultimately, despite what the Government believes

20   about the presence of the marijuana and its intended use or

21   the fact that it intended to be distributed, there is no hard

22   evidence that that happened.  Ultimately, this is a case of

23   constructive possession.

24           He was revoked on the probation case, and I

25   represented him there.  I followed him through that case.  And

1    the reason why I ask for 28 months is because Probation is, in

2    essence, asking for this case to run consecutive to the state

3    case.  My argument to the Court is that, at this point, no

4    matter what sentence you give him now, it already is *de facto*

5    a consecutive sentence.

6         **THE COURT:**  Here, let me stop you for just a second,

7    and I'll let you get right back on that train.  But I just

8    want a little bit more information about that revo case.

9         **MS. ZHENG:**  Um-hum.

10        **THE COURT:**  How long did he get, and has he already

11   served that time?  Has he expired that time?

12        **MS. ZHENG:**  The answer's not entirely clear based

13   on --

14        **THE COURT:**  Okay.

15        **MS. ZHENG:**  -- what we last -- what we -- what we had

16   talked about at the last hearing.

17            So he was revoked for -- what was it? -- an 18 to 48.

18   That was the underlying sentence that he had.  It was either

19   an 18 to 48 or a 19 to 48.  When he was revoked, he was also

20   charged on the stateside for the same gun.  There was a state

21   ex-felon possession of firearm --

22        **THE COURT:**  Sure.

23        **MS. ZHENG:**  -- case, and that was pending.  Because

24   he went forward with the revocation, I had already spoken to

25   the district attorney on the state gun case, and that case

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

1    was, in effect, negotiated and resolved.

2          The maximum time that he could have been facing on

3    the state gun case was a 28 to 72.  That was going to be the

4    negotiation.  It was going to run concurrent to the revocation

5    proceeding.  At that point, the State was also waiting to file

6    on the complaint.

7          Given that the case was resolved already, that was

8    why I went forward with the revocation hearing.  Had I known

9    that the feds were looking at this, I would have done

10   everything in my power to keep this from going forward with

11   the revocation or to hold it open for as long as I could have

12   otherwise.

13         **THE COURT:**  So the revo on the state case, entirely

14   about this gun?

15         **MS. ZHENG:**  Yes.  Yes, entirely about this gun.

16         There were a few other minor violations in there.  I

17   think there was -- related to the stop on the party bus as to

18   whether or not he broke parole.  But all of those, otherwise

19   but for this gun, everything that was stated in his probation

20   violation would have been a technical violation.  So on the

21   stateside, because he had already done -- he was almost done

22   with probation.  I think he had six more months on probation.

23   However, anything that is a technical violation for the State,

24   it is now structured in regards to how those cases are

25   handled.  So most times we just stipulate to it because any

1    technical violations on a first violation report is 30 days in

2    custody, and he would have gladly done the 30 days.  But it

3    became a nontechnical violation because of the gun and because

4    he was pending the State's new gun case.

5            After we had negotiated the state case, the State had

6    filed it, we had set it for a preliminary hearing, and we were

7    otherwise going to enter to a plea.  The State then withdrew

8    the offer saying that the feds were looking at grabbing the

9    case and that they couldn't negotiate it out from the feds

10   prior to finding out whether or not the feds were going to

11   pick up the case.

12           And as a result of that, we set a status check, and

13   subsequently the feds indicted him on the very same gun that

14   he was subject to the probation violation for, the very same

15   gun that he was charged in the state ex-felon possession of a

16   firearm for, and the feds took this case.

17           And on some level, I understand why.  Everyone has

18   their statistics, everyone has their convictions, and this

19   case is appealing to the federal authorities quite simply

20   because of the way that it was going to line up with

21   Mr. Whitney's criminal history calculations.  The feds' desire

22   to pursue that four-level enhancement, in so many ways it was

23   going to ratchet up his guideline range, his calculations, and

24   his sentence that he would be facing a substantially larger

25   amount of time in the federal system.

1                I know that this is a different court, and I know

2     that certainly this court is not bound by anything that would

3     have happened in the state.  But the reality is that, had this

4     case stayed a state case, he essentially would have been

5     looking at going to the Parole Board 28 months from basically

6     when the case was filed in October of 2020.  The case came

7     over federally, and I tried as hard as I could to get him over

8     to the federal system first -- to get him over to federal so

9     that he could start earning federal time.

10               And when we last talked about it at the last hearing,

11    we're all not quite sure where that is.  He had signed a

12    waiver asking to stay in state court so that he could complete

13    his state sentence.  Ultimately, it was ordered that he would

14    be allowed to go back to the state court and that he would be

15    allowed to attend his parole hearing.  However, as soon as he

16    was finished attending his parole hearing, he was to be

17    transported back to serve his federal sentence.

18               At that point, I had come on to the case.  I followed

19    him to the Parole Board and represented him there.  He went to

20    parole March of 2021 --

21           **THE COURT:**  And this is on the revo?

22           **MS. ZHENG:**  No.  This is on the state parole.

23           **THE COURT:**  Okay.

24           **MS. ZHENG:**  So he's already been revoked, and on that

25    case, because of the good-time credit and what -- he had gone

1    to the Parole Board.  He was revoked in September, and then he

2    was eligible for parole and went to the Parole Board

3    March 31st of 2021.  I followed him to the Parole Board, and

4    following that I followed up on the parole commissioner's

5    finding.  They did find sufficient reason to grant him parole,

6    and parole was granted.  However, that's where it all kind of

7    went askew.  Because even though parole commissioners had

8    decided that he was eligible for parole, because he had been

9    transported back to the federal system, there was no body to

10   parole.  He was physically not there to have done his exit

11   paperwork or to have parole granted to him.

12          And so, in essence, we're not sure whether or not

13   they let his parole -- let the sentence expire or at some

14   point granted him his mandatory parole.  And so, as to today,

15   I am not sure whether or not he is in primary state custody or

16   primary federal custody.  When I did call the marshals to try

17   to find out, exactly what I was told was simply was that he

18   was writted over from the state.  And so I can't give the

19   Court, with any certain answer, what that is.  But the truth

20   is, there's no dispute that it is effectively for the same gun

21   that he has been in custody since September 2nd of 2020.

22          I think, if the Court is going to take into

23   consideration the arguments that were made in regards to the

24   four levels and the criminal history calculations and the

25   overrepresentation as to the factors with Mr. Whitney, I

1    think, in my memory of practicing, I haven't had a sentencing

2    case where I was so at odds with the Government and Probation

3    on almost every single factor with sentencing.  And I think

4    much of that stems with how Mr. Whitney is perceived.  And I

5    understand why they picked up this case, because on paper it

6    looks terrible.

7         But in the time that this case has been open, in the

8    almost three years that I've had this -- in the three years or

9    two years -- almost three -- that I've known him, Mr. Whitney

10   has significantly changed my mind as to the character of his

11   person and who he is.  He is undoubtedly one of my most

12   respectful clients.  He is quiet.  He is introspective.  And

13   when he says to me and when he tells the Court that he's

14   looking to make a change in life -- and I don't think that a

15   100-month sentence, it's just excessively punitive, and I

16   don't think that it's going to teach him any better lesson

17   that he can learn.  And I think what he's looking forward to

18   is changing his life.

19        During his time in custody, because of the pandemic,

20   programming wasn't open to a lot of people.  But since it has

21   opened up, given his second supplemental exhibits that we

22   submitted to the Court, he is making every effort every day

23   while he is in custody to learn all the skills that he needs,

24   specifically targeting things that will help him form a better

25   life and be a better person.  And quite frankly, given his

1    past and everything that he has endured, I don't want to say

2    that anyone doesn't have a chance, but the odds were severely

3    against him from the start.  And I mean from the start, from

4    early childhood.  And I think much of that was detailed in the

5    sentencing memorandum and as he reported it to Probation, so I

6    don't want to rehash that again.

7           But it's such a difficult life going up to his

8    adolescence, and the first offense that he was implicated with

9    was an offense in which there were multiple co-defendants.  He

10   was 17.  He was picked up.  He didn't plan the offense.  He

11   didn't quite know that it was going to happen.  He didn't have

12   a gun in the offense.  He was the third person out of the car

13   or into the shop.  He was supposed to have been the lookout

14   co-defendant in that case; in an odd twist of fate was shot

15   with his own gun, died before Mr. Whitney, and he was 17 at

16   the time.  That case became an enhancement in this case

17   because it was considered a crime of violence.  However, it

18   wasn't the robbery portion of it.  It was the kidnapping

19   portion of it.  Yet, as to the specific facts of the case and

20   anything that was alleged to the kidnapping, in terms of

21   moving people around in the store or to the back area,

22   Mr. Whitney wasn't a part of.  He just wasn't a party to that.

23   He was a party to the crime.  And for someone who was 17,

24   going into prison, he served eight years for that.

25           He got out, and in the PSR it states that, as soon as

1    he got out and he was granted parole, he basically started

2    working.  He's worked either one job, multiple jobs.  He's

3    left every job to pursue better opportunities for himself.

4    There was a slipup in which he was then placed on probation,

5    and we're here today.  But so many things in Mr. Whitney's

6    life I would almost characterize as, if he didn't have bad

7    luck, he'd have no luck at all.  And he is just at every turn

8    at the cusp of being the worst-case scenario for something.

9    And it keeps befalling on him.  And yet, for as long as I've

10   known him, he's not ever since -- he's not once ended a phone

11   call with me without telling me that he was thankful for the

12   fact that I was trying to do all that I could for him, that I

13   was trying to fight for him, that he accepted what went wrong

14   in this case, and that this case took as long as it did to

15   negotiate that he ultimately pled without the benefit of a

16   negotiation not because he had ever shied away from accepting

17   responsibility for the fact that there was a gun in the house

18   and that he knew it was there.

19          The bridge that we couldn't gap between the

20   Government and I in terms of trying to resolve this case is

21   that we were so far apart on the four-level enhancement.  And

22   as I stand here today, I -- all due respect to the Court's

23   decision, I still think that it's too vague.  That if there

24   was a case in my entire career where I thought it was so

25   close, this would be it; that we have an 87-page interview,

1    and the only thing that we got out of the interview was that

2    there was a black nine-millimeter semiautomatic gun in the

3    house.  I -- for what was alleged and what the gun was

4    supposed to have been used in connection with, I don't know a

5    single drug dealer, generally, that can't tell you and doesn't

6    know necessarily the make or the model of the gun.  And in 87

7    pages of that, you can't get it.

8              And, you know, I'm bringing this up only because I

9    presented to the Court some documents that he had asked me to

10   pull out after the last hearing.  He had said to me that I

11   honestly don't know.  He didn't know the make and the model of

12   the gun.  He did know that it was a nine millimeter, and

13   ultimately what he said was that -- he's, like, they told me.

14   They told me before I even started the interview that it was a

15   nine millimeter.  He goes, not only did they tell me, they

16   handed me the piece of paper saying exactly that.  And because

17   he fought so hard about it, I was like, okay, I'll go pull

18   your picture from it.  And he's right.  In fact, he is holding

19   the search warrant for his buccal swab.  So it is the search

20   warrant for his buccal swab.  But in terms of holding it, it

21   tells him precisely on that search warrant that the reason why

22   they're getting a buccal swab from him was because there was a

23   nine-millimeter semiautomatic handgun that was either

24   discovered or that was what it was in relation to.

25             And in all of the 87 pages of an interview and this

1    supposed confession, all he says is that he knows that the gun

2    is a mostly black, nine-millimeter semiautomatic.  And with

3    that vagueness and the lack of information, all of that in its

4    totality, Your Honor, what I'm asking the Court to consider is

5    that -- to give him the 28-month sentence.  Because, in so

6    many ways, that's what he would have got.

7         And I know that we brought this over to Federal Court

8    because we can make a federal case out of it.  But in terms of

9    meting out a punishment and what he deserves, he doesn't

10   deserve a 100-month sentence at all.

11        And I'm going to submit it with that.  I know that

12   his fiancée, Ms. Rodosh, would like to address the Court on

13   his behalf.

14        **THE COURT:**  And certainly, Mr. Whitney has an

15   opportunity to address the Court, too.  You said on his

16   behalf.  I didn't know if that meant in lieu of him addressing

17   the Court.  But I wanted to give Mr. Whitney the opportunity,

18   if there was anything he wanted to say in his allocution.

19        Mr. Whitney, this is your opportunity to speak to the

20   Court directly and to tell me anything else that you think I

21   should consider in deciding what sentence to give you in this

22   case.  Is there anything that you would like to say, sir?

23        **THE DEFENDANT:**  I've been in this situation before,

24   and I never wanted to read off a paper because I didn't want

25   to look rehearsed.  But, I mean, at this point I tried to

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

```
 1    figure out some type of pattern of what keeps going left.  So
 2    I'll go back to the beginning.
 3          And what I think about, if you took away all positive
 4    role models or influences from a child's home, I don't even
 5    think you can estimate the type of mistakes that that child
 6    would make in a lifetime.
 7          You may know from what you have on record already.  I
 8    mean, I'm all of the cliches.  My father was in prison since I
 9    was nine months old.  My mother worked graveyard in the
10    casinos.  My sister was a teenage mom.  My brother was living
11    with his foster parent.  My other brother was in the streets.
12    Nobody taught me nothing.  The first time I learned how to tie
13    my shoe, I was in the backseat of my mom's car coming to see
14    my father from prison, and I figured it out.
15          I'm saying that to say, you know... I don't think
16    anyone ever paid attention to me enough to take the
17    responsibility to guide me and teach me anything.  In
18    elementary school, I woke myself up for school.  I dressed
19    myself.  I made sure I got to school on time.  I was a
20    straight-A student.  But every day I remember, before school
21    got out, that the reality set in that nobody was going to be
22    home when I got there.
23          It wasn't that I was being neglected, I don't think.
24    When I got home, my mother would usually be running errands or
25    sleeping to get rest before work, which usually left me alone.
```

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

 1    You know, when she was leaving for work, I would be on my way

 2    to bed.  When I would wake up, she would be gone or she would

 3    be sleeping.  So I signed myself up for youth football to fill

 4    a void.

 5          As -- as a nine-year-old, I had no positive male

 6    examples, not one that I could think of.  Even as a child I

 7    knew that the men in my mother's life didn't truly love her

 8    because they didn't pay attention to me.  They ignored me.

 9    And I remember what that felt like.

10          Truthfully, I didn't even think that I would live

11    this long.  So, for the most part, I'm kind of like a deer in

12    the headlights in most situations.  I'm completely exhausted.

13    I don't know what people expect people like me to look like

14    when they're trying to change, but if I had to make a guess, I

15    would be the example for what the transition looks like.  I

16    don't know what else anyone would advise me to do.

17          When I went to prison on that case, I was helping a

18    friend.  He asked me for his help.  I wasn't -- I didn't have

19    the -- the life experience to know that I was affecting people

20    on the other side of the decision.  All I thought about was

21    helping him, and I had to watch him die because of that.  And

22    then I went to prison for that.  That situation tore my

23    parents' marriage apart.  After my father came home and tried

24    to do the good things, then that happened.

25          So, I'm not really sure of the -- the process I went

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

```
 1    through while I was gone.  I don't know really.  It was kind
 2    of -- just felt like I was on another planet or something.  It
 3    wasn't no -- I was rebuilding, but I wasn't sure exactly what
 4    I was trying to fix.  But what I'm saying is, after that time
 5    was over and I got myself prepared to come home and to move
 6    forward in my life, it seemed like the same thing happened
 7    again.
 8            My mother was pretty much living in her car.  My
 9    sister was living with her friend.  They weren't in a position
10    to help me transition after that.  I was subject to the same
11    possibilities as before, only now it was -- it was more
12    critical for me because I had no life experience.  Here I am
13    in my mid 20s thrown back out into the world with -- with
14    nobody to help me but me.
15            I don't know -- I'm not an emotional person.  I don't
16    look for sympathy.  I don't ask people for anything.  But I
17    don't know, what's the message?  What are you trying to get
18    across to me?  What do you want me to do?  I did everything I
19    can do.  Right when I got off of parole, I kept trying to move
20    forward.  The only reason I quit that job was because the
21    place that I moved to, the only place I had to go to, was
22    completely far out of my transport range.  There was no way I
23    could get to that place of work.  And then I met her.
24            When I met her, she was going through her own
25    tragedy.  She was losing her father to cancer.  The only value
```

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

```
1    I had towards her that I felt was that I knew how to cope with
2    death for the most part.  It was too familiar to me.  So I
3    think me just trying to help her get through that is where she
4    saw the value in me.  But it wasn't because I wanted something
5    from her or needed something from her.  I just knew what that
6    change was going to be like and what she was going to be
7    dealing with from that point on.  I know what death feels
8    like.  That was -- that was my friend before anything.  I
9    never wanted her for nothing.
10          It seems like everybody keep trying to save her from
11   me, like I'm some type of monster or something.  I never did
12   nothing but be there for her.  That's all I ever did.  I don't
13   know why the energy keeps coming across like somebody's trying
14   to save her from me or protect her from me when I give her
15   every opportunity to -- to go and find what I feel she
16   deserves.  I can't tell you how many times I -- in -- in a
17   month I would try to get her to find somebody that -- that's
18   maybe more deserving of her because I know that I'm -- I'm --
19   I'm complicated.  I don't -- I don't...
20          What I'm saying is, is right after that happened, my
21   brother was murdered in coldblood not even a year after me and
22   her started.  That was the only person that -- that even made
23   me feel strong.  I've never seen a stronger man in my life.
24   So to see him shot in his heart by the one -- the same heart
25   he loved this woman with, I don't even know how to describe
```

```
 1    that pain to get a phone call from my mother saying that my
 2    brother's laying in the parking lot...
 3           So what I'm saying is, even then I still stayed
 4    focused.  I was still hopeful.  I didn't let it unravel me.  I
 5    had to be there for my mother, my sister, those children.  It
 6    took everything in me to try to be positive, and then another
 7    storm happened.  We were expecting a child.  What I thought
 8    was a new beginning and maybe some clarity through a storm or
 9    some type of understanding that was coming out of all that, it
10    turned out to be another nightmare.  And it just keeps
11    trapping me in this place of I don't know what the expectation
12    is.
13           Ever since I caught that first case, the only thing
14    they banged into my head was victim empathy.  How you affect
15    people determines the severity of how we treat you.  How you
16    impacted people's life.  So that whole time I was gone, I
17    focused on how I affect people, how my decisions affect
18    people.  And I think I became a good person because of that.
19    I motivate people to be the best them they can be.  I'm -- I'm
20    respectful.  I'm positive.  I'm -- I'm optimistic whenever I'm
21    asked for advice.  I did everything in my power to push her to
22    be the best person she can be.  When I met her, she was
23    working in a storage unit, and now she's trying to get a real
24    estate license.  I just saw she had the potential to do it, so
25    I tried to help her believe in that.
```

1          So when we lost the child, it was like -- it felt

2     like I didn't have a reason to keep trying to be better

3     because everything I was trying to be better for kept getting

4     taken away from me.  Like, there's -- there's never been

5     anyone around me who cared enough to help me do anything.

6          Even after that, I still worked.  I moved us into a

7     better neighborhood -- or we moved us into a better

8     neighborhood, got a better car.  She got a better job, helped

9     fix our credit.  I did all the things that they say you're

10    supposed to do or try to do when you're changing.  True

11    enough, I had caught that case.  I was on probation.  But I

12    went to counseling.  I paid my fines.  I worked.  And then the

13    pandemic happened.

14         My trauma is bad enough alone.  I don't need help

15    being in a dark place.  Like, I don't know if people think

16    that it's serious or not, but I -- I think about death all

17    day, every day.  It's my reality, that at some point it's

18    going to be that time.  So when this pandemic thing happened,

19    every time I turned on the TV they're telling me to be afraid.

20    You're telling me that my peers will kill me.  You're telling

21    me that officers in the street will kill me.  You're telling

22    me that the suicide rates are up, that I can potentially kill

23    myself.  On top of me seeing all these things manifested at

24    one point in time in my life, I knew it to be real.  These

25    were real fears and real concerns.  In a global pandemic, what

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

1    was I supposed to do?  I don't even know -- out of all this

2    scrutiny and all this judgment that's been placed my way, I

3    still haven't had anybody say:  This is what you should have

4    did.

5            I'm still kind of shocked that I'm being so heavily

6    judged over something that happened in a once-in-a-lifetime

7    pandemic.  Like, I remember what was going on.  It was -- it

8    was -- it was a lot of political uprisings, and the tension

9    was crazy.  And me, as being young and black and that being

10   the -- the narrative, outside was terrifying at that time.

11   Like, there was -- I didn't know what to do.  The only reason

12   I stopped working was because of the pandemic.  I was a

13   full-time worker.  I don't know what -- what's the option?

14           Even after I lost my child, I still did everything in

15   my power to be the best father and example that I can be to

16   her child.  What was I supposed to do?  Just -- just -- the

17   only alternative I could think of was to leave them if I had

18   nothing to contribute to them.  I watched her lose my son, and

19   I still took on the responsibility to be an example to her son

20   when I didn't even know what the example looked like.  I've

21   never seen a father in a functional household before.  So I

22   took on that responsibility and didn't even know what it was

23   that I was supposed to be doing.

24           And I stayed.  I didn't leave.  I didn't cheat on

25   her.  I was faithful.  I cleaned.  I cooked.  I worked.  I --

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

```
1    I gave her advice to help her family and her friends with.
2    The advice that they seek from her in situations usually come
3    from our conversations.  So, in essence, me being the good man
4    to her is helping everyone around her.
5         And then, in these type of situations it still comes
6    across like everybody's trying to save her from me, like I'm
7    so -- what am I doing that's so bad?
8         I'm just exhausted.  I don't really know -- I don't
9    really know what to do next.  What -- what's the formula for
10   change?  I don't know.  Working?  Going to counseling to try
11   to fix your trauma?  Getting a relationship?  Being faithful?
12   Taking care of your responsibilities?  Everything they told me
13   a man is supposed to do I've done it, and I can prove I've
14   done it.  And still, because I went out one night -- and,
15   truthfully, my only motivation for going out that night, my
16   family completely split apart after my brother's death.
17        Me and one of my favorite cousins had a falling out
18   over the circumstances behind my brother's death, and we
19   repaired it.  And I was going out that night just to be with
20   him.  I was so far removed from my whole world and everything
21   I knew that it was tearing me apart to not have any type of
22   friendships from my past, including family and everything.  I
23   was in a completely new environment, space, life.  Everything
24   was completely different.  And it was hard for me to adjust
25   because I had nothing to bring from my old world into the new
```

1    world.  I went out with him that night just to hang out with

2    him, and it turned into this.

3            So, I mean, I don't -- I always take responsibility

4    for -- for everything that comes my way.  I make excuses for

5    nothing.  But at this point I'm just curious of what exactly

6    is it that's expected of me?

7            What does anybody want me to do?  Do they want me to

8    settled down and be married and be faithful and a good man and

9    work and -- I did all those things, and I'm still here in

10   the -- in the worst situation again.

11           If nothing else, I feel like this is what effort

12   looks like.  If nothing else, I tried.  I don't know what else

13   to say.  That's the only thing that helps me fall asleep at

14   night is replaying everything and knowing that I put the

15   effort in.  If things out of my control happen and a mishap or

16   two of mines, you know, became a bad recipe, then I can't

17   fight the universe.  I'm not in control of the elements and

18   the possibilities.

19           So I fall right to sleep at night.  I tried.  I did

20   everything in my power.  It's -- it's -- I don't...

21           **THE COURT:**  Thank you, Mr. Whitney.

22           All right.  Who wanted to speak, Ms. Zheng?

23           **MS. ZHENG:**  I think Ms. Rodosh would like the

24   opportunity to address the Court.

25           **THE COURT:**  Sure.  And there's a microphone right

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

```
 1    there at the front of the gallery.
 2            Hi, there.  You can tilt that up, too.
 3            MS. RODOSH:  Okay.
 4            THE COURT:  There you go.
 5            MS. RODOSH:  Can you hear me?
 6            THE COURT:  I can.  Can you just -- can you spell
 7    your last name for the record?
 8            MS. RODOSH:  It's R-o-d-o-s-h.
 9            THE COURT:  And your first name is?
10            MS. RODOSH:  Jessica.
11            THE COURT:  All right.  Ms. Rodosh, what would you
12    like to say?
13            MS. RODOSH:  I stand by everything I wrote in my
14    letter.  That day that everything happened, I was extremely --
15    I was scared.  As Stephon said and Ms. Zheng said, we lost a
16    child.  So when they came to the house that day and I was told
17    that I would lose -- I could have my son taken away and they
18    were going to destroy my house, I did what any other -- what a
19    mother who's already lost a baby would do.  I don't want to
20    lose my son.  I didn't want to lose any of my sons.  And it
21    was so traumatizing when we did lose our baby that, when I was
22    told that they were going to take my son if there's anything
23    in the house, I said that there was nothing.  I was scared.  I
24    was scared.  I would do anything to protect my children.
25            The way we lost our child was an extremely
```

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

```
 1    traumatizing situation for me, for him, for both of us.  I
 2    didn't want to take pills to numb the pain.  The doctor said
 3    my depression and anxiety gets so bad, it feels like someone's
 4    sitting on my chest, like I can't breathe.  To have that is --
 5    I've never experienced that until we lost our child.  I did
 6    find smoking marijuana or even taking edibles helped me.  I
 7    was able to be happy for my oldest son.  I was able to
 8    function and cook dinner.  And even going to counseling didn't
 9    help that much.
10            He didn't know I smoked.  I mean, he -- not like I
11    did.  I would always go outside and smoke.  I never did it in
12    the house.  Go for a walk around the block.  I -- I would --
13    honestly, I would roll it, and then I would put it in an empty
14    container and put it above the stove in the kitchen.  I had it
15    in little containers everywhere just because sometimes I
16    didn't want to walk back and put it back in the bag.  It was
17    so big, I didn't -- and that was my fault.  I -- I honestly
18    didn't think he would get in trouble.  I didn't think it would
19    get to this aspect as it is right now.
20            He's not a bad man at all.  He -- people look at him
21    and they look at his past, and because he's tattooed and he's
22    black and dreads and he got in trouble when he was younger,
23    it's an automatic judge.  And he's not like that.
24            When he found out I was pregnant, he got a job.  He
25    got his OSHA certs for being a flagger.  He went to every
```

1    parent-teacher conference with me for my son, Michael.  He --

2    sometimes I even say he was probably a better parent I felt

3    than I was.  Because when he went to the parent-teacher

4    conferences, he was the one talking to the teachers asking

5    what we need to do because my son had a little bit of a speech

6    impediment, asking, you know -- and he can't focus.  So he was

7    the one asking what can we do to help him focus, what can I do

8    at home.

9           He did -- he sat down and did his projects with him.

10   I came in the house one day, and they were doing a live art

11   museum.  I didn't ask him to.  He just sat down with him and

12   did it, and it was something that they did together.  He took

13   him to flag football practice.  I'd be at work.

14          For someone who didn't have that growing up, he was a

15   great role model for my son.  My son loves him.  He loves his

16   stepdad.  He says he can't wait for him to come home because

17   he can talk to him because he understands him, he gets him.

18   He's not a bad person.

19          Everything that has happened, I don't know why.  I

20   don't, and I wish I did.  Like I said, us losing our son

21   was -- was a traumatic experience.  You know, he went to every

22   doctor's appointment.  He -- he was everywhere with me.  He's

23   been an amazing -- an amazing man.  He helped me get through

24   so much.  Like he said, when my dad was going -- sick with

25   cancer, he checked on me every day.  He was there making sure

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

1    I was okay.

2            He's just -- he has helped me become a better person.

3    I -- like he said, I'm doing real estate school.  I also went

4    from a 13-dollar-an-hour job to now I'm at 18, and I'm getting

5    another raise in January to 20.  I wouldn't have had that much

6    confidence if I -- I feel if I didn't have him there

7    supporting me.  He's been a great support staff for me and,

8    like I said, for my son.  He's been there, like, every step of

9    the road with him.  And that -- you know, it was -- it was my

10   fault.  I was scared.  I -- like I said, I didn't want to lose

11   another child.  I didn't want to lose another family member.

12   I lost my dad and then we lost our son and then this happened.

13           You know, and I'm not going to lie, in the middle of

14   COVID I did buy a gun.  I was scared.  There was a lot going

15   on.  I mean, and in our neighborhood, even after he left,

16   someone tried to break in my house while I was there with

17   Michael.  They came in there, opening the door, and the guy's

18   saying, oh, I'm -- I think I'm -- I thought this was my house.

19   You know, it's scary.  And being a woman and, like I said,

20   already losing so many people, I had a momentary lapse of

21   insanity.  I can say that.  And there's times I do still

22   because I'm not sure if I'm doing it right, and I feel like

23   I've made such a big mistake that now he's suffering for it.

24           I mean, I did -- I did purchase it.  You can -- you

25   can purchase a pound in a dispensary.  Granted, I didn't

1    know -- that dispensary ended up getting shut down I think two

2    months later.  It was a part of I think five in a raid.  I

3    didn't know.  We walked in -- I walked in and it was a legal,

4    operating dispensary, and I was able to purchase a large

5    amount.  I did it because, like I said, I didn't want to have

6    to keep going back.

7           I just wanted something to help with my anxiety that,

8    like, wasn't going to be pill wise.  That -- where I'm going

9    to be so knocked out I'm not going to function.  At least

10   smoking I could function.  I mean, everybody's different.

11   Some people can't.  But like I said, for me, I was able to be

12   a happy mother for my child and for my family.  I can sit

13   there, and I can smile.  I can eat.  Because, without it,

14   there's times I can't.  Like I said, that panic, those anxiety

15   attacks are so bad.  And after what we've been through, it's

16   just... it has to end.  I feel like it just -- it hasn't

17   stopped.  It just -- it keeps going and going, and we need to

18   heal.  He needs to heal.  My son, his family, all of us.

19          He doesn't -- he doesn't deserve all of this.  He's

20   not a bad person.  He worked.  He was trying.  Like I said, he

21   was great with my son.  Every morning they have WWE wrestling

22   matches before school.  I'm the one yelling at them to come

23   on.  You know, I mean, if someone was such a bad person, why

24   would they be -- have such a good impact on everybody around

25   them?

```
 1            He made mistakes when he was younger, but he was
 2    changing.  He had changed.  He had changed.  He never did
 3    anything wrong to me.  He didn't cheat on me.  He didn't -- he
 4    never hit me.  He's never done anything wrong.  He's someone
 5    my dad, yes, would have been proud of because he took care of
 6    my -- his daughter.  My mom sat there and talked to him when
 7    she found out I was pregnant.  And she -- after she talked to
 8    him, she -- my whole family loves him.  My cousin has a
 9    company.  He wants to give him a job.  He was already getting
10    ready to give him a job when this happened.  So it's not like
11    he would come home to nothing.  He would come home to at least
12    a job, a family.  He'd have a lot more opportunities than he's
13    had before.
14            I just -- I would just love him to just get a second
15    chance and just all this end.  And, like I said, he's not a
16    bad person at all.  He's not.  I know it looks horrible on
17    paper, and I know everybody, like I said, just they look at
18    him and it's an instant, you know -- he's not.  He's really
19    not.  I mean, people can change.  They really can.  People
20    have an opportunity to change, and he took that opportunity.
21            This was my fault, and I can admit that.  And I
22    understand how it's hard.  But you guys weren't in my shoes
23    when I lost that baby.  Nobody was there.  He was there with
24    us that night.  What we went through when we lost our son is
25    something I have to relive every day, and so does he.  And
```

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

```
 1    it's -- it just -- it needs to end.  And like I said, I can
 2    admit I -- I had a break.  I did.  I lost my son.  I have one
 3    now.  I try every day.
 4          This is the end of it, though, and it is so hard
 5    knowing that, because of my actions, these are his
 6    consequences.  And it's not fair because it's just something
 7    that we keep reliving.  I just -- I want to be able to get
 8    through this, and I want him to be able to get through this.
 9          Everybody says -- people say that, when couples lose
10    a child, they don't survive.  But we did.  He didn't leave me.
11    He didn't.  And not that I expected him to, but I -- I was
12    surprised that he stood through everything with me.  But that
13    was my own insecurities.  Because he never once faltered from
14    everything he showed me.  Like I said, he was there for my
15    son.  For the first day of school, I mean, he was -- picked
16    him up, took him, everything.  And Mikey loves him.  Like,
17    that is his -- that's his best friend beyond just stepdad.
18    Like, he would do anything, you know?
19          And my family, we just need this to end now.
20          THE COURT:  Thank you, Ms. Rodosh.  And I'm sorry for
21    your loss.
22          MS. RODOSH:  Thank you.
23          THE COURT:  Ms. Zheng, anyone else?
24          Hi, there.  Tell me your name.
25          MS. WHITNEY:  Janice Whitney.
```

1      **THE COURT:**  And your relationship for the record,

2  Ms. Whitney?

3      **MS. WHITNEY:**  I'm Stephon's mother.

4      **THE COURT:**  Okay.  What would you like to say?

5      **MS. WHITNEY:**  I just want to say that Stephon is the

6  child -- he's the third -- my last -- my last child.  And I've

7  been a single mother since he was born off and on.  I had to

8  work, come home, and take -- I worked graveyard so that no one

9  would have to deal with my children through the daytime, feed

10  them, yell at them.  I worked graveyard all my life just so my

11  children wouldn't have to go through other people's trauma to

12  be yelled at or fed through the day.  I could come home and

13  make sure my children is fed, go to school.  My son -- I would

14  fall asleep.  My son would wake me up so that he can get to

15  school.  He would already be dressed.  He was humble, never

16  gave me any problems.  Always a respectful child, straight-A

17  student.  Until I got married in 2002.

18      I lost my oldest son to his foster parents, and I

19  fought, I fought, and I fought for my oldest son.  So I had my

20  son and my daughter that I had to protect.  I had to shield

21  them.

22      Me and my husband got married in 2002, got divorced

23  in 2021 but we was already separated.  And things kept going

24  on in the home to, well, my son is not a talkative child.

25  He's not an argumentative child.  He don't want to be in the

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

```
1    midst of chaos, drama, whatever.  And I wish I would have just
2    left my husband to keep my son and my children.
3           And in the midst of me being a single mother raising
4    my children, my daughter, she had to be a teenage mother
5    because it was just us.  And me being as a single mother
6    trying to raise a son, women can't raise a child to be a --
7    a -- a little boy to be a man.  I tried.  And I'd tell my son
8    all the time, I don't know where I failed.  I don't know what
9    happened, but I wish I could have saved him.
10          And my son is not what society think he is.  My son
11   gives me guidance.  My son tells me things that I need to
12   hear.  My son give me correction that I need, that he see that
13   I need.  Me and my son have talks all the time.  My son is --
14   all I'm asking is -- my son don't deserve what he's going
15   through.  He tried.  He tried.  He tried.  He tried.
16          And losing a child is hard.  My child didn't die, but
17   I lost him to the system.  And that's hard enough.  It is hard
18   enough when your child goes through the system, and I'm the
19   only one that's stuck trying to fight.
20          It traumatized my children because their brother was
21   gone, and I just -- if he could just get a chance to show how
22   great he is in society, my son is not a bad person.  He's
23   humble.  Like me, he never talk.  He never have a lot of
24   friends.  I just -- just please be remorseful for my son.
25   Just please be -- give him... that's all I have to say.
```

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

1          **THE COURT:**  Thank you so much.

2          **MS. WHITNEY:**  You're welcome.

3          **THE COURT:**  All right.  Does Probation have anything

4     to add?

5          **PROBATION OFFICER:**  No, Your Honor.  Thank you.

6          **MR. COWHIG:**  Your Honor, defense had referenced some

7     images.  Would those be made part of the record?

8          **THE COURT:**  Oh.  I appreciate you keeping the record

9     clean for me there.

10         So I was handed some images.  Did you -- Ms. Zheng,

11    did you want to move those into the record?

12         **MS. ZHENG:**  If we could, please, Your Honor.

13         **THE COURT:**  Mr. Cowhig?

14         **MR. COWHIG:**  I believe the most appropriate course

15    would be to include them as demonstratives rather than as

16    fully admitted exhibits as we don't have the foundation for

17    them.

18         **MS. ZHENG:**  I agree, Your Honor.

19         **THE COURT:**  Do we need to seal them?

20         **MS. ZHENG:**  I don't think so.

21         **MR. COWHIG:**  I don't believe so, Your Honor.  I don't

22    think there's any -- there was one appearance of PII that has

23    been redacted.  And they -- they only refer to this case, no

24    other ongoing proceedings anywhere.

25         **THE COURT:**  All right.  Summer, I'm going to hand

1    this to you and ask that it be placed in the docket.  It's

2    going to be noted as Demonstrative Exhibit A.

3         *(Court's Demonstrative Exhibit A, marked and received.)*

4              **MS. ZHENG:**  Thank you, Your Honor.

5              **THE COURT:**  Thank you, both.

6              Is there any reason, legal or just, why I should not

7    proceed with sentencing at this time?

8              **MR. COWHIG:**  No, Your Honor.

9              **MS. ZHENG:**  No, Your Honor.

10             **THE COURT:**  Just to reiterate, I have agreed with

11   Probation's guideline calculations that this is a total

12   offense level of 25 with a criminal history category of V.

13   The guideline range is 100 months to 120 months, and Probation

14   is recommending a sentence of 100 months consecutive to Docket

15   Number C338650.  That's the state revo case; is that right,

16   Ms. Zheng?  The state revo case?

17             **MS. ZHENG:**  Yes.

18             **THE COURT:**  The Government concurs with that

19   recommendation and asks the Court to sentence the defendant to

20   100 months in custody consecutive to any remaining state time,

21   followed by three years of supervised release.  And the

22   defense, who entered a guilty plea without the benefit of a

23   plea agreement -- a written plea agreement in this case is

24   asking for a sentence of 28 months in custody.

25             There -- I have heard and considered the charging

1  document, my notes from the plea hearing, the Presentence

2  Investigation Report, the parties' various sentencing memos

3  and responses and objections and all of the attachments to

4  those, the statements and arguments of counsel, the

5  defendant's statements to the Court today, Ms. Rodosh's

6  statements, his mother's statements to the Court today, and,

7  of course, all of the factors and considerations under

8  § 3553(a).

9         Mr. Whitney pled guilty to the offense of felon in

10  possession of a firearm, and he admitted the facts necessary

11  to support that conviction here.

12        To his credit, he is educated, has some employment

13  history, and certainly has the love and support of his family

14  as demonstrated by their support here today.

15        There's no question that he experienced an extremely

16  turbulent upbringing and a great number of tragedies.  But the

17  record also reflects that he has established quite a criminal

18  history placing himself in one of the higher criminal history

19  categories.  He has sustained felony convictions for

20  first-degree kidnapping, conspiracy to commit robbery, robbery

21  with use of a deadly weapon, and possession of controlled

22  substance with intent to sell.  He's had failed opportunities

23  for community supervision.  His history includes violence and

24  a disregard for the law as he was on probation at the time

25  that he was discovered in possession of the firearm that forms

1    the basis for this case.  And whether or not it was his or he

2    was also selling marijuana, there was certainly a large

3    quantity of it in this home.

4          But on the plus side, this offense itself does not

5    involve violence or the use of brandishing -- the use or

6    brandishing of the firearm.  And he has a great deal of family

7    support and has endured a number of tragedies and certainly

8    made steps to better his life throughout the opportunities

9    that he did have.

10          I am sympathetic that -- had this case not been

11   picked up by the Federal Government.  The reality

12   unfortunately is, though, that it was and the offense conduct

13   is a federal offense regardless.  And the types of sentences

14   imposed on these facts in Federal Court I think we all

15   recognize are just more severe than they are in state court,

16   and that is one of the realities that we face here.

17          And although I agree with Probation's guideline

18   calculations under the letter of the law, I do consider the

19   nature of those criminal convictions and the youthfulness of

20   so much of his criminal history, and I take all of that into

21   consideration in finding that a guideline sentence of 100

22   months or more on these facts is far greater than necessary,

23   than needed to effectuate the goals and objectives of

24   sentencing.

25          So, based on overrepresentation of criminal history

1    and in light of the factual circumstances of this case and the

2    nature of the offense and in light of the defendant's personal

3    circumstances and the lack of violence involved here and the

4    significant family support that he has, I am going to vary

5    down significantly and find that a sentence of 54 months

6    concurrent to the revocation sentence, if any remains, in the

7    state court case, C-19-338650, followed by three years of

8    supervised release is sufficient but not greater than

9    necessary to accomplish the goals and objectives of

10   sentencing.

11         I find that this sentence takes into account the

12   nature and circumstances of the offense, the history and

13   characteristics of the defendant, the kinds of sentences

14   available, the sentencing range, and the policy statements of

15   the Sentencing Commission.  I believe it reflects the

16   seriousness of this crime, promotes respect for the law,

17   provides just punishment, affords adequate deterrence to

18   criminal conduct, will help protect the public from further

19   crimes by this defendant, will avoid sentencing disparities as

20   well.

21         So the defendant is committed to the Bureau of

22   Prisons for a term of 54 months.

23         Let's talk about supervised release conditions.

24   Ms. Zheng, in the PSR Probation recommends a number of

25   supervised release conditions.  They begin on page 25.  Do you

1    have any objections to any of those?

2            **MS. ZHENG:**  Court's indulgence, please.

3        *(Defendant conferring with counsel.)*

4            **MS. ZHENG:**  No objection, Your Honor.

5            **THE COURT:**  While on supervised release, the

6    defendant will be required to comply with the standard

7    conditions of supervision recommended by the Sentencing

8    Commission.  The mandatory conditions of not committing

9    another federal, state, or local crime; not unlawfully

10   possessing a controlled substance; and refraining from use of

11   a controlled substance; and submit to the drug testing

12   protocol.  He also must cooperate in the collection of DNA as

13   directed by the probation officer.

14           Additionally, the search and seizure condition, the

15   substance abuse treatment and mental health treatment

16   conditions, the drug testing condition, and the no-gang

17   affiliation will apply.

18           I find that all of these conditions are reasonably

19   related to the goals of deterrence, protection of the public,

20   or rehabilitation; that they involve no greater deprivation of

21   liberty than is reasonably necessary to achieve those goals;

22   and that they are consistent with the pertinent policy

23   statements issued by the Sentencing Commission.

24           Do we have a copy of those for the defendant, please?

25           **PROBATION OFFICER:**  Yes, Your Honor.

1          **THE COURT:**  Mr. Whitney, you're being handed a copy

2    of the written conditions of supervised release.  Can you

3    acknowledge for the record that you've received those?

4          **THE DEFENDANT:**  Yes, I have.

5          **THE COURT:**  Thank you.

6          A mandatory penalty assessment of $100 is required by

7    statute.  It's hereby imposed, and it is due immediately.  No

8    fine will be imposed based on a demonstrated inability to pay.

9          Not a restitution or forfeiture case; is that right,

10   Mr. Cowhig?

11         **MR. COWHIG:**  That's correct, Your Honor.

12         **THE COURT:**  Thank you.

13         Sir, in your -- I'm advising you that you have 14

14   days to file a notice of appeal.  If you cannot afford an

15   attorney to handle your appeal, one will be appointed to

16   represent you.  If you cannot afford a transcript of the

17   record in this case, one will be prepared for appeal at the

18   Government's expense.

19         Do you understand all of that, sir?

20         **THE DEFENDANT:**  Yes.

21         **THE COURT:**  Thank you.

22         He pled straight up to a single-count indictment; is

23   that correct?

24         **MR. COWHIG:**  Yes, Your Honor.

25         **THE COURT:**  All right.  So nothing to dismiss.

1           And, Ms. Zheng, does your client request a

2    recommendation to be designated to serve his sentence at a

3    specific facility or one was a particular program?

4           **MS. ZHENG:**  Your Honor, my client's asking for a

5    designation to Phoenix, Arizona, if that's possible.  And as a

6    second choice, we're asking for Terminal Island.

7           **THE COURT:**  And would both of those requests be based

8    on proximity to family and support?

9           **MS. ZHENG:**  Yes.

10          **THE COURT:**  Okay.  Those will be the recommendations;

11   primarily Phoenix and secondarily, Terminal Island, all --

12   both based on proximity to family and support.

13          Is there anything else that we need to address?

14   Mr. Cowhig?

15          **MR. COWHIG:**  No, Your Honor.  Thank you.

16          **THE COURT:**  Ms. Zheng?

17          **MS. ZHENG:**  Not at this time, Your Honor.

18          **THE COURT:**  Ms. Cravotta?

19          **PROBATION OFFICER:**  No, Your Honor.  Thank you.

20          **THE COURT:**  All right.  Thank you.

21          Mr. Whitney, I wish you the best of luck, sir.

22   Defendant's remanded to the custody of the Marshal to await

23   designation by the Bureau of Prisons, and we are adjourned.

24       *(Proceedings adjourned at 3:16 p.m.)*

25                        --o0o--

1               COURT REPORTER'S CERTIFICATE

2       I, AMBER M. McCLANE, Official Court Reporter, United
  States District Court, District of Nevada, Las Vegas, Nevada,
3 do hereby certify that pursuant to 28 U.S.C. § 753 the
  foregoing is a true, complete, and correct transcript of the
4 proceedings had in connection with the above-entitled matter.

5 DATED:  5/1/2023

6

7                        /s/ *Amber M. McClane*
                         _____
8                        AMBER McCLANE, RPR, CRR, CCR #914

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25